## LEGAL TENDER CASES.

### KNOX v. LEE.

### PARKER v. DAVIS.

1. A purchase of the property of a loyal citizen of the United States under a confiscation and sale made pursuant to statutes of the late rebel confederacy, passed in aid of their rebellion, is void. *Texas* v. *White* (7 Wallace, 700), affirmed on this point.
2. The acts of Congress known as the Legal Tender are constitutional, when applied to contracts made before their passage. *Hepburn* v. *Griswold* (8 Wallace, 603), on this point overruled.
3. They are also valid as applicable to contracts made since.

THESE were two suits; the first a writ of error to the Circuit Court for the Western District of Texas, the second an appeal from a decree in equity in the Supreme Judicial Court of Massachusetts.

The case in the FIRST one, *Knox* v. *Lee*, was thus:

Before the rebellion, Mrs. Lee, a loyal citizen of the United States, resident in Pennsylvania, owned a flock of sheep in Texas, which, on the outbreak of the rebellion, she left there in charge of their shepherd. In March, 1863, the Confederate authorities, under certain statutes which they had passed in aid of the rebellion, confiscated and sold the sheep as the property of an "alien enemy," one Knox purchasing them at $10.87½ apiece, "Confederate money;" then worth but the third part of a like sum in coin. The rebellion being suppressed, Mrs. Lee brought trespass below against Knox for damages (laid at $15,000) for taking and converting the sheep. Knox pleaded in bar the confiscation and sale by the Confederate government; a plea which the court overruled. The case then coming on to be tried, it was proved that the flock consisted of 608 sheep, of which 30, 40, or perhaps 50, were bucks, about 140 or 150 wethers, and about 300 ewes; the witnesses varying both as to the number of sheep and the proportion of bucks, wethers, and ewes. It was also proved that in 1860 and 1861 the flock was worth $8 per head for ewes, and about $4 per head for

wethers, and about from $20 to $25 per head for breeding bucks, *in specie.* The witnesses all testified that the sheep would not bring in March, 1863, the price that they would have brought in 1860 or 1861, though one witness testified that at the sale one party remarked, *that if he could get a good title to the sheep* he would give $10 or $12 a head for them. Whether he meant specie or Confederate paper was not testified to.

The ordinary money in use in the United States at the time of the sale and purchase being notes of the United States, commonly known as " greenbacks "—notes whose issue was authorized by acts of Congress, and dated February 25th, 1862, July 11th, 1862, and March 3d, 1863,* and which the said acts declared should be a legal tender in the payment of all debts—the plaintiffs offered to prove what was the difference in value between gold and silver and this United States currency known as greenbacks, for the purpose of showing that gold and silver had a greater value than greenbacks, and for the purpose of allowing the jury to estimate the difference between the two, to which evidence *the defendant*, at the time it was offered, *objected*, on the ground that the United States currency was made a legal tender by law, and that there was no difference in value in law between the two. The court sustained the objection, and excluded all evidence as to the difference in value between specie and legal tender notes of the United States, and no evidence was allowed to go to the jury on this point.

After having ruled as above, the court, on its own motion, at the conclusion of its charge, said as follows:

" In assessing damages, the jury will *recollect* that whatever amount they may give by their verdict can be discharged by the payment of such amount in legal tender notes of the United States."

The jury found, June, 1867, for the plaintiff, $7368, and

---

* 12 Stat. at Large, 345, 532, 709. For the form of the notes mentioned in the text, see Bank v. Supervisors (7 Wallace, 26); and for the exact language of the acts, see Lane County v. Oregon (Ib. 74), and Hepburn v. Griswold (8 Id.), 605.

the defendant brought the case here, complaining, first, of the overruling of his plea, and second, of the above-quoted sentence in the charge; which he alleged had led the jury improperly to increase the damages.

There had been a previous trial, when, so far as the record showed, without any instruction of the sort complained of as increasing the damages, the jury found a verdict for $7376, an amount slightly greater than that given by the second verdict.

*Messrs. Paschall, Sr. and Jr., for the plaintiff in error:*

1. The plea was wrongly overruled. The Confederate government was a government *de facto*. It is easy now to say that it was not a government, but those who were within the scope of its action know that in point of fact it was a fearful reality. It had courts. It declared war; and long waged it. A title under its confiscations must therefore stand. *Mauran* v. *The Insurance Company*,* covers our case.

2. If this point is well taken, the court need not consider our objection to the last sentence of the charge. But if it is not well taken, our objection to it remains. Our objection is this: that in view of the facts that were proved before the jury, what the judge said to the jury at the conclusion of his charge, was equivalent to saying—

"The proof, as to the value of the sheep at the time of conversion, has been of their *specie* value. You will assess that value and add to it the known premium which it requires to buy that much gold with paper."

Thus, in fact, while he recognized the principle that greenbacks might discharge the claim, he yet left the jury to infer that they can only be forced upon the creditor at the rate which they would bring in gold. This instruction was wrong, because, practically, it made a distinction between coin and paper tenders, in regard to a debt accruing *after* the passage of all the legal tender acts. *Hepburn* v. *Griswold*,†

---

* 6 Wallace, 13.　　　　　† 8 Id. 604.

does not require this. There the cause of action accrued prior to the passage of any of the legal tender acts; here it accrued subsequently to them all. Indeed, in *Hepburn* v. *Griswold* the court say that the decision is not meant to control cases where the cause of action arises subsequently to the passage of the legal tender acts. Parties under that condition of things contract in reference to them.

*Mr. Wills, contra :*

1. Though the rebel government must, in some cases, be regarded as a government *de facto*, it is going too far to say that a purchase, by a rebel resident, of the property of banished loyal citizens, under its laws " in aid of the rebellion," can stand. Such a purchaser takes with full notice of his questionable title; *Texas* v. *White** is in point.

2. The argument of the opposing counsel proceeds upon a misapprehension of what the court meant in its charge. He would make it directly in the face of its ruling a few moments before. That it was so is not to be easily inferred. The charge must be interpreted reasonably. In the ruling, the court refused to receive evidence to show that greenbacks and coin had different values. The plaintiff had offered evidence of the difference between the two. Objection was made by the defendant, and the point was ruled against the plaintiff. Nothing was more natural, therefore, than that the court in charging the jury should advert to its rulings on the point—a very important one to be considered by the jury in making up its verdict—made at the defendant's instance, and to tell the jury to recollect it. That is what the court did do. The charge therefore means just the opposite of what counsel on the other side suppose. It means that greenbacks *would* discharge the debt, and that in considering the evidence given of the worth in gold of the sheep, the jury was not to add a premium for paper. This direction involves the question whether an obligation arising *after* the passage of the legal tender laws can be dis-

---

* 7 Wallace, 700.

charged in greenbacks; and the court charged that it could be. This may or may not have been within the ideas entertained by the court in *Hepburn* v. *Griswold,* but it certainly was favorable to the defendant. He cannot complain, and we do not.

That in point of fact there is no ground for the allegation that the jury were misled, or the damages exaggerated, appears by a short calculation. It was proved that the flock consisted of 608 sheep, of which number 30, 40, or perhaps 50, were bucks; about 140 or 150 wethers, and about 300 ewes. Add all these numbers, taking the highest estimates, 50, 150, and 300, and we have only 500 sheep accounted for; leaving 108 to be accounted for and valued, according to the different values of the different kinds of sheep. Now there was direct evidence fixing the *average value* of all the sheep *per head in specie,* in 1860 and 1861. Besides, it is well known that in Texas, as in California, coin is the standard of value in business, except when the contrary is stated. The depreciation of value at the sale, arising from the apprehended *defect of title,* which the event has shown to have been well grounded, must not be disregarded in arriving at the value of the sheep at that time. Accepting, therefore, this estimate of their average value, with a good title, the 608 sheep, at $10 per head, would be worth $6080 *in specie.* Adding four and one-third years' interest—that is, from March, 1863, till June, 1867—at 8 per cent. (the rate in Texas), say $33\frac{1}{3}$ per cent. $= \$2026.66\frac{2}{3}$, and we have the aggregate amount of $8106.66\frac{2}{3}$, an amount *larger* than the verdict complained of, saying nothing, according to the ruling of the judge, about the *difference* between the value of the sheep, when estimated in gold and silver and when estimated in legal tender notes of the United States.

Moreover, on the first trial, where no such instruction as is here complained of was given, the verdict was for a greater amount than on the second.

The case in the SECOND suit, *Parker* v. *Davis,* arose on a bill in equity by Davis, to compel the specific performance

of a contract by Parker to convey a lot of land to Davis upon the payment of a given sum of money. This contract was dated and the suit brought upon it before the passage of any of the acts of Congress already referred to, as authorizing the issue of government notes, and making them a legal tender in payment of all "debts." The Supreme Court of Massachusetts in February, 1867 (after the passage of the acts), decreed that Davis should pay into court a certain sum of money, and that Parker should thereupon execute a deed to him of the land in question.

In pursuance of that decree Davis paid into court the sum named, in notes of the United States, known as "greenbacks." Parker refused to execute the deed required by the decree, upon the ground that he was entitled to have the sum paid into court in coin, and that the payment into court of greenbacks was not a compliance with the order of the court. Whereupon the court, upon hearing of the parties, changed the decree, and ordered that Parker should execute the deed required by his contract upon payment into court by Davis of a specific sum in notes of the United States. From that decree the case was brought here under the well-known 25th section of the Judiciary Act.

*Mr. B. F. Thomas, for the plaintiff in error,* contended:

1. That the consideration or sum of money to be paid for the conveyance of the land, did not constitute a debt within the meaning of the acts of Congress, known as the legal tender laws.

2. That if a debt, it was contracted before the passage of the legal tender laws, and not affected by them; a point determined in *Hepburn* v. *Griswold.*

*Mr. Benjamin F. Butler, contra,* contended:

1. That Parker having refused to perform his contract, there was no debt due him from Davis until he performed the judgment of the court by the execution of the deed mentioned in the decree; that then, and not till then, he

had a claim upon or a debt due from Davis. Thus the case was not within *Hepburn* v. *Griswold.*

2. That the court below has decided that it was equitable that Parker should execute his deed in performance of his contract, upon receiving- a given sum in United States Treasury notes; that it would not be doubted that it was competent for that court to do this, that is to say, to create an obligation upon Davis only *sub modo*, or, according to its terms, which were, to pay into court a certain amount in a specific currency (notes); that the order, therefore, created only that specific liability. If this was so, then the determination of the court below (the counsel contended) was not within the jurisdiction of this court to review, no law or statute of the United States being involved.

The cases being thus before the court, Mr. Clarkson Nott Potter, by whom the case of *Hepburn* v. *Griswold,** and the gold question,† had been argued, stated to the court that he had been informed that it was asserted that these or some other cases before the court, involved the question of the power of Congress to make Treasury notes a legal tender between private individuals in discharge of pre-existing debts; and he asked the court, in case they should find that this question was involved in the decision of any of the cases, and should determine to reconsider it, to allow him to be heard upon it.

Subsequently, a majority of the court (four judges dissenting) made an order:

"That Mr. Potter and the Attorney-General be heard in these cases upon the following questions:

"1. Is the act of Congress known as the legal tender act constitutional as to contracts made before its passage?

"2. Is it valid as applicable to transactions since its passage?"

And the argument was had on the 18th of April, 1871.

*Mr. Potter, in support of the negative:*

That no power has been expressly conferred upon Con-

---

\*  8 Wallace, 606.                                  † 7 Id.

gress by the Constitution to make the Treasury notes of the government a legal tender between private individuals in discharge of pre-existing debts, must be admitted.

Can such a power, then, be implied from the authority given Congress "to coin money and regulate the value thereof?" Or can it be regarded as one of the measures "necessary and proper" to carry into effect either the power to "borrow money," to "regulate commerce," to "raise and support armies," to "provide and maintain a navy," to "suppress insurrection," to "repel invasion," or any other of the powers delegated to Congress?

I. *This power is not embraced in the authority given Congress to "coin money."*

*Money* is used in the Constitution in two senses. In the second subdivision of the section relating to the powers of Congress, the Constitution speaks of the power "to borrow money;" and there the word must be used in the larger sense of strict money, or of anything received instead. But in the fifth subdivision of that section, which gives Congress power "to coin money and regulate the value thereof, and of foreign coins," it must be evident that Congress referred only to *metallic* money.

From time immemorial, in all countries, in all ages of the world, the precious metals have been the medium of exchanges, and the strict moneys. The value of these metals has been designated by a stamp upon them indicating their fineness and weight; that is, indicating the value at which the coins were rated. When the coins have possessed the value indicated, they have passed from hand to hand as of that value. When they have been found not to possess that value, they have, *except within very narrow limits*, failed to so pass.

. It is true that, at certain periods in the history of some of the States, the skins of the beaver passing by tale; strings of shells, known as wampum, passing by measure; and packages of tobacco of defined weights were, in the absence of the precious metals, used as money, and were made the medium of exchanges. But none of these was a "legal

tender" as money,* or ever had anything but a local and limited circulation, or ever was used as a substitute for money, after money was introduced.   While in all ages of the world, in all countries, the precious metals, when stamped with a designated value, have been known as moneys; and (with representatives of such moneys) have always been the great and universal medium of exchanges.

Not only has "money" meant *metallic* money, but, upon looking at the public history of the times (which this court has established as a proper guide to the construction of the Constitution),† we find that in the history of the country there was no period in which "money" was more distinctly understood and meant to be hard money than at the period when the Constitution was framed and adopted.  "Its framers had just passed through all the horrors of an unredeemed paper currency."  "The history of that currency had been, within the view of those who staked their property on the public faith, always freely given and grossly violated."‡  "The mischiefs of the various experiments that had been made were fresh in the public mind, and had excited general disgust."§  With the bills of the government unredeemed—indeed, become at last so hopelessly beyond redemption as to be entirely given up as worthless,||—the country had returned for circulation to a specie currency, to absolute money having an *intrinsic* value; and neither had nor wished any other currency.

But the context as well as the word itself shows that the power is confined to metals.  This grant is not a grant to create money, but simply "to coin money"—a power that can be exercised only on money that admits of being coined; that is, a bare power to "strike coin," which was the phrase used in the Articles of Confederation as the equivalent of "to coin money."  It was from those Articles that the power to coin money and regulate the value thereof was transferred to the existing Constitution.  And that this provision only

* 2 Duvall, 63.    † Briscoe *v.* Bank of Kentucky, 11 Peters, 332.
‡ Ib. 348.    § 3 Madison Papers, p. 1345.
|| Story's Commentaries on the Constitution, § 1360.

gave Congress power to strike coin and regulate its alloy and value, was declared at the time, and undisputed. The Federalist, No. 43, tells us:

"The right of coining money, which is here taken from the States, was left in their hands by the Confederation, as a concurrent right with that of Congress, under an exception in favor of the exclusive right of Congress to regulate the alloy and value. In this instance, also, the new provision is an improvement on the old. Whilst the alloy and value depended on the general authority, a right of coinage in the particular States could have no other effect than to multiply expensive mints, *and diversify the forms and weights of the circulating pieces.*"

Indeed, the very next clause of the Constitution (subdivision 6) which gives Congress power to punish the "counterfeiting of the securities and current coin of the United States," expressly distinguishes between the coins and the obligations of the government.

If, however, Congress could take the power of stamping leather, or paper, under this clause, and the leather or the paper so stamped could be considered as "coined money," the value whereof could be regulated by Congress, even that would not support the legal tender provision of the Treasury notes. With such a power, Congress might, indeed, stamp a lump of leather, or a ream of paper, so that they should circulate as current money; that, however, would not make these notes such stamped paper, nor current money.

Treasury notes have, as substance, no appreciable value. They are not declared to be, and do not purport to be, of any value as substance. They are not stamped with any intrinsic value. They are not, so far as they possess value, things at all, but only things in action. The material holds the evidence of the promise; but it is the promise, and the promise alone, which is, and which purports to be, of value. One dash of the pen across the signature of the Treasurer of the United States at their foot, and the note is not a Treasury note; not a thing in action; not a matter which bears the government stamp of value; not ten dollars at all, but a worthless rag of paper, once used to hold a promise,

now cancelled. If, therefore, "money," in the phrase "to coin money," could be considered as embracing other substances beside those precious metals, alone in use throughout all the world as coin, none the less would it remain that to utter *promises* to pay money would not be "coining," or "to coin money."

I cannot find that before the passage of this legal-tender act it had ever been supposed by any court, or by any judge of any court, or by any commentator or statesman, that this power "to coin money" had reference to anything but a metallic currency. Indeed, of all the judges who have given opinions, as well in the support of as against the legality of this law, I find hardly any who do not concede that to "coin money" was a grant of power relating to the coining of the precious metals. Nevertheless, although the power to coin money has not sufficed to support the right to · make these Treasury notes a legal tender, the power to "regulate the value thereof," that is, of coined money, has been taken as one of the most effective arguments to support this law.

If, under this power to regulate the value of coined moneys, Congress may debase the coinage; if it may put upon the coined moneys any other than their true intrinsic value; if it may declare that one-half or three-fourths of a dollar, when stamped by it as a dollar, shall be taken to be equal to a whole dollar, and may thus impair the obligation of contracts and transfer one man's property to another; why, it is asked, under the constitutional power to borrow money, and other delegated powers, and the powers necessary and proper to enable it to exercise the delegated powers, may Congress not do a like thing to produce a better result with these Treasury notes? To this I answer:

II. *This power cannot be implied from the power to regulate the value of money.*

For, 1st. Congress has no power given it to regulate the value of the money it borrows, but only of the money it coins, and of foreign coins. The analogy claimed would exist if the Constitution gave Congress power to *borrow*

*money and regulate the value thereof.* But that it does not give.

And, 2*d.* Congress has no power to even materially debase the coin. A power to regulate is not a power to destroy.

I quite agree that "a uniform course of action involving the right to the exercise of an important power for half a century, and. this almost without question, is no unsatisfactory evidence that the power is rightfully exercised."* But a careful review of the legislation of Congress on this subject, will show not only that Congress has not (as the Court of Appeals in New York,† and the other tribunals which have affirmed the validity of this law have assumed) exercised plenary power over the subject of currency and the legal tender laws, but that, on the contrary, the legislation of Congress from first to last has been strictly confined to designating the value of coined money, and to discriminating with reference to its real value.

Let us review the legislation on coinage. From the establishment of the government to the passage of the act authorizing Treasury notes, the legal tender coin has been three times debased, and three times only. Once, in June, 1834, when the gold coinage was reduced about 6 per cent. in value; once, in 1851, when the three-cent pieces were first coined; and once, in 1853, when the fractional silver coinage was reduced some 6 per cent. in value. But the pieces of these latter coinages were restricted as legal tender within such very narrow limits, and for such fractional and special uses, that, practically, these laws did not operate as debasements of the coin at all.

From the first issue of coin by this government to this time, the unit of calculation and of coinage, the silver dollar, has remained the same. It remains still of the same intrinsic value as when first coined; whatever changes have been made, have been made to bring the other coin into more actual and just relation to it.

When the subject of coinage was first considered by the

* Briscoe *v.* Bank of Kentucky, 11 Peters, 318. .
† Metropolitan Bank *v.* Van Dyke, 27 New York, 425, 426.

Confederation, it was proposed to have a unit of account and of coinage-much smaller than the dollar, and to employ the decimal system. Jefferson, while recommending the adoption of the decimal system, suggested a coin equal to the then existing Spanish milled dollar as the unit of value. His recommendation was adopted, and the dollar has ever since remained the same.*

The first coinage was under the act of April 2, 1792,† and that act provided (§ 11) that the coinage should be of both gold and silver, and *that the relative value of the two metals should be as fifteen to one*, that is, that 1 ounce of gold should be taken as the equal in value of 15 ounces of silver. By that act (§ 9) "*dollars or units*," as they were styled, were each to contain $371\frac{4}{16}$ grains of *pure silver*, and to weigh 416 grains according to the then standard, which was, *for silver*, (§ 13), 1485 parts pure or "fine" to 179 parts alloy; and eagles (§ 9), "each to be of the value of 10 dollars or units," and to contain $247\frac{4}{8}$ grains *of pure gold*, and to weigh 270 grains, according to the then standard *for gold*, which was (§ 12) 11 parts pure to 1 part alloy.

Both of these precious metals were, after that, coined as money; both became lawful money, and therefore, *ex necessitate*, a tender in payment of debts due in money, even if not so declared by law; just as coals of the specified kind are a lawful tender in discharge of a contract for coal, and cotton, of a contract calling for cotton. But in the lapse of years, the relation in value existing and established by Congress in this act of 1792, between the two precious metals, was lost. Owing to the increased produce of silver, and perhaps to the increased demand by the commerce of the world for gold, their relative value had so materially altered that, by 1823, the Secretary of the Treasury called the attention of Congress to the fact that gold had relatively appreciated in value, so that their true relation was then as 16 to 1, and to the evils resulting from the erroneous standard main-

---

* Randolph's Jefferson, vol. 1, 395-6; Jefferson's paper on coinage, in the Appendix to his works.

† Chap. 16, vol. 1, Stat. at Large, 246-9.

tained.* For as soon as gold had advanced or silver declined in relative value so that they really bore to each other the relation of 16 to 1 in value, instead of 15 to 1, as they were valued by the law, every person who could secure an ounce of our gold coinage for 15 ounces of silver secured what was intrinsically worth 16 silver ounces; that is, made a profit of about 6 per cent. It followed, of course, that all the gold was taken up as fast as coined and sent out of the country to be recoined, and that the country retained, instead, only silver, and the gold coins of those countries whose gold coinage bore a true relation to the existing value of gold and silver. In fact, our gold coin went regularly directly from the mint as fast as coined to the foreign packet; and, out of some $12,000,000 of gold which had been coined, it was computed there was hardly a gold piece to be found in the whole United States. As was said in Congress :‡ " Hitherto, like the tracks to the lion's den, the coins have gone all one way—to Europe; and not one solitary eagle has ever made good its cisatlantic flight." This evil led at last to the introduction into Congress of a bill to regulate the value of the gold coinage of the country, by adjusting the rate for gold coin to its true relation to the existing and continuing silver coin.‡ The debate upon the bill,§ shows how anxious Congress was to get at the true relative value of the two precious metals, and to fix the coinage accordingly. Opinions as to the relative values of gold and silver ranged from 15.60 to 1, to 16 to 1. The majority of those best qualified from their pursuits to understand the subject, including the New York banks, regarded the true ratio to be as 15.62 to 1, *although for the previous few years it had averaged* 15.80 to 1. But Congress, at the instance of the friends of metallic money, determined to adopt 16 to 1 as the relative value; partly because that seemed to be the ratio which had proved practically the most correct in the nations which had adopted it; partly because the

---

\* Congressional Debates, 6th Feb., 1828, p. 859.

† Ib., June, 1834, p. 4654.

‡ Chap. 95, Laws 1834, 4 Stat. at Large, p. 699.

§ Congressional Debates, June 21, 1834.

variation from the true relation was, if any, so small it might safely be disregarded; and partly because it was believed that the relative appreciation of gold which had been so long going on would continue, and that the slight over-valuation of it, if any there was, would be thus in time corrected.* By that act (§ 1) the eagle was reduced from 247⅜ grains *of pure gold*, as required by § 9 of the said act of 1792, to 232 grains *of pure gold*, or about six per cent. in intrinsic value. But, so far from Congress assuming any power to materially depreciate the coinage or impair the rights of creditors, the power of Congress to make depreciated coin a legal tender was expressly disclaimed in the debate.† And the statesman at whose instance, and by whose will, this bill was mainly carried through was, of all men who ever had part in the government of this country, the last to be quoted on the side of the power of Congress to make promissory notes a legal tender in payment of private debts,—Thomas Hart Benton.

The court will thus see that while Congress did indeed reduce the standard and value of gold coinage, so that $100 of the new gold coins were hardly equal in intrinsic value to $94 of the former gold coinage, yet *that in fact Congress did absolutely nothing to impair the obligation of contracts or to destroy the rights of the creditor*. For, from the beginning, the debtor had the right to pay in the coinage of either of the precious metals. At first these were of equal value, and payment in either was indifferent. Gradually the gold ap preciated or the silver depreciated, and then, of course, the debtor, *as he had the option*, paid in silver; so that, in 1834, the debtor who owed $1000, and had $940 of the then gold coinage, could exchange his gold for $1000 in silver coin, and discharge with these his debt of $1000.

Therefore, although Congress did reduce the value of the gold coinage in 1834, the debtor, after 1834, could no more pay his $1000 with money of less intrinsic value than he

* 1 Benton's Thirty Years, p. 469.
† Congressional Debates, June 21, 1834, pp. 4650, 4652-3.

could before. True, he could take $940 in gold of the old coinage, and get with it $1000 in gold of the new, with which to pay his debt. But so, before the law, he could take this same $940 of gold coinage, and purchase $1000 of the then, and still, equivalent silver coinage, with which to pay the debt. Indeed, that law, so far from taking $\frac{1}{18}$ of the debt from the creditor and giving it to the debtor, as at first appears, actually gave the debtor no new privilege, and deprived the creditor of no property. It remained optional with the debtor, after the law as before, to pay in the gold pieces of the old coinage. True, it became possible, after the law, for the debtor to pay in the new gold coinage; but it had been optional with him · before the law to pay in the constant silver coinage *equivalent in value* to the new gold coinage. The law was, in fact, but an adjustment and recognition of the true relation between the values of the two ·metals, the selection of which had always remained optional to debtors, and, so far from being an attempt by Congress to regulate money without reference to or differing from its intrinsic value, it was, on the contrary, a most careful and earnest effort to bring the recognizable value of its money more closely to its intrinsic value.*

Following this act of June 28, 1834, Congress passed an act on the same day, conforming the value at which foreign coins were to be rated to their true intrinsic value.†

In 1837,‡ Congress fixed the standard of both gold and silver coin at $\frac{9}{10}$ths fine; that is 9 parts of pure metal to 1 of alloy. By this change the *gross* weight of the dollar was reduced to $412\frac{1}{2}$ grains (§ 9), but the *fineness* was correspondingly increased, and the dollar therefore continued to contain $\frac{9}{10}$ths of $412\frac{1}{2}$ = $371\frac{4}{18}$ grains of pure silver, as provided for the dollar when first coined, and to remain therefore of the same intrinsic value as before. And the *gross* weight of the eagle was, by the same act, somewhat increased, but it con-

---

* Congressional Debates, June, 1834, pp. 4643–4671.

† Chap. 96, 4 Stat. at Large, 700.

‡ Chap. 3, 5 Stat. at Large, p. 136–7, § 8.

tinued to contain, however (§ 10), 232 grains of *pure* gold, as provided by the act of 1834.

This change in the gross weight of the silver coinage has led to the idea it was then debased, the corresponding increase in its fineness having been overlooked.

Let us refer to later changes in the silver coinage? For nearly twenty years after the passage of these laws of 1834, the relations between the precious metals remained undisturbed, so that no action by Congress was required. But the unlooked-for discoveries of gold in California disturbed again, and in a reverse direction, the relation between the two metals, and thereafter silver advanced and gold declined in relative values; so that, by 1853, silver attained a marked premium over the gold coined since the act of 1834, and a scarcity in silver coin had been felt. Congress, however, did not thereupon generally depreciate the silver coinage. It was, indeed, urged upon Congress to appreciate the gold coinage.* Instead, however, of doing this, thinking, probably, that this gold harvest was to be of short duration, and its disturbance of the relation, then so long subsisting between the two metals, not likely to continue; and striving to meet the evil of small notes issued by every kind of corporation and of paper tokens for change, then pressing —Congress did depreciate the silver coin, *for parts of dollars* only, about 6 per cent. (so that two half-dollars or four quarter-dollars are no longer equal to one dollar piece). But these depreciated coins were restricted from being legal tender for any sum greater than $5 in all, although the smaller silver coin of the earlier coinage remained a tender for any amount.

Prior to this, in 1851, Congress had directed the coinage of three-cent pieces of a fineness and weight which gave them a value of only 80 cents on the nominal dollar of these pieces (*i. e.*, 33 pieces of three-cent coinage were worth intrinsically only $\frac{80}{100}$ of one silver dollar); but these pieces were only made tender to the extent of 30 cents in the ag-

---

* *Vide* New York Tribune, and other journals.

gregate, and their issue was very limited and was shortly stopped, and by the act of 1853 their intrinsic value was raised to the standard of that of the other fractions of the dollar.*

Then as to change in the copper coinage. Congress, also, in 1793 and 1796, reduced the weight and the intrinsic value of the cent to accord with the increased value of copper, the planchets for which government had to import.† *These cents, however, were not made a legal tender.*

The interference by government with the rights of creditors by regulations of the coin have, therefore, been :

1. By the acts of 1834, a possible, but disputed and doubtful depreciation, if of anything, of less than 1 per cent.

2. By the act of 1851, a depreciation of fractional silver coin (the three-cent piece) to an extent which could not, in the largest tender, exceed 6 cents; shortly, however, altered, so that it could not exceed in the aggregate 2 cents.

3. By the act of 1853, a depreciation of fractional silver coinage to an extent which could not exceed in the largest tender 30 cents.

Now, if these debasements of fractional coin be deemed merely such ; nevertheless, from their minute and fractional nature, they would form no precedent for future material debasements of the coinage, or indicate any acquiescence by the people and the courts in an assumption by Congress of the right to put a false or arbitrary value upon its coined money. *De minimis non curat lex.*

But, indeed, these acts of 1851 and 1853 were practically not at all infringements upon the rights of creditors or debasements of the coinage below its value. As already remarked (page 464), when coins were struck with a value which they did not possess, they have, " except within very narrow limits," failed to pass at more than their true intrinsic worth. But there are limits within which coins, somewhat depreciated below their true value, will circulate as

---

* Edelman's Bullion Dealers' Guide, pp. 14, 15; 9 Stat. at Large, p. 591; 10 Id. p. 160.

† Report as to the Mint, Congressional Debates, February, 1823, p. 804

well as if they had not been depreciated.   Those limits are when the payment is so small that the difference between the nominal and intrinsic values, does not leave it worth while to regard the difference, or when some particular convenience about the coin, such as its portability or denomination, overbalances the intrinsic depreciation; that is, the peculiar fitness for the fractional purpose required, will, in such cases, actually make good the depreciation, and carry the small coin, for all purposes of use, up to the stamped value.

All will recollect how often, in the days of the Spanish piece for 12½ cents, we accepted 12 cents instead, and took Spanish quarters with holes drilled through them equally with perfect coin.   Those who have been in England know that the sovereign has so depreciated by wear that a large majority of the coins in circulation in Great Britain are intrinsically worth less than the standard value—2d. per sovereign it is said—and yet, for all minor payments, they pass from hand to hand by tale equally as of full weight; while in large transactions they are always paid out by weight and not by tale.   So with the depreciated three-cent pieces of 1851; within the very narrow limit at which they were legal tender, their *portability and convenience* made up what they wanted in intrinsic silver value.

And so, too, with the depreciated coinage of 1853.   It was confined to fractions of a dollar, which were so slightly depreciated, and the convenience of which was such, that the trifling intrinsic loss was not to be regarded.   But the depreciated coins were made a legal tender only to twice the amount of the lowest tenderable gold coin, Congress still keeping to its idea of a double money standard, and still holding to its unchanged unit of value, the silver dollar.

Now it is submitted that all these exercises of the powers of Congress to " coin money and regulate the value thereof" were within the letter and spirit of the Constitution.   Congress has, indeed, established the value of certain foreign coins at one time and changed it at another; made them a tender, and deprived them of that quality; and changed

from time to time the standard of value of coin struck at its mint. But how has it done this? Without regard to the intrinsic value of the coin struck? By fixing upon it any arbitrary value, and making it a tender at anything but its true value, as all the courts which have supported the constitutionality of the provision we are considering have assumed? Not at all; but, on the contrary, by uniformly seeking to conform the stamp upon its coin to its true value, and by scrupulously limiting the departures from intrinsic value for special purposes within limits so narrow that the special usefulness of the coin within those limits has actually made good the trifling deficiency in weight.

In the same spirit, Congress has provided that its coin shall be a legal tender at its stamped valuation only when of full weight; if of light weight, only proportionately, according to its weight.

In fine, Congress, under a power to coin money and regulate the value thereof, has done only and exactly what those words in their plain signification imply; has struck metallic coins, and has regulated the value thereof and of foreign coins; and has done this on every occasion with careful regard to their true intrinsic value; manifesting as well by the particular purposes and narrow limits within which they have departed from intrinsic value, as by their general strict regard for such values, not their belief that they could strike any metal and stamp it with an arbitrary value, but that they could rightfully regulate the value of money only by truly declaring the value thereof. Not that they "possess a magic power to give, by their omnipotent fiat, a precious value to inanimate and valueless things," but that they possessed only power to regulate the coin stamped, by declaring its value according to the fact—according to the value stamped upon it when of full weight, and of only proportionate value when of light weight.

In the opinions which have been given in various legal tender cases, nothing has seemed to go so far toward supporting the authority of Congress to make treasury notes a legal tender as the assumption that Congress had been left

by the Constitution at liberty to impair private rights and the obligation of contracts by debasing the specie coinage, and that it had actually debased that coinage and impaired those rights to the extent of $\frac{1}{16}$, without question or challenge. Had this been the action of Congress, it would not indeed have established its power or right to do this. One permitted invasion of an established right does not do away with the right. That Congress had debased the coinage $\frac{1}{16}$th would not establish the right to further debase it; would, at most, indicate that the power to regulate it extended up to that limit, and would, of itself, furnish no justification for a more general or further invasion. Nevertheless, the assertion, in all the opinions, that government had assumed to debase the coinage to the extent of $\frac{1}{16}$th, impairing to that degree the recovery of all creditors, and that this action had been submitted to without question, has seemed to me the strongest argument for the power of government to exercise plenary control over coined money. Indeed, it was through inquiry as to how it was possible that creditors could have submitted to so serious an infringement of their rights without contest in the courts that I learned that in fact nothing of the kind really took place.*

On the contrary, we see that, so far from "Congress having claimed and exercised unlimited power over legal tender," so far from having assumed the power to make even coin a legal tender, without regard to its real intrinsic value, as all the decisions supporting this law assume, its legislation

---

* Notwithstanding the true facts of the case, so little have they been rightly understood, that 'we find an article in that excellent journal, the American Law Register, as late as February, 1871 (vol. 19, p. 91), still asserting in the course of a review of Hepburn v. Griswold, and other decisions of this court, in legal tender cases reported in 7th and 8th Wallace, that the power of Congress to make dollars of a greater or of a less value had been exercised in various instances; and that "in 1834, 6 per cent. was taken from the weight and value of the gold dollar, and the holders of all debts subjected to a corresponding loss;" that "in 1837 and 1853, the half-dollar and smaller similar coin underwent a similar reduction." Yet this is all a mistake, except as to the fractions of a dollar coined under the act of 1853.

shows that for seventy-five years, from the beginning of the government down to the act authorizing these legal tender notes, through all the most pressing exigencies of peace and war, Congress—not only by its direct efforts to regulate the coinage from time to time, according to its intrinsic value, but also by the narrow limitation it imposed on the right of legal tender when diverging slightly from intrinsic value for special and temporary purposes—has shown a determination, as uniform as just, to keep the stamp upon the government coins a true index to their value, and to so regulate these coins as that they should have and express their actual values. Nay, by reference to the debates in Congress, it will be seen that the right of Congress to debase the coin and make the debased coin legal tender, in such wise as to materially affect the rights of the creditor or debtor, was not only never professed or asserted, but that, so far as the question has arisen, the right has been directly repudiated.

So, therefore, the difficulty, judges and other persons have had in perceiving why, if Congress, under this power to coin money, could coin any metallic substance and stamp it with an arbitrary value, it would not have equally the power to declare its treasury notes a legal tender without reference to their intrinsic value—is a difficulty that this court is freed from, and that should never have existed. Indeed, I look in vain to-day for the production of the declaration, prior to these legal tender days, of one judge, one statesman, one commentator, that Congress, by the power "to coin money and regulate the value thereof," possessed the right of striking even metals with false and arbitrary values. The right, therefore, to make a promise to pay—a promise not expected to be kept at the time for which it was made, nor at any other certain or definite time—the substitute for the thing promised, and to oblige every creditor to accept this of his debtor instead of the thing promised, is not only not within the provisions of this grant to Congress "to coin money and regulate the value thereof," but we have seen that no kindred power in fixing the value of even

coined moneys has ever been claimed or attempted under that grant.

We are driven, therefore, to seek in other parts of the Constitution this power to make treasury notes a legal tender between private parties at their nominal value for pre-existing debts.

But it has been asserted that the power of thus making the bills of the government legal tender is a power " necessary and proper"—in the sense in which those words are settled to have been used—to carry into effect some one or more of the powers delegated to Congress by the Constitution. I say " necessary and proper" in the sense in which those words have been settled to have been used, because I admit that this court has decided that they are not to be construed according to their literal and precise meaning.

Those judges of this court who stated in the dissentient opinion in *Hepburn* v. *Griswold*,[*] that it was claimed that *when an act of Congress is brought to the test of this clause of the Constitution, its necessity must be absolute and its adaptation to the conceded purpose unquestionable*, were stating no claim of mine; and the discussion of that question, so fully pursued in that opinion, will not be necessary, since I shall adopt for these words the most liberal construction ever asserted by this court.

Indeed, whatever differences might exist as to the true construction of this clause of the Constitution, as a lawyer, addressing this supreme tribunal, I am bound to remember that its meaning was long since defined and settled here. In the very first Congress the meaning of this clause was greatly discussed. There were those who held, with Mr. Jefferson, that it authorized only those means without which the grant would be nugatory. Others took a more liberal view of its meaning. The latter prevailed in Congress. The discussion was then renewed in the Cabinet. Washington finally followed the opinion of Hamilton, who main-

---

[*] 8 Wallace, 631.

tained the more liberal view. Subsequently the discussion was·from time to time renewed in Congress, until finally the meaning of this clause came, in 1819, to be decided by this court, in *McCulloch* v. *Maryland*,* when Marshall, C. J., speaking for the whole court, gave as the result of their most careful consideration, that precise definition which opposing counsel admit was, by his intrinsic and perfect reasoning, wrought into the texture of our constitutional law. Nevertheless, the utmost that great chief justice, who extended the Federal authority to its farthest limits, then said, was:

"Let the end be legitimate; let it be within the scope of the Constitution, and all the means which are appropriate, which are plainly adapted to that end, and which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

We must inquire, therefore, to the exercise of which one of the powers delegated to government "it is necessary and proper," it is even "appropriate and plainly adapted," that treasury notes should be made a legal tender for antecedent debts. Is it appropriate and plainly adapted to the power to borrow money, to regulate commerce, to raise and support armies, to provide and maintain a navy, to suppress insurrections or repel invasions, or even to any of these powers united? For it is true that Congress had occasion to exercise every one of these powers at the time when these notes were issued.

III. *The exercise of this legal tender power was not necessary, nor appropriate and plainly adapted to carrying into execution any of the powers expressly delegated.*

No one can read the opinions of any of the courts which have held this law to be constitutional without finding their decisions distinctly put upon the importance of this provision to enable government to borrow money and carry on the war, and to maintain its very existence. But it is sub-

---

* 4 Wheaton, 421.

mitted, especially after the experience of the past nine years, that no such necessity existed, and that no such advantage was gained by the provision. On the contrary, at no time before since the establishment of the government was the national wealth so great; at no time were private debts, in proportion to the means of the country, so reduced. The panic and suspension of 1857 had led to very general liquidation. The agitations of the succeeding years had tended to check men in forming new engagements, or entering upon speculative undertakings. At no time had so few new schemes for capitalists been proposed; had so few bubble corporations been projected; had so little general speculation prevailed. At no time were our traders so little extended, or had our people so few debts (excluding debts maturing at the end of long terms of years). The banks and the government had already suspended specie payments for months before the issue of these notes. The entire business of the country was being done in unredeemed bank paper and treasury notes, which were not a legal tender in payment of debts, but which, nevertheless, circulated everywhere, and never fell at the great centres of trade to any considerable depreciation. Finally, the government determined upon an issue of legal tender notes.

The security of the notes was not increased by the legal tender clause. Had they been issued without the clause they would have been equally secure. Without it, they still had, as fully as with it, whatever security the credit and faith of the government could give them. So, too, without that clause, they would have been equally as available and valuable as now, in all payments for taxes, public lands, or other dues to the government. The only value that clause did give the notes was the power it gave debtors to discharge pre-existing debts with them, equally as with real dollars. I say pre-existing debts, because, as to subsequently contracted debts, the dealings of the country would have been in these notes, whether or not they had been made a legal tender. The country was, at the time of their issue, carrying on its dealings in the unredeemed paper money of the banks, styled

"currency," in which all ordinary transactions were measured, and payments made. This currency had not at that time depreciated more than 3 per cent. below the specie standard; and yet treasury notes, as soon as issued, at once fell to the same depreciated value. Their legal tender character never seems at any time to have made them better, than the bills of any other solvent but suspended debtors not containing that clause.

It has indeed been urged that general insolvency and ruin would have followed, had not debtors been authorized to meet their demands with these notes.* But what really would have been the effect had these notes not been made a legal tender for pre-existing debts? Necessarily they would have been as well secured and as useful for payments of taxes and public dues as now. They would have been as valuable as now, for the purchasing of goods, and service, and labor. True, the debtor could not have discharged his debts of long standing in them; but what of that? In great part, the debts of the country consisted of commercial paper, even then payable in what was styled "currency." As to the debts of the country not already specially payable in "currency," the great bulk of the residue matured within a short time, so that, had the debtors not been able to have benefited by the slight depreciation in treasury notes which took place during such times, it would have caused no widespread disaster. For they would in no event have had to pay more than they received, nor was there, after these notes were issued, any such depreciation of property, even reckoned at its specie value, as would have made such payments generally disastrous. Specie payments have been suspended by the banks and the treasury in 1837, and 1857, and 1861, without producing any great ruin. Irredeemable paper circulated after the suspension of the banks in 1857 and 1861, as well as before. Indeed, the crisis was before the suspension of the banks, not afterwards.

Neither the bills of the old Confederation nor those issued

---

* See dissenting opinion in Hepburn v. Griswold, 8 Wallace, 632, 3.

by the government in 1812 were ever made a legal tender at all, and yet circulated generally. So in England during all the great Napoleonic wars, the notes of the bank were never made a legal tender. They are by law a tender, everywhere except at the counter of the bank so long as the bank pays specie. In 1797, however, the government authorized the bank to suspend specie payments. The law provided* that the bank might suspend specie payments; that if sued on its notes (§ 1) it might apply to the courts and have proceedings against it stayed on such terms as might be just; and (§ 7) that payments *voluntarily received* in the notes should be regarded as payments of cash. But the notes were not made a legal tender except for government dues and taxes. Nevertheless, they answered every purpose of our notes.†

So those United States notes that were not a tender always rated equally high with those which were; and as matter of fact, capable of being proved by price currents of the day after the decision in *Hepburn* v. *Griswold*, that treasury notes were not constitutional as a discharge for pre-existing debts, they at once advanced in market value as compared with gold.

But, were it conceded that the quantity of legal tender gave to these notes a material advantage which they would not have possessed without it, how can it be said that this provision was " necessary and proper" or "appropriate and plainly adapted" to the exercise of any of the powers expressly delegated to Congress?

It should be borne in mind that (except in the single aspect of a regulation of commerce, to which I shall presently refer) this legal tender provision has been maintained

---

\* Chap. 38, Laws George III, 41 Pickering's Statutes at Large, 523.

† Encyclopædia Britannica, title, Money. In 1811, it was made penal in England to buy coin at a premium, or to sell notes of the bank at a discount; and tender of notes of the bank stopped distress for rent, and payment in them satisfied executions (like the bills of the Bank of Kentucky, Briscoe v. Bank of Kentucky, 11 Peters, 315). But this law continued in force only till March, 1814, and was, in effect, a "stay-law," as the notes of the bank were at no time made a legal tender so as to discharge debts or to release securities.

as necessary or proper to the exercise of the delegated powers, and has been asserted to be appropriate and plainly adapted to their exercise, in no other way than that by this measure the government was made stronger. The effect of this provision is to take the property of the creditor and transfer it to the debtor to the extent to which these notes may be depreciated below their nominal value. To which one of the delegated powers is such a wrong "appropriate and plainly adapted?" To all, as much as to one. For clearly this power has no relation whatever to the power to raise armies and maintain navies; to suppress insurrections; to borrow money; unless it is the relation which results from the mere fact that government was made stronger and more efficient by it. In no other sense is it appropriate, or adapted, or auxiliary at all to the exercise of any or of all the delegated powers.

I concede that if this provision of legal tender be a "proper ancillary means," to use the words of Strong, J., in the Pennsylvania cases,* for executing the delegated powers singly or together, it is enough. Any *means* which *is* appropriate, and plainly adapted to carrying into effect two or more or all of the delegated powers, is not *on that account* less to be implied than if it has such relation to one only of the delegated powers. But the question remains, is the power sought to be implied appropriate, and plainly adapted to the exercise of delegated powers? To be appropriate, to be at all adapted to the exercise of powers, it must have some direct relation to such powers; some particular fitness for the exercise of those powers. As Mr. Clay felicitously said:

"The principal and incidental ought to be congenial with each other, and partake of a common nature. The incidental power ought to be strictly subordinate, and limited to the end proposed to be attained by the specific power."

Referring to the first great debate on the powers of Congress under this clause, and remembering that one portion

---

* 52 Pennsylvania State (2 P. F. Smith), 9.

of the men contemporaneous with the Constitution agreed, with Mr. Jefferson, that the means to be authorized under this clause must be means without which the grant would be *nugatory*, it is instructive to note how even those who favored a more liberal construction of this clause regarded it.*

That eminent Federalist, Mr. Sedgwick, declared the means, authorized by this clause, "must be a known and usual means in the exercise of the delegated powers to effect their end, as expressed in the Constitution."

Or, as Mr. Ames said, "must be fairly relative and necessarily incident to the delegated powers."

Or, as Mr. Giles said, "a subaltern authority necessarily connected with the exercise of the delegated powers."

According to others, it was to be "embraced in as a detail of the enumerated power, and to be inseparable from it."

And in their opinions on the constitutionality of the United States Bank, both Hamilton, Madison, and Randolph united in defining a constitutional means as a natural *means* of executing the delegated power.

As Hamilton himself said, "The *criterion* of what is constitutional, and what is not so, is the end to which the measure *relates* as a *means*. If the end be clearly comprehended within any of the specified powers, and if the *means* have *an obvious relation* to that end, it may be deemed within the provisions of the national authority."

As Mr. Madison elsewhere said, the constitutional means must be "a *direct* and *incidental* auxiliary;" must be "incidental to the nature of the specified power."

As Marshall, C.J., said, in *Gibbon* v. *Ogden*, the auxiliary power must be *clearly incidental* to the powers expressly given, to be implied.

As Story, J., said, in *Martin* v. *Hunter*, "The powers actually granted to the Federal government must be expressly given, or given by *necessary implication*."

But this provision of legal tender has no relation, no fitness,

---

* 1 Congressional Debates, 1940, *et seq.*, Feb. 3–8, 1791.

no adaptation to the exercise of any one or more of the express powers conferred by the Constitution; none whatever. It is as much auxiliary to one as to the other; nay, as much auxiliary to every conceivable power of government granted or forbidden, requiring revenue, as to either or to all the delegated powers. Its aid is derived from the fact, and the single fact, that thereby government was made stronger. But it is an abuse of language to so construe a grant of particular powers as to treat anything by which the grantee is made stronger in the exercise of the particular power as an incident of such power, and therefore to be implied. Surely, a grant to a man to run a ferry or to sail a privateer, or to establish and maintain a fort and trading post, would not give him the right to rob on the highway; to cheat his creditors; or to sell to other persons the right to cheat their creditors as an incident to such a grant. And yet such powers would make him stronger; would make him better able to run his ferry; to sail his privateer; to defend his fort. They would be auxiliary in the sense that they made him stronger to do the authorized work. They would, indeed, if he was not able otherwise to execute his grant, be a necessity for its execution. But not a granted necessity; not a granted auxiliary; not to be implied as a *means* to the authorized powers.

Just so, this power of legal tender, if it was of any practical importance to government, which I deny, was in no otherwise an aid to the delegated power of raising armies, maintaining navies, and regulating commerce, than that it made the government stronger; not that war could not be made, armies raised, or commerce regulated without it, for these and all other powers of government had been exercised without it; not that it had any relation to the exercise of any of those powers as a *means*, but solely because it made government generally stronger.

Test this idea, that because by this sale of indulgences to one man to wrong another, government was made better able to execute its delegated powers; and that, therefore, this power was ancillary or auxiliary to those powers. The

Constitution gave Congress power to establish post-offices and post-roads; and this grant has been taken as authorizing the establishment of new offices and new routes, the conveyance of the mails, the punishment of offences against them, and even as authorizing government to assert a monopoly of that business; and all these powers have an appropriateness and a plain adaptation to the power expressly granted. But let us suppose government should sell licenses to rifle every tenth letter, or licenses to take half, or a fourth, or a tenth of all the valuables inclosed in the letters directed to particular offices. Will any one pretend that such a power would be authorized? And yet government would be stronger for it, richer for it, better able to carry the·mails for it; that is, better able because of this authority to execute the powers delegated to it. Nay, it might even be that without such extraordinary resource it might not be able to carry the mails at all. But who will pretend that such a necessity would any the less make such an assumption of power unauthorized and outrageous?

I understand one member of this bench to have maintained in another tribunal* that even a substantive power might be implied as an incident to the execution of a delegated power. I do not so understand the law. I had understood the direct reverse of this to have been asserted by those who framed the Constitution, both before and after its adoption, in all the great discussions upon the power of Congress; and by the men who favored liberal as well as those who favored strict construction; and to have been established in *McCulloch* v. *State of Maryland*, where the Chief Justice gave it as the unanimous opinion of the court that " a great substantive and independent power cannot be implied as incidental to other powers, or used as a means of executing them."

But, however this may be, whether another substantive power can, or cannot, be properly implied as an incident to the execution of an enumerated power, the substantive

---

* See Legal Tender Cases, 52 Pennsylvania State (2 P. F. Smith), 9.

power, in order to be implied, must at least have the same
fitness and adaptability to the power to which it is implied
as incidental as is required of other means.

It has, however, been asserted that Congress is to judge
of what means are appropriate and adapted to the end, and
that whether a particular measure be or be not such a means
is for Congress alone to determine. But it was to decide
whether the action of Congress was within the authority of
the Constitution that this supreme tribunal was established.
The Constitution delegated to Congress certain specified
powers. It delegated also the necessary and proper means
to carry those powers into effect. Whether a particular au-
thority be delegated either expressly or as a means to carry
into effect the delegated powers, may, and should indeed,
in the first place, be inquired into by the legislature. But
the power of this court to revise these determinations of the
legislature was uniformly asserted, as well during the Con-
vention which framed the Constitution, as throughout the
discussion by which it was commended to the people, and
by the wisest men of every political view after the Constitu-
tion was adopted, and has been established by the repeated
decisions of this court.

"If," said Hamilton,* "it be claimed that the legislative
body are themselves the constitutional judges of their own
powers, *and that the construction they put upon them is conclusive
upon the other departments*, it may be answered that it is not
to be supposed that the Constitution could intend to enable
the representatives of the people *to substitute their will* to that
of their constituents. It is far more rational to suppose that
the courts were designed to be an intermediate body between
the people and the legislature, in order, among other things,
to keep the latter within the limits assigned to their authority.
The interpretation of the laws is the proper and the peculiar
province of the courts. A constitution is, in fact, and must
be regarded by judges, as a fundamental law. It must,
therefore, belong to them to ascertain its meaning, as well

---

* Federalist, 88.

as the meaning of any particular act proceeding from the legislative body. The intention of the people ought to be preferred to the intention of their agents."

"Whatever meaning," said Mr. Madison,* "the clause of the Constitution conferring on Congress the power of using all necessary and proper means to carry into effect the enumerated powers may have, none could be admitted that would give an unlimited discretion to Congress."

"To what purpose," said Marshall, C. J., speaking for this court in *Madison* v. *Marbury*, "are limitations committed to writing, if these limits may at any time be passed by those intended to be restrained. The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed;" but all powers under the discretion of a choice of means are left open to them. And in that case the court held the law of Congress unconstitutional.

So in *McCulloch* v. *Maryland*, he said:

"Should Congress in the execution of its powers adopt measures which are prohibited by the Constitution, or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government, it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land."

The utility of a measure can never be any proper test of its constitutionality. As Hamilton declared in that great argument upon chartering the first United States Bank, which successfully maintained the Federal power, and upon which all subsequent arguments on that side of the question have been based—because, as Marshall, C. J., said, it exhausted the arguments upon that side—"the degree in which a measure is necessary can never be a test of the *legal right* to adopt it. That must be a matter of opinion, and can only be a test of expediency. The relation between the means and the end, between the nature of a *means* employed toward

---

* 1 Annals of Congress, p. 1898.

the execution of the power and the *object* of that power, must be the criterion of unconstitutionality; not the more or less of necessity or utility."

I concede that if a means be appropriate, and plainly adapted to the exercise of an enumerated power, and not prohibited, then, whether it may be useful or not, is for Congress alone to judge. I agree, too, that engagements by Congress to purchase arms, which may prove to be worse than useless, to buy ships which may not be needed, and the like, are engagements within the constitutional powers of Congress; and that this court may not inquire into the propriety of their judgment in such regards. But what brings these measures within the constitutional powers of Congress, except that they are appropriate, plainly adapted means, to the end of enabling Congress to make war, to maintain navies, or to executing other powers expressly delegated to Congress—and are therefore authorized? *And, being authorized,* whether useful or useless, whether Congress judged wisely or unwisely in selecting them, is not open to review.

As Marshall, C. J., said in *McCulloch* v. *Maryland*, in discussing the constitutionality of the United States Bank, "Were its necessity less apparent, *none can deny its being an appropriate measure;* and if it is, the degree of its necessity is to be discussed in another place."*

But where a means has no fitness, no adaptation, *except that it makes government stronger*—except that it is in that way useful—then, if it can be considered as *therefore* an authorized means—one that may be implied, which I dispute—the constitutional power of Congress to exercise that means must, in that event, depend upon that utility alone; and of that utility this court is, in such event, the ultimate judge.

---

* It may be here stated that the appropriateness of the bank as a fiscal agent to enable the government to borrow money, collect taxes, and the like, although not now so apparent, seems at the time of the decision in McCulloch *v.* Maryland to have been generally conceded. But whether, notwithstanding that appropriateness, it was an authorized means, was most severely contested, since government *could* borrow money and collect taxes without it.

If it be insisted that this court was never meant to judge of such utilities—that this is the province of the legislative, and not of the judicial branch of the government—my answer is, that the absurdity grows out of selecting as an appropriate means, or incident, or auxiliary to the delegated powers, that which has no fitness, no adaptation to such powers, except merely that it makes government stronger. For if any means that increases the strength of government may be taken as therefore to be implied as a constitutional means, to be, for that mere quality, fit—which I deny—then it remains that since this court is the ultimate judge of fitness, it must be, according to that assumption, the ultimate judge of whether the measures in question did, indeed, make government stronger.

IV. *This power cannot be assumed as a necessary inherent sovereign right.*

It is claimed that the right to declare what shall be a legal tender for private debts is a necessary right inherent in every sovereignty. That, within the scope of their respective authorities, the Federal and State governments are sovereign; and that, consequently, this power must be lodged with one or the other authority, and that, since it is prohibited to the States, and not prohibited to Congress, it must therefore be taken to dwell with Congress.

But upon what principle is it a necessary sovereign right? True, it is a right which has been exercised by absolute sovereigns. So has every other form of power and plunder. But that does not make it a necessary right in a limited constitutional government established to maintain justice. It is by no means clear that this right exists in England. Blackstone says that

"The coining of money is the act of the sovereign power, *that its value may be known on inspection.* Every nation fixes on it its own impression, that the weight and standard, *wherein consist the intrinsic value, may be known by inspection only.* . . . Of this sterling metal all the coin of the kingdom must be made; *but the*

*King's prerogative seemeth not to extend to the debasing or enhancing the value of the coin below or above the sterling value."*[*]

To the same effect speaks my Lord Coke :[†]

"The law doth give the King mines of gold and silver *thereof to make money*, and not any other metal, because thereof money cannot be made, and hereof there is great reason ; for the value of money being in effect the value of all contracts, is in effect the value of every man."

It was, indeed, one of the glories of Queen Elizabeth, that she restored her moneys to their true value. "*Religio reformata. Pax fundata. Moneta ad suum valorem reducta,*" is the inscription on her monument.

In truth, there seems to have been a general misapprehension as to the action of England. Although base moneys were formerly issued, I find none authorized in England for nearly three hundred years past.

It is a mistake to suppose that the framers of this government, or the people who ratified their work, intended that all powers of government should be vested either in the Federal or the State governments. On the contrary, this was an artificial government; not the result of gradual growth, but formed by the union of independent States; not formed for the benefit of any family, or ruler, or person, but formed to secure certain ends for those who thus united. What those ends were, the framers of the government took care to declare. Far from requiring that the new government should possess all the powers usual to sovereigns, they expressly forbade some most sovereign powers, and refused to grant others. From that day it was the boast of the people that their Federal government was the freest and most limited government that had ever existed. That while it possessed powers necessary for protection against foreign and domestic attack, it contained none by which individual rights could be destroyed without process of law or just compensation.

It is true the powers to make *ex post facto* laws, pass bills,

---

[*] 1 Commentaries, 278.    [†] 2 Institutes, 534.

of attainder, confer titles of nobility, are expressly forbidden to both State and Federal governments. But they were forbidden to both, because otherwise—States by virtue of their original authority, the Federal government by virtue of its expressly enumerated powers—each within its province might lawfully exercise these powers; and this at the time of the adoption of the Constitution was fully discussed and understood. Indeed, the friends of the Constitution were very generally called upon to show that the restrictions upon the Federal power were not to be taken as implying the grant of powers not expressed. Accordingly it was everywhere shown that the restrictions upon the Federal government contained in the Constitution were necessary as exceptions to powers *particularly* granted in the Constitution. A very precise statement was made in the Virginia convention by Mr. Edmund Randolph of the particular grant upon which each restriction on the Federal power was a limitation.*

It is true, also, the power of legal tender, though restricted by the States to gold and silver, was not forbidden to the Federal government; *but neither was it granted.*

As Hamilton said in the Federalist:†

"Why declare that things shall not be done which there is no power to do? Why, for instance, should it be said that the liberty of the press shall not be restrained when no power is given by which restrictions may be imposed?"

And Mr. Marshall‡ asked, in the Virginia convention, "if gentlemen were serious when they asserted that if the State governments had power to interfere with the militia it was by implication? The State governments," he said, "did not derive their powers from the General government, but each government derived its powers from the people, and each was to act according to the powers given it. Would any gentleman deny this? Could any man say so? Could any man say that this power was not retained by the States, *as they had not given it away?* For," says he, "does not a power remain till it is given away?"

---

* 3 Elliott, 464.    † No. 84.    ‡ 3 Elliott, 419.

Indeed, where a particular power is neither expressly granted nor fairly to be considered as a means of executing the granted powers, it cannot, because of its necessity or of its importance, be implied, since those sovereign powers which the framers of the government thought necessary were expressly enumerated.

"A distinction," as Mr. Madison said,* "is to be kept in view between a power necessary and proper for the government or Union and a power necessary for executing the enumerated powers." In the latter case, the powers included in the express powers were not expressed, but to be drawn from the *nature* of each. In the former, the powers composing the government were expressly enumerated. *This constituted the peculiar nature of the government; no power, therefore, not enumerated could be inferred from the general nature of the government.* Had the power of making treaties, for example, been omitted, however necessary it might have been, the defect could only have been lamented, or supplied by an amendment of the Constitution.

So Judge Story, in his Commentaries,† lays it down:

"On the other hand, a rule of equal importance is, not to enlarge the construction of a given power beyond the fair scope of its terms, merely because the restriction is inconvenient, impolitic, and even mischievous. If it be mischievous, the power of redressing the evil lies with the people by an exercise of the power of amendment. If they do not choose to apply the remedy, it may fairly be presumed that the mischief is less than what would arise from a further extension of the power, or that it is the least of two evils. Nor should it be ever lost sight of that the government of the United States is one of limited and enumerated powers; and that a departure from the true import and sense of its powers is, *pro tanto, the establishment of a new Constitution. It is doing for the people what they have not chosen to do for themselves.* It is usurping the functions of a legislator and deserting those of an expounder of the law. Arguments drawn from impolicy or inconvenience ought here to be of no

---

* 1 Annals of Congress, p. 1900.          † § 426.

weight. The only sound principle is to declare, '*ita lex scripta est*,' to follow and obey."

So Mr. Webster said, in reply to Hayne:

"The people, sir, erected this government. They gave it a Constitution, and in that Constitution they have enumerated the powers which they have bestowed on it. They have made it a limited government. They have defined its authority."

And so distinctly was this recognized as to draw from Chief Justice Marshall, in *McCulloch* v. *Maryland*, the sharp reproof:

"This government is acknowledged by all to be one of enumerated powers. The principle that it can exercise only the powers granted to it would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge. That principle is now universally admitted."

And so this court, in other cases,* declared that

"The people had a right to prohibit to the States the exercise of any powers which were, in their judgment, incompatible with the objects of the general compact; to make the powers of the State government, in given cases, subordinate to those of the nation, or *to reserve to themselves those sovereign authorities which they might not choose to delegate to either.*

"The sovereignty of the States is surrendered, in many instances, where the surrender can only operate to the benefit of the people, and where, perhaps, no other power is conferred on Congress than a conservative power to maintain the principles established in the Constitution. The maintenance of these principles, in their purity, is certainly among the great duties of the government. One of the instruments by which this duty may be peaceably performed is the judicial department."

So far, however, from the power of making the promises of the government a legal substitute for the thing promised having been regarded as a necessity of government when this government was established, it seems to me impossible

---

* Cohens *v.* Virginia, per Marshall, C. J.; Martin *v.* Hunter, per Story, J.

to review the history of the times without being convinced that this power was not only not regarded as a necessity, but rather as an evil to be forbidden.

V. *The history of the Constitution and of the country indicates that this power was not intended to be exercised at all, but was reserved to the people.*

Looking to the history of the Constitution, how natural and probable it is that the power, in respect to legal tender, now claimed by the Federal government, was not intended to be granted to it. The union of the Confederation was established for the same purpose as the present Union. It was equally to be "perpetual." By the Articles of Confederation, the Confederation had the identical powers given it in respect of money which the Constitution gives to our Federal government. And yet when, during the sore needs of the Revolution, it did issue treasury notes, and wished to make them legal tender, it found itself powerless to do so.* The States, however, generally made their bills a tender; and with the result, Judge Story says, of prostrating all private credit and all private morals, " entailing the most enormous evils on the country, and introducing a system of fraud, chicanery, and profligacy which destroyed all private confidence, and all industry and enterprise."†

Indeed, the framers of the Constitution had themselves experienced the mischief of these experiments, which were in the Convention declared " to have excited the disgust of all the respectable part of America." [The learned counsel here referred to the action of the Convention which framed the Constitution in striking out the clause authorizing the emission of bills on the credit of the United States, and in adopting the clause restricting the States from issuing bills of credit; and especially Mr. Madison's remark as to the first matter, that it would "cut off the pretext for making them a tender;" to the declaration of the Federalist (No. 44), and to the debates of the State conventions held to

---

* Story's Commentaries on the Constitution, § 1360.    † Ib. § 1371.

ratify the Constitution.* He also quoted the opinion of this court in *United States* v. *Marigold,*† *Craig* v. *Missouri,*‡ *Ogden* v. *Saunders,*§ *Fox* v. *Ohio,*‖ *Briscoe* v. *Bank of. Kentucky,*¶ and also to the strongly-expressed declaration of Mr. Webster. As these authorities are quoted in the opinion of the dissenting justices,** they are here omitted.]

To recapitulate:

The Articles of Confederation gave the same power to the Confederation that the Constitution gives to Congress, to coin money and regulate the value thereof. Nevertheless, the Confederation never assumed to make treasury notes a legal tender.

The States did make their own notes a legal tender, and with results which disgusted the people.

Accordingly, when the Convention met that framed the existing Constitution, they struck out of the draft the power emit bills on the credit of the United States, in order, as . Madison says, that it might not be a pretext for declarg such bills a tender.

They took from the States the power of making anything but gold and silver a tender, and even refused to permit its. exercise with the permission of Congress.

It was declared in every State whose debates on adopting the Constitution are reported, that paper money was to be put an end to.

For several years, in the direst needs of the country, Congress not only never asserted any right to make treasury notes a legal tender, but, by the nature of its legislation, has indicated that it had no power to even materially debase the coin of the republic, or stamp it with false and arbitrary values.

During these years this court has spoken of the legal tender as pernicious, and has pronounced the money power a trust delegated to Congress to maintain a pure metallic standard.

---

* 1 Elliott, Id. 492; 5 Id. 435, 485; 3 Id. 486; 4 Id. 184, 185, 436; 2 Id.. 290, 291, 471, 478; Yates's Minute, 39–40.

† 9 Howard, 567.      ‡ 4 Peters, 434.      § 12 Wheaton, 288.
‖ 5 Howard, 433.      ¶ 11 Peters, 317.      ** See *infra.*

Not only Mr. Madison thought Congress had no power to make paper a tender, but Mr. Webster thought so; and the power has been frequently denied in Congress, and prior to the law in question never contended for.

No framer of the Constitution, no judge, no commentator, is found prior to this law who claimed any such power for Congress.

With the clause giving it power to coin money and regulate the value thereof, Congress received also power to *fix the standard of weights and measures;* and, as the Federalist* declared, on like considerations with the previous power of regulating coin, which considerations, it added, were to provide for the harmony and proper intercourse among the States. But can Congress fix a standard, and then reduce its pound to eight ounces, its foot to six inches, its acre to two roods, and thus provide that no man shall collect upon his contracts, and that no one need pay more than one-half of what was bargained for? And if Congress cannot do this arbitrarily and by itself, can it regulate the standard of weights and measures, by making sales of licenses which would give to the holder, for every dollar paid, a right to abate or increase an ounce, or an inch, or a rod, in every contract of sale he had made? And yet the right to fix weights and measures is a sovereign right and prerogative, as well as the right to coin money and regulate the value thereof.

VI. *This legal tender power was not proper, nor consistent with the letter or spirit of the Constitution, and was prohibited.*

In seeking to show that an auxiliary power, to be implied, must have in itself some particular relation to and fitness for the exercise of the delegated power or powers to which it is claimed to be incident, I have been treating the question as if these were the only considerations required. But, indeed, that is not all; not only must the auxiliary power be appropriate, and plainly adapted to the exercise of the

---

\* No. 42.

delegated power, but the end must be legitimate, and within the scope of the Constitution as well; and the means must not merely be appropriate and plainly adapted to such an end, *but must also be not prohibited.*

But the dissenting judges in *Hepburn* v. *Griswold**[*] have said that "the argument is too vague for their perception, by which the indirect effect of a great public measure in depreciating the value of lands, stocks, bonds, and other contracts, renders such a law invalid as taking private property for public use, or as depriving the owner of it without due process of law." But in its effects upon the creditor, this provision does not operate indirectly, but directly. If the issue of treasury notes, without this provision, by inflating or depressing prices and values, by making money easy or hard to realize, affected creditors, that would be a case in which the evil resulting from the indirect action of a public measure could not be considered as impairing its authority. But in this case, the power which enabled debtors to discharge pre-existing debts by treasury note promises, instead of real dollars—discharge their debts by paying one-half or three-fourths of the amount due, according to the rate at which treasury notes could be procured—operated not indirectly, but directly on the creditors' rights; was the sale of a license to let men pay in short measures.

We are told that the government has power when prosecuting a war to seize any man's property, burn any man's barns, raze any man's house. And so it has when these operations are necessarily exercised in the course of the actual prosecution of the war. But an officer carrying on war in Carolina has, therefore, no authority to raze a house in Illinois; still less to raze every house throughout the country. His authority to destroy is limited to property *immediately necessary* to be destroyed in the prosecution of the war; and for the property so taken or destroyed, government becomes liable.[†] Government has indeed power to take the property of citizens to carry on war, but it is a

---

[*] 8 Wallace, 637.    [†] Mitchell *v.* Harmony, 13 Howard, 134.

constitutional power, to be exercised by government, by taxation, or other method prescribed by the Constitution; not by the sale of licenses to let one man wrong another. Nor is a wrong the less a wrong because enacted as a part of a great public measure, instead of by private act. Is my property any the less unjustly taken, any the less taken without process of law, because taken by a general law instead of by a special one? Surely the injustice of the act does not depend on the number of persons affected by it. The Constitution did not declare it should not be lawful to take private property for public use, nor deprive persons of property without compensation, except generally, and by great public acts. On the contrary, it declares it shall not be done at all, nor to any person.

Those judges of this court who concurred in that opinion have presented,* as analogous cases, the discharge of the creditors' claim by a bankrupt court, depreciating the value of his vessels by a declaration of war, reducing the worth of his furnaces or of his mills by a change in the tariff; and have declared that these measures would be subject, equally with this legal tender provision, to the objection that they are unconstitutional, as taking private property without compensation. And they would indeed be unconstitutional as coming within this very provision, but for the vital distinction; among others, that they happen, each one of them, to be *expressly* authorized by the Constitution. Can it need argument to show the distinction between the effect of a general prohibition in an instrument upon a power expressly authorized, and upon one only implied? The people expressly delegated to this government certain powers; among them was the express power to " declare war," although it would depreciate the value of ships; to "establish a system of bankruptcy," although it would discharge the debtor from his liability to his creditor; to " lay and collect, and remit duties and imports," although they should enhance or diminish the value of furnaces and mills. They delegated,

---

* 8 Wallace, 637.

also, to the government the power to "make all laws necessary and proper to carry into execution" the granted powers. And then to make sure that powers should not be implied beyond those granted which might impair private rights, they added the provision that "no person should be deprived of life or property without due process of law, nor should private property be taken without just compensation." Had the Constitution conferred upon Congress the express power to make treasury notes a legal tender in discharge of pre-existing debts, then, I grant that the analogy between the cases suggested and the case of legal tender would have been competent, and I should then no more be here contending that this prohibition against the taking of private property prevented the issue of such notes than I am contending that it prevents a declaration of war, the establishment of a system of bankruptcy, or the change of tariff. But it is exactly because the express power given in every one of these instances is wanting in this instance, and is sought to be implied, and because it is the settled rule that a power to be implied as an auxiliary to a delegated power must be "not prohibited," that I assert against the implication of the legal tender provision the prohibition which the Constitution imposes.

VII. *This law impairs the obligation of contracts.*

The court, on the late argument of this question in *Hepburn* v. *Griswold*, were all agreed that the legal tender provision did impair the obligation of pre-existing contracts. But a portion of the court declared that this was not forbidden to Congress, and that, in some cases, it was expressly authorized. I am not unmindful of the impression that has prevailed among the profession in this respect; and I beg to point out the misapprehension I think has existed as to this.*

---

* It has been said that this law does not impair the obligation of contracts, because, in all agreements to pay mere dollars, the creditor takes the risk of what the law may declare to be dollars. But this is to beg the question of power to work such injustice. Indeed, until such law is established or expected, the risk of it cannot be said to enter into the contract.

In the course of a cause tried in 1816,* in the Circuit Court in Philadelphia, Mr. Justice Washington is reported to have made the interlocutory remark that Congress was not restricted from impairing the obligation of contracts. This remark has been since frequently quoted without either approval or disapproval. It is a singular instance of a casual observation, passing for years unaffirmed and unchallenged by all the great commentators upon the Constitution. This was said in reference to a grant by the Federal government of a patent for an invention. If it meant that Congress was at liberty to recall its voluntary grant, I shall not dispute it. If it even meant that the government was not compelled to keep its own contracts, I need not dispute it, for government can never be coerced. It can only be sued according to its own provisions; and whether it be or be not constitutional for government to extinguish its contracts without fully performing them, it nevertheless remains that the creditor can in no event recover anything more than the government chooses he shall have. The remark does not indeed imply that Congress had any such general power; but only that it was not restricted by any such limitation in the exercise of its particularly granted powers.

That the power to impair the obligation of contracts is not generally forbidden to Congress in express terms, I admit. It was unnecessary, upon the theory of the Constitution, to have so forbidden it. That such power in the case of bankrupts is expressly authorized, and not therefore to be taken as forbidden by the general prohibitions in favor of private rights, I also admit. But that it is not withheld or otherwise forbidden, I deny. It is, except in the authorized cases, indeed forbidden, by the very nature of the instrument, from the fact that it is *not* authorized. It is forbidden by those amendments which forbid the infringement of private rights and property. It is forbidden by the scheme and object of the instrument, which it itself declares was "to establish justice and secure the blessings of liberty."

---

* Evans *v* Eaton, 1 Peters's Circuit Court, 323.

Thirteen States met to form a common government. Before such meeting, and except as then formed, this government had no existence. Certain powers were invested for the general advantage in the hands of what Marshall, C. J., in *McCulloch* v. *Maryland*, called the common agent; what Daniels, J., in *Fox* v. *Ohio*, called the common arbiter. Such of these powers as were important to be exercised for the general good, like the power to make war, maintain a navy, enter into treaties, and the like, were conferred on the agent, and were forbidden to the States; others were left concurrently to both; still others were forbidden to both. Among the powers of the States when they thus met was the power to impair the obligation of contracts; but only within their respective limits. New York had no power to impair contracts in Delaware, but only in New York; nor had Delaware power to impair contracts in New York, but only in Delaware. Now, the whole history of the time shows this was regarded as a dangerous power; as a power to be limited even between the States and their own citizens—*not to be extended throughout all.* It was, therefore, forbidden to the States. In particular cases of general concern, the power was expressly granted to the Federal government. But to assume it was otherwise granted, and to imply it, because expressly forbidden to the States and not to the Federal government, is to reverse the whole spirit and purpose of the times; to turn a restraint upon a limited evil into permission to make it general. Since then, except in these specific instances, when, before this legal tender law, has Congress claimed to exercise such a power? Has it ever been suggested that Congress can direct divorces—can authorize a man to discharge a contract for one hundred bushels of wheat by delivering fifty, or fulfil a contract to convey one thousand acres of land by conveying nine hundred? We all know it cannot.

Indeed, that Congress has power to impair the obligations of private contract is absolutely without authority. I find no court that has so decided. On the contrary, the very

reverse has been declared by this very court, and other high constitutional authorities.*

If Congress possesses, by implication, this power to impair the obligation of contracts, why was authority to establish a uniform system of bankruptcy expressly granted to it?· If Congress took this sovereign power in any case without express grant, surely it would be in connection with bankruptcies, where it might be regarded in some aspects as a regulation of commerce, and as, indeed, in the interest of creditors generally. As Marshall, C. J., remarked, "the bankrupt law had been said to grow out of the exigencies of commerce, and to be applicable solely to traders." The Federalist† refers to the grant of power to establish a uniform system of bankruptcy "as so intimately connected with the regulation of commerce, and so preventive of frauds, that its expediency was not likely to be drawn into question." That such a power was regarded as necessary‡ to be specifically granted, establishes, I maintain, that the Federal government took by the Constitution, even as it was before the restrictive amendments were added, no general power of impairing the obligation of contracts.

And when the dissenting judges of this bench declared, in *Hepburn* v. *Griswold,* "that it is difficult to perceive how it can be in accordance with the spirit of the Constitution to destroy directly the creditors' contract for the sake of the individual debtor, but contrary to its spirit to affect remotely its value for the safety of the nation," I answer that in the one case it is in accordance with this spirit, because it is so expressly declared and provided; and in the other it is not in accordance with it, because it is not provided for at all, but is in violation of its general restrictions,—a discrimination which, recalling those provisions of the Constitution, I submit it is not difficult to perceive; difficult, indeed, not to perceive.

---

* Wilkinson *v.* Leland, 2 Peters, 646, 657 ; Calder *v.* Bull, 3 Dallas, 386 ; Sturges *v.* Crowninshield, 4 Wheaton, 206 ; Ogden *v.* Saunders, 12 Id. 269, 270, 312, 303, 304, 327, 331, 336, 354; Federalist, No. 44.

† No. 42.                             ‡ 12 Wheaton, 274.

This whole question, however, of the power of Congress to impair the obligation of contracts depends upon the other question of what power Congress can take by implication; returns, indeed, to the pivotal question of whether Congress is a body of absolute or limited powers. And here let me remark, that it seems to me very immaterial whether it be considered that it is for Congress to determine what means are necessary and proper to carry into effect the delegated powers, and that its decision is not subject to revision here, or whether it be that this court is the ultimate judge, if it be decided that any means are appropriate to the exercise of any of the delegated powers which make the government stronger. The one conclusion would relieve Congress from all restraint but that of its own judgment; the other conclusion would relieve it from all but the express limitations of the Constitution. If by the assertion of the discretion of Congress it be meant that when the end is legitimate, and within the scope of the Constitution, and a choice of appropriate means exists, Congress is the sole judge of which to select among those means, and that its judgment in such selection is not open to review, I shall not deny it. But to hold that Congress, in selecting the means to carry into effect any of the delegated powers, may select means not authorized, not necessary nor proper, not appropriate nor plainly adapted, and can make them appropriate *simply by its selection of them,* is to make the power of Congress generally absolute.

On the other hand, a decision by this court that Congress, in order to raise armies or execute any of its enumerated powers, may exercise any other powers that make the government stronger, without regard to the fitness of its measures to such delegated powers; that it may take any power by which strength is gained to execute the delegated power as *therefore incidental* to those powers—whether really fit or not, and whether coming within the general prohibition of the Constitution or not—is a doctrine which equally makes Congress absolute, and leaves it—except as to the provisions especially forbidden in the Constitution itself—without check

or limitation; and makes much of the great bill of rights contained in the amendments of no effect.

It was indeed because, as Strong, J., maintained in the Pennsylvania cases,* there might be powers not enumerated, not even means to execute the delegated powers which might be claimed as resulting from the Constitution, and which would transcend the limits intended to be fixed by the Constitution, that the people insisted upon the amendment and inserted their general declaration, which properly, as I maintain, prevents Congress from taking, by implication, any power to deprive persons of property without process of law.

What do the amendments to the Constitution provide? Not particularly that Congress shall not impair the obligations of contracts; not particularly that it shall not intervene to declare what shall be a legal tender in discharge of pre-existing debts between citizens of any State; but they provide that private property shall not be taken for public use without just compensation, nor any person be deprived of property without due process of law. But this legal tender clause takes the creditor's property to the extent of one portion of his right of action; takes it, to be sure, not directly to the public use, but, as asserted, takes it because of the public necessities, and gives it to the debtor; equally takes it from the creditor, and takes it from him without any compensation. So, too, this legal tender clause deprives the creditor of his property to the extent of one portion of his debt, of his chose in action, without due, or any, process of law. By what authority is this done? Not by the express authority of the Constitution; for that is not pretended. Not surely by its implied authority; for authority to be implied must be " not prohibited, within the scope of the Constitution, consistent with its letter and spirit." But this act which thus strips the creditor of his property without process of law is absolutely prohibited. It establishes injustice, and cannot therefore be consistent with the letter of the

---

* 52 Pennsylvania State, 2 P. F. Smith, 114.

Constitution; establishes injustice, and therefore is flatly opposed to its whole scope and purpose—cannot therefore possibly be implied.

NOW AS TO THE SECOND PROPOSITION, as to which the court has directed argument—that is, the effect of this legal tender provision of the law upon subsequent transactions.

It is to be observed that the Constitution contains nothing whatever in respect to tender except that it limits the States against making anything but gold and silver coin a tender in payment of debts. But whether the tender f r debts should be of gold or silver, and of which of the coins of either or both, it is left with the States to declare. No limitation as to the class of coins which might be adopted for that purpose was imposed. Indeed, at that time our decimal system was not established. No such coins as those we use existed, and various descriptions of coin and methods of account prevailed in all the States. Congress early established a decimal system, and, under its power of coining money and regulating the value thereof, coined moneys according to that system, with the dollar as the unit of account and coinage, and regulated the relative value of different foreign coins with the dollar by weight. The dollar thus coined thereupon became, *ex necessitate*, even without any express law, a lawful tender for contracts calling for such dollars, just as wheat, and wheat only, is a lawful tender for a contract for wheat, and wine for a contract for wine, since it alone complies with and satisfies the contract. The States having made no other coins a tender in payment of debts, and having all adopted the Federal system of account and reckoning, the dollar has thus remained not only the universal tender in payment of such debts, but has become also the universal unit of calculation, upon which all damages are estimated and all recoveries of money are made. Subsequently the government issued its notes, also called dollars, and they went into universal circulation. Of course, contracts calling either expressly or by implication for these treasury-note dollars are satisfied and discharged by the pay-

ment of the requisite number of them; and this because they meet and satisfy the contract—are what the contract requires. Sovereigns would not satisfy such a contract; neither would they satisfy a contract for specie dollars; nor would any description of dollars satisfy a contract for sovereigns. When, therefore, a man has a contract upon which dollars are due, the first question must be, what description of dollars is meant by it? If these treasury-note dollars, then the stipulated number of them will satisfy the contract, and will satisfy it equally whether such notes be or be not a lawful " tender in payment of debts," unless, indeed, these treasury notes are wholly unauthorized and invalid.

If it were an open question, I should be disposed to think that Congress had no power to issue bills of credit. Looking at the history of the times; at the action of the Convention which framed the Constitution; at the declarations of the men who participated in that Convention; at the general opinion throughout the States when the Constitution was first considered, it does certainly seem to have been intended that no power of issuing paper money should be given to Congress at all. None the less, the power to borrow money does embrace the power to issue obligations for the money borrowed, and can, perhaps, be taken of itself to sustain the issue by the government of its bills of credit. The power was regarded as existing by many very early in the history of the government, and in 1812 the government did put out its treasury notes, which circulated as money, although not declared a legal tender. This course of action was repeated in 1837, 1842, 1861, and has been continued and sustained by this court. So that whatever might have been originally the proper determination of that question, it is now too late to assume that the Federal government does not possess the power to issue bills of credit, and that they are not valid. Being valid, they will of course lawfully discharge any contract made expressly payable in them; and any contract which, although not so particularly expressed, now implies that it is made payable in them. That is, any contract simply expressed in " dollars," which is the term which now

distinguishes these notes from coined, or, as they are gen-
erally styled, specie dollars.  So, too, when the courts come
to allow recoveries upon contracts calling for treasury-note
dollars, they can give judgment for their payment, and this,
whether they be or not the tender in payment of debts au-
thorized by the Constitution, just as the court can enter a
decree for hay on a contract for hay.  Whether, therefore,
these treasury notes are a lawful tender in payment of debts
in the sense of the Constitution, or not, it is nevertheless
true that they are, and may properly continue, a medium of
exchange; and that contracts can be met by and recoveries
had in them.

Nevertheless, when the courts come to turn contracts and
claims into judgment debts; when they come to assess dam-
ages, and allow recoveries for wrongs, the question remains,
can they do so in this treasury-note dollar; or, is it no law-
ful money for such purposes, and must the court make their
calculations, allow their damages, and state their judgments
in the coin of the country as the only authorized constitu-
tional standard of value?

My ox has been converted.  Its value is $100 specie or
$110 treasury-note dollars.  A recovery by me of the given
amount of either of those dollars would be just, and make
me whole.  And it may not, therefore, seem of much public
importance whether recoveries in law should be had and
reckonings made in specie dollars, as customary on the Pa-
cific coast (where they quoted "greenbacks" at a discount),
or in treasury-note dollars, as on the Atlantic side (where
specie is quoted at a premium).  And yet, can anything be
of greater public importance than to have the value of every
transaction measured by a certain, instead of a fluctuating
standard?

Nevertheless, whatever its importance, the question of
power in Congress to make these notes a tender in payment
of debts remains.

If Congress has such power, where is it granted?  To
what delegated power can it properly be regarded as aux-
iliary?  I can find none.  It is true that making these notes

a legal tender for subsequent transactions does not impair private rights, as it must if they be regarded a tender for pre-existing debts. The presumption against the power is not, therefore, so strong in the former as in the latter case, and yet the question of power remains. Where was it conferred upon Congress? I repeat, I cannot find that it has been conferred at all. The power given Congress by the Constitution to coin money and regulate the value thereof, and of foreign coins, and to provide for punishing the counterfeiting of the securities and current coin of the United States; the analogous power given it to fix the standard of weights and measures; and the restriction upon the power of the States against making anything but gold and silver coin a tender in payment of debts, all combine to establish that the government has no power to make any legal tender whatever except the coin that it strikes. The action of the Convention which framed the Constitution, the discussion by which it was recommended to the people, the debates in the State conventions by which it was adopted, and the whole record of the times combine also to establish that the power to make bills of credit a tender was not intended to be given to the Federal government at all; but that, on the contrary, it was intended and believed to be wholly beyond the power of either States or Union. Story says in his Commentaries:*

"The prohibition to 'emit bills of credit' cannot, perhaps, be more forcibly vindicated than by quoting the glowing language of the Federalist—a language justified by that of almost every contemporary writer, and attested in its truth by facts from which the mind involuntarily turns away at once with disgust and indignation."

This prohibition, as we have seen, met the warmest approbation of the Federalist,† and was evidently considered by the author to prevent all legal tender paper and all substitutes for coin. The Federalist further declared‡ that:

"The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen

* Sec. 1358.          † No. 44.          ‡ Ib.

with regret and indignation that sudden changes and legis-
lative interferences in cases affecting personal rights became jobs
in the hands of enterprising and influential speculators, and
snares to the more industrious and less-informed part of the
community.  They have seen, too, that one legislative interfer-
ence is but the first link in a long chain of repetitions, every
subsequent interference being naturally provoked by the effects
of the preceding.  They very rightly infer, therefore, that some
thorough reform is wanting, which will banish speculations on
public measures, inspire a general prudence and industry, and
give a regular course to the business of society."

In *Craig* v. *The State of Missouri*,* Marshall, C. J., said,
speaking of paper money:

"Such a medium has been always liable to considerable fluc-
tuation.  Its value is continually changing; and these changes,
often great and sudden, expose individuals to immense loss; are
the sources of ruinous speculations, and destroy all confidence
between man and man.  *To cut up this mischief by the roots—a
mischief which was felt through the United States, and which deeply
affected the interest and prosperity of all*—the people declared in
their Constitution that no State should emit bills of credit."

And so Judge Washington in *Ogden* v. *Saunders*:†

"This policy was, to provide a fixed and uniform standard of
value throughout the United States, by which the commercial
and other dealings between the citizens thereof, or between them
and foreigners, as well as the moneyed transactions of the gov-
ernment, shall be regulated.  And why establish a standard at
all for the government of the various contracts which might be
entered into, if those contracts might afterward be discharged
by a different standard, or by that which is not money?"

Why was the power of fixing the standard of weights and
measures given to Congress but to enable it to fix a *general
and uniform standard of weights and measures ?*  Why was the
power of coining money and regulating the value thereof,
and of foreign coin, given to Congress, except to enable it
to provide a *fixed and uniform standard of value ?*  And yet
you cannot have a measure of weights that have no weight,

---

* 4 Peters, 432.                    † 12 Wheaton, 265.

nor a standard of measure without length. How, then, can you have a uniform standard of value without value? A substance that constantly fluctuated in weight, or that would not weigh—like gas—could not be made a standard of weight. An elastic and variable measure could not properly be made the standard of measures. How, therefore, can Congress, under this power to establish a uniform system of coinage and values, select as the standard of value, not a coin at all, but a fluctuating and changeable unit; not even a thing at all, but only the promise of a thing? This power of coining money was intrusted to Congress, and restrictions were put upon the States, in order to secure "uniformity of value, and to preclude a fluctuating and variable currency." The people, when called upon to sacrifice their right to issue bills of credit, and make anything but gold and silver a tender, did so for the same end. This court has never spoken of the power of Congress except as a trust to maintain the uniformity and purity of the standard of value. Under that trust, and that alone, Congress seeks to establish a standard of value, neither pure nor uniform. On the contrary, a standard without any intrinsic value whatever; forever fluctuating and uncertain, and affecting with those qualities all transactions in it in arithmetical proportion to their magnitude—a standard which, instead of affording certainty and uniformity of value, invites forever to uncertainty, to speculation, and extravagance. This is not what the Constitution granted to Congress. It is exactly what it forbade to the States—exactly what the wise men who framed this government never intended either State or Federal government should possess, and what no statesman from the foundation of the government to the introduction of this law had ever claimed for it.

The question before the court is no mere question for to-day, when the two currencies are nearly equivalent in value,*

---

* Gold was at the time of this argument worth about 10 per cent. more than the notes of the United States, called " legal tenders." There had been a time, during the rebellion, when it was worth 185 per cent. more.—REP.

but it is a question whether this supreme tribunal will establish, as the permanent standard for the dealings, values, and engagements of this great nation, something without intrinsic value at all—a forever fluctuating and uncertain unit.

The importance of the question is that its decision depends upon, and must determine, the powers of Congress in respect of private rights. For if Congress may impair the obligation of contracts in this respect, it may in other respects; and the obligation of contracts is among the most important subject as to which Congress can legislate. It is, as Chief Justice Marshall well said, a power which comes 'home to every man; touches the interest and controls the credit of all. What was true in that regard at the foundation of the government, when the fathers saw the importance of limiting such power, is vastly more true now, when our property is so extensively represented in notes, bills, bonds, coupons, mortgages, and other money obligations.

The decision by this court that Congress can use the legal tender provision as a means to any delegated power, leaves Congress as much at liberty to use it as an auxiliary to borrowing money, or to regulating commerce, as to levying war. It will thus be, that whenever the great corporate and moneyed interests of the country wish to wrong their creditors, they will create a necessity which shall compel the issue of these notes; while, whenever the creditors would wrong the debtors, they will struggle to repeal the law making these notes a tender. It was the feeling created by the decision that such notes would not be legal tender for preexisting debts which, more than anything, I think, tended to deter the lower House of the last Congress from passing a bill to increase their issue.

Who can deny that a whole community is being demoralized, as under such a system of paper money communities everywhere and at all times have been demoralized? Who can deny that men will do now what they would have shrunk from ten years ago, before this system existed? When the wicked prosper, other men make haste to do like-

wise. And now, not from the cities only, but from every part, men seek the great marts to try their fortune in the ventures of the hour, hoping to gather where they have not strewn. Gambling in stocks, with the dangerous combinations it invites, and the corruption which it encourages, has become general; so that it is deemed venial to artificially inflate or depress prices, to create fictitious values by forced scarceness, or undue depression by combined attacks. And whatever danger may come to the public debt of this great country, will come, not from the unwillingness of the people to pay; not from their want of ability to pay; but will come, if it shall come at all, from the recklessness of a people carrying out their schemes upon the waves of an inflated currency, and from the demoralization which such speculations produces. How can it be expected that this people will make the sacrifices necessary to enable their government to keep its pledged faith, when it has not only failed to keep its own faith with its creditors, but has filled its coffers from the sale of licenses to men to wrong each other by short payments, and has made haste to ratify, by the decision of its supreme tribunal, the constitutionality and righteousness of such a course?

It is said that the course of action and decisions, since this law was passed, has been favorable to its validity. To the action of Congress, in this respect, I do not attach weight. There were various opinions in Congress as to its power, and the time was one of doubt and danger, illy suited to the consideration of that question. As Mr. Gouverneur Morris said, in his famous letter to Mr. Pickering, "The legislative lion will never be confined in the meshes of a logical net." And legislators will always find it in their consciences to consider that measure constitutional which they wish to adopt.

As to the decisions of the State courts, though the majority were in favor of the law—only Kentucky and Indiana being adverse—they were almost all by divided courts, and in all there were indications that these decisions were given doubtfully and in view of the existing crisis, and with the feeling

that the ultimate determination of the question of power should, under the circumstances, be left to this tribunal.

There was, however, a decision on this subject in Rhode Island, in 1786, in the case of *Trevitt* v. *Weldon.* That State had issued bills of credit and made them a tender, and fixed a penalty for refusing to receive them at their nominal value. Mr. Weldon refused, and was prosecuted for the penalty, and the Rhode Island court held the legal tender provision unauthorized on the same general principles which were declared by this court in *Wilkinson* v. *Leland*, also from that State. And for that decision the judges lost their office.

This court rather avoided the consideration of the question until forced upon it after the determination of the Kentucky Court of Appeals in *Griswold* v. *Hepburn.* When, however, that case had been argued and submitted here, the court, at the suggestion of the government, ordered it to stand over to be reheard, when counsel, than whom there were none more eminent in the country, were heard in favor of the validity of the provision. After which the court, being then *a full court,* held the case under advisement, until, in February, 1870, when it decided that the law was invalid in respect of pre-existing debts.

Here let me remark that I think Judge Grier was right, in the view he took of the act, as not applying to precedent contracts. I see no principle of construction by which this statute—if it be considered that Congress has the constitutional power to issue notes which shall be a legal tender in discharge of pre-existing debts—should be held to embrace such debts. The law contains no necessary expression of the kind. True, it provides that the notes shall be a tender for all debts except customs and bonded interest. This was, however, a distinction necessary for subsequent debts. Indeed, since there were relatively few debts due for customs or bonded interest at the time of the passage of this act, this distinction would rather indicate that it was meant to apply only to subsequent debts. But surely, if the power to impair private rights is not to be taken to exist without very strong

and direct expression, where it does exist, it should not be presumed that the legislature intended to exercise it without like clear and positive expression.

I shall say nothing to this high tribunal as to the general importance to courts of justice of the maxim of *stare decisis.* Those judges who have been longest here know best how carefully and wisely it has adhered to that maxim.

It has been urged upon the court to review the legal tender question in these cases, in order to settle the law as to the abstract power of Congress to make treasury notes a legal tender in discharge of pre-existing debts. But how can the court thus settle the question? Should you affirm the former decision, you would indeed settle it; but should you overrule that decision without change in the opinions of the justices who have heretofore passed upon the question, how then will you have settled it? What can then result but to leave this question open for the future, and destroy the consistency and influence of the court?

It is the high and peculiar function of this supreme tribunal that it has not merely to determine questions of right between private parties, but even to pronounce upon the validity of the laws themselves. And why was this momentous and delicate duty committed to this great court by the people but for the belief that by its wise and independent judgments those disputes as to the powers of government, which, under a limited government, based upon a written compact, must unavoidably arise, would be likely to be most wisely and certainly settled? Now, whatever importance there may be in the doctrine of *stare decisis* in the determination of questions of private rights, it is to a tribunal charged with the determination of the limits of the power of government that certainty and consistency are absolutely essential. For more than seventy years this supreme tribunal, by the high character and learning of its members, by its rare and practical wisdom, and, above all, by its uniform, cautious, and consistent course, has so secured the respect and confidence of this people as to be able, in the stormiest times, to successfully establish the limits upon the rights and powers

of the States and of the General government. To now, for the first time in its history, so gratuitously and needlessly review an abstract constitutional question so solemnly decided; to review it, not because of changes or doubts on the part of those who shared in the decision, but through a change in the composition of the court, is to divert the regard of the people from the court itself to the *personnel* of those who compose it; and would, as it seems to me, be in effect to abdicate the highest function with which your honors are intrusted. For men cannot be expected to submit their views of the powers of government to the construction of this tribunal when they once learn that, after a construction has been most solemnly established, they can change that construction by changing the persons who compose the tribunal.

Those of us who, in the words of the late Thaddeus Stevens, "believe, as all should believe, that the judiciary is the most important department of the government, and that great, wise, and pure judges are the chief bulwark of the lives, liberty, and rights of the people," will then, indeed, have reason to fear that the court, in reviewing this question, will, so far from having actually and finally settled the principle of constitutional law involved, the rather have unsettled it; and, in so unsettling it, have unsettled also the grounds for the confidence and submission of this people under the determination by this tribunal of constitutional questions.

*Mr. Akerman, Attorney-General, contra :*

Two questions are submitted. The first, as the chief one, will be chiefly considered. If that is decided affirmatively the second must be so answered also.

According to the uniform custom, when the powers of

---

* A brief which had been filed in the case of Latham *v.* The United States, a real or supposed legal tender case, which having been withdrawn by the appellant (9 Wallace, 145), never came to hearing,—that brief being the same that had been filed in Hepburn *v.* Griswold,—was also submitted and relied on by Mr. Akerman, here.

Congress are questioned, the court is told that ours is a limited government, and that Congress has no powers but what are derived from the Constitution. In the words of the vexed patriarch, "Who knoweth not such things as these?" Of course the court will not sustain the legislation in question, unless it finds authority for it in the Constitution, either expressly given or fairly implied.

It would be wonderful that a government formed in modern times and for a commercial people; and in large measure the offspring of commercial wants, should not be provided with all the powers on the subject of money—that indispensable instrument of commerce—which have been possessed by the governments of other commercial nations. The world's experience did not fall into barren soil when it was cast by history into the minds of the men who framed the Constitution of the United States. Many of them were well versed in financial history. All of them had seen their country undergo a memorable financial experience. Thus instructed, they went to their work. They gave to Congress express powers on the subject of money. They laid Congress under no express restrictions on the subject of money. The only restrictions which they imposed in this matter were upon the States. They are in these words:

"No State shall make anything but gold and silver coin a tender in payment of debts."

From this clause—the only place in the Constitution where tender is named—a mind guided by the rules of strict construction, and jealous of national power, might derive the doctrine that the right to prescribe a legal tender is in the States only. This doctrine would have a stronger foundation in the letter of the Constitution than most of the propositions which are seriously put forth against the validity of the legal tender act. But it has no advocates; at least none whose views deserve consideration in this court. It would encounter invincible reasoning, fortified by the practice of the government from a very early date. Congress has never hesitated to enact what should be a legal

tender in payment of debts.    The right thus-to enact has
been assumed in twenty-four statutes, passed in the presi-
dencies of Washington, Jefferson, Madison, Monroe, Jack-
son, Tyler, Polk, Fillmore, Pierce, Lincoln, and Johnson.

Before the act now in question the authorized tenders
were all in metallic coin; but under modifications in purity
and value according to the pleasure of Congress.' Debts
contracted when money was of a certain degree of purity,
have been made dischargeable in money of the same nomi-
nal value, but of less purity, and. therefore of less intrinsic
value.    Counsel on the other side has attempted to show
that this statement, which has often been made in dis-
cussions of this subject, is not correct.  He goes into an
analysis of the statutes, and while he admits that coins of
certain denominations have been debased, he affirms that.
the quantity of pure silver in the dollar coin has remained
unchanged.    This fact, if demonstrated, does not answer
his end.    It does not disprove that a man who lent ten eagles
at one time might afterwards, by the force of an intervening
act of Congress, be compelled to take in satisfaction of the
principal of that loan ten eagles of 6 per cent. less intrinsic
value.    This legislation assumes that, in contemplation of
law, money of every species has the value which the law
fixes on it; that Congress has the constitutional power to
say that 10 pennyweights of silver shall henceforth be the
dollar, and do the office hitherto done by 17 pennyweights
and $4\frac{1}{2}$ grains.

We have been told that the practice thus established is
not pertinent to the present argument: First, because the
extent of debasement has been small.  Secondly. Because
the currency with which these liberties were taken remained
metallic through all the changes.

The right to debase cannot depend on the extent of the
debasement.   If the right exists, it is bounded only by the
pleasure of Congress.   In this matter questions of constitu-
tional right are not questions of more or less.   Congress at
one time has said that a gold coin of a certain weight and fine-
ness shall be worth ten silver dollars, and a legal tender for

that sum. Congress has afterwards said that a coin containing less of gold shall be worth ten silver dollars, and a legal tender for that sum. The power to make this debasement to the extent of 6 per cent., and to give to the debased coin the quality of a legal tender for precontracted debts, involves the power to carry the debasement to the extent of 60 per cent., and to give the same quality to the coin thus debased. And it is difficult to see the difference in constitutional principle when the article on which a legal value is fixed, and which is made a legal tender, is the nation's paper promise to pay, now worth in the market over nine-tenths of its legal value in coin, and certain, if the nation keeps its faith, to be ultimately worth its par in coin.

Some men appear to consider that there is a peculiar constitutional virtue in metal, whether gold, silver, nickel, or copper. According to them, what is a crime against the Constitution, if done in paper, may be innocently done in metal. The obligation of contracts may be impaired, in metal. The dictates of justice may be disobeyed, in metal. A man may be lawfully compelled to take, in metal, a fraction in value of what he contracted for. The scope for the discretion of Congress is unlimited within the metallic field. That sensitive being, always invoked in such discussions, whom they denominate "the spirit of the Constitution," though enraged by the rustle of paper, is lulled to repose by the clink of metal, however base.

The Constitution nowhere declares that nothing shall be money unless made of metal. Congress has enacted that these treasury notes shall be lawful money. Nobody questions here the power to issue them and to give them some of the qualities of money. This power has been expressly admitted by this court. With certain exceptions, they are receivable for all dues to the government, and payable for all dues from the government, old and new. The largest creditor in the land, the government, is bound to take them. The largest debtor in the land, the government, pays in them. The creditors of the United States (except holders of bonds and of interest-bearing notes) must take them or

nothing. Nobody maintains that they are not "money" in the sense in which that word is used in some places in the Constitution. "No appropriation of money" [to the use of raising and supporting armies] "shall be for a longer term than two years."* This provision would certainly be violated by an appropriation of treasury notes to the support of the army for three years. "No money shall be drawn from the treasury but in consequence of appropriations made by law."† Treasury notes could not be drawn from the treasury without such appropriation. The regular statement "of the receipts and expenditures of all public money," which the same section requires to be published from time to time, would be incomplete if treasury notes were left out.

These notes, then, are money, for most purposes, between the government and the citizen. It is argued, however, that they are not money between citizen and citizen for all the purposes for which Congress has made them such; that though Mr. Davis (a party now before the court) might be allowed by Congress to discharge a debt to the government contracted in 1857 with treasury notes, he cannot be allowed by Congress to discharge a debt of the same date to Mr. Parker with the same currency; that a debt which he owes to the collective American people is less sacred than a debt which he owes to one of them. Hence, it follows, from the reasoning of opposing counsel, that what can be made money, in the constitutional sense of the word, for some purposes, cannot be made money for other purposes. The singularity of the conclusion suggests that there must be a fallacy in the logic.

The supporters of the legal tender provision are called on to show the authority for it in the Constitution. To this call different responses have been made.

Some have found the authority in the power to coin money and regulate its value. They think that the word "coin" is here used in the large sense—to make, to fabricate; and the meaning of the word "money" is not limited

* Art. 1, § 8.                    † Ib. § 9.

to metallic coinage, but extends to everything which had been in general use as money, or which may answer the purposes of money—a definition which will embrace a government's promises to pay, of a form and denomination designed for circulation as currency. They maintain that an article may be money for some uses or for all, at the will of the power that creates it; that one sort of money may be good to pay duties on imports and another to pay for public lands; that one sort may be a legal tender for all debts and another for debts of a certain kind or amount, as Congress may determine. Probably this view was in the mind of Congress when the act of 1862 was framed, and suggested the words, "shall be lawful money." Perhaps it was in the mind of the statesman who then had charge of the national finances, who issued the legal tender notes, and who afterwards, in vindicating this policy before the people, said: "Under these circumstances I coined the credit of the nation."*

But this derivation of the required power, though supported by strong reason and respectable authority, has received less of professional and judicial favor than the derivation from the power "to make all laws which shall be necessary and proper for carrying into execution all powers vested by the Constitution in the government of the United States, or in any department or officer thereof."†

Among the admitted powers which the act in question is believed to aid in executing, are the powers of borrowing money on the credit of the United States, of declaring war, of suppressing insurrection, of raising and supporting armies, and of providing and maintaining a navy. The power to borrow money carries with it the power to give to the lender an evidence of the debt thus created, and to strengthen the loan with incidents and adjuncts making it the more attractive in the market. And it is one of these incidents that the evidences of the debt shall perform the offices of money between government and citizen, and between man and man.

---

* Hon. S. P. Chase, at Louisville, Ky., in 1864.          † Art. 1, § 8.

Counsel on the other side has insisted that the value of treasury notes is not increased by the circumstance that they are legal tender. One might as well say that a commodity is not increased in value by the opening of a new market for it. The more uses there are for an article, the greater is its value. A bank whose notes are in demand for many purposes is (other things being equal) in better credit than one whose notes will do fewer services to the holder. The credit of the United States is better when its promises will pay debts than when they will not. At least such was the judgment of Congress, from whose judgment on questions of expediency there is no appeal to the judiciary.

Whenever the extent of "the auxiliary powers" of Congress is in controversy, those who take the most restricted view are in the habit of quoting the following paragraph from Marshall, C. J., in *McCulloch* v. *The State of Maryland:*

"Let the end be legitimate, let it be within the scope of the Constitution, and all the means which are appropriate, which are plainly adapted to that end, which are not prohibited, but are consistent with the letter and spirit of the Constitution, are constitutional."

It is assumed, rather inconsiderately, that Marshall, C. J., held all means not coming within this description to be unconstitutional. Such is not the fact. In *United States* v. *Fisher*,[*] his language was, "any means which are, in fact, conducive to the exercise of a power granted by the Constitution." In another part of the opinion in the case of *McCulloch* v. *The State of Maryland*, his language was, "any means calculated to produce the end." These words are less restrictive than the first quotation.

Returning to that quotation, let us apply the rule there laid down to the matter in hand. It has not been denied here that the ends for which this currency was issued, and for which it was made a legal tender, were legitimate and within the scope of the Constitution. Insurrection could not be suppressed, armies could not be raised and supported,

---

[*] 2 Cranch, 358.

and a navy could not be provided and maintained, without a currency. This court has pronounced it within the undisputed power of Congress to provide a currency for the country consisting largely of treasury notes.\* There is no pretence that the means in question are prohibited.

But it is affirmed with confidence that the means are not consistent with the letter and spirit of the Constitution. The means consist in the issue of the notes as a currency and in the imparting to them the faculties of paying dues to and from the government, and of legal tender. If it is consistent with the letter and spirit of the Constitution to issue these notes as a currency, to protect them against a rival currency (which is held to be authorized in the case of the Veazie Bank), and to give them many of the ordinary faculties of money, it is difficult to see how the letter and spirit of the Constitution are violated when another of those faculties is given to them.

The opponents of the power which we maintain lay most stress upon that part of C. J. Marshall's definition of the allowable means which describes them as "appropriate and plainly adapted to the end." That the issuing of a paper currency on the credit of the United States was an appropriate and plainly adapted means of maintaining the government during the insurrection is not questioned. That this currency should, by law, be made to do most of the offices of money, even as the term "money" is used in the Constitution, seems to be of admitted constitutionality. But to go a step further, and to complete the investiture of this currency with the attributes of money, our friends on the other side think carries us beyond the region of "appropriate and plainly adapted means." Soliciting a judicial opinion adverse to that of the legislature on a question of appropriateness and adaptation of means, they go into financial discussion, and argue that the usefulness of the treasury notes was not increased by making them a legal tender. So the question of constitutionality, in their view, is to be

---

\* Veazie Bank v. Fenno, 8 Wallace, 549.

determined by the agreement or disagreement of the court
with the legislature in opinion upon finance, a subject on
which men differ as much as on theology. This view has
been pressed in the thorough argument to which we have
listened, with an earnestness that permits no doubt that it
is seriously taken.

But unless the court is prepared to say that the means
cannot, in good faith, be supposed by Congress to have any
adaptation to the proposed end, it cannot pronounce them
unconstitutional. The individual judgment of judges in re-
gard to their expediency should not be substituted for that
of Congress. This court cannot say that the means now in
question lay without the field of examination when the in-
strumentalities to the desired end were to be chosen. This
admitted, the privilege of selection is with Congress. Within
that field Congress is supreme. This court may consider the
question of congressional power, but not the question of
congressional wisdom. If Congress may issue a currency
as an appropriate means to lawful ends, it may, in its discre-
tion, give to that currency few, many, or all of the faculties
of money.

The main objection to this mode of reasoning is that it
goes very far. So it does. It leads to the conclusion that
Congress has a great deal of power. A government without
power is contemptible. The men who made this govern-
ment intended that it should have strength enough to main-
tain its own existence, and to accomplish the ends for which
it was made. The mainspring of a government is in the
department that makes the laws, and there the Constitution
has wisely reposed power sufficient for national exigencies.
In relation to money and contracts, the Constitution is jealous
of the States, but shows no jealousy of Congress. Power in
Congress is as little liable to abuse as power elsewhere. Of
course, there is a possibility of abuse in the imperfection of
man; and an argument against a claimed power, on the
ground of this possibility, is an argument against all govern-
ment. Every legislature, state or national, can do infinite
harm by abusing its trust, and yet keep within its constitu-

tional limits. Congress, at any session, if disposed to mischief, could reduce the country to misery by the exercise of express and undoubted powers. It could declare pernicious wars. It could impose oppressive taxes. But these great powers have never been exercised to the country's ruin. We have had, and I hope we shall continue to have, sufficient safeguards in the character and accountability of the members and their identity in interest with the people on whom their laws bear. The same safeguards stand against the abuse of the auxiliary powers.

The counsel on the other side says that now, after nine years' experience in war and peace, it is manifest that there was no necessity for giving to the treasury notes the faculty of legal tender. Without admitting that such is the lesson of this experience, I must deny that the constitutionality of an act of Congress can be determined by events subsequent to its passage. A statute which is constitutional if it shall work well, and unconstitutional if it shall work ill, would be a novelty in legislation. The counsel probably meant to lay down no such rule. Yet this part of his argument is baseless without such a rule. This question ought to be decided now as it would have been decided in 1862. The Constitution is not variable. Where Congress has a choice of means, the validity of its action cannot be affected by the correctness or incorrectness of its judgment in choosing.

Opposing counsel quotes the felicitous expression of Mr. Clay, that " the principal and the incidental power ought to be congenial to each other." This doctrine contravenes no part of our argument. There is a kinship between the coining of money and the making of that money a legal tender. There is a kinship between the borrowing of money and the issuing of a currency made valuable by being invested with all the faculties of money, in evidence of that borrowing. There is a kinship between supporting armies and paying the soldiers in a valuable currency. And so on, through the long list of good services which this currency has performed, the congeniality required by Mr. Clay is abundantly manifest.

Mr. Webster is also quoted by the counsel on the other side, and it is true that he expressed himself very emphatically against the power of Congress to make paper a legal tender. Admitting that great respect is due to the opinion of that eminent but not infallible man, I am at liberty to suggest that the authors of the act in question had an experience in public necessities which was wanting to him, and that his inexorable proposition that there can be no legal tender in this country but gold and silver is clearly wrong. This proposition would forbid the use in coinage of a metal better adapted than gold or silver to the purposes of coinage, should such a metal be discovered. We may not know all that is in the bowels of the earth. The discovery of such a metal would not be stranger than the discovery of the gold fields of California.

The counsel quotes from the debates in the Federal Convention of 1787 to show that members of that body were opposed to making paper a legal tender. The very quotations prove that the members considered that the power to emit bills of credit involved the power to make them a legal tender, and hence they struck out of the draft of the Constitution the power to emit bills. But it is no uncommon experience that the words of a constitution or statute are found, in their fairest interpretation, to import more than their authors distinctly designed. It is not given to man, when framing a constitution, to foresee all the cases to which the conferred powers will properly extend. And in this very matter, notwithstanding that the power to emit bills of credit was struck out, this court has held that the power exists; and why, then, does it not exist with all that in 1787 was supposed to belong to it?*

The counsel says that not much inconvenience will be caused to debtors by holding the legal tender act invalid, because most of the debts existing in 1862 have been already paid in treasury notes. This is, in effect, to say to those creditors who trusted the government in dark hours, that

---

* 5 Elliott, 432.

they were the victims of a foolish confidence; to declare that, in future national embarrassments, the most selfish men will come out best. The decision which he desires will favor the churls and disfavor the patriots.

It has been urged also that the decision in *Hepburn* v. *Griswold* should be held final under the doctrine of *res adjudicata*, independently of the merits of that decision. But circumstances, the absence of a court as large as now,* lessened the force of that decision, and induced a great portion of the legal profession to desire a reconsideration of the question. Moreover in that case the question of the validity of the legal tender act, as to debts contracted after its passage, was not decided, and a discussion of this question involves the whole subject. Indeed this doctrine of *res adjudicata* is against the position of opposing counsel, inasmuch as the court, by ordering the present argument, has adjudged that the question is still open.

On the first of May, 1871, judgment in both the cases, as already mentioned in 11th Wallace, p. 682, was AFFIRMED;

---

* By act of March 3d, 1863 (12 Stat. at Large, 794), the court was ordered to consist of ten members; a new member being then added. By act of July 23d, 1866 (14 Id. 209), "to fix the number of judges of the Supreme Court of the United States," &c., it was enacted "that no vacancy in the office of associate justice shall be filled by appointment until the number of associates shall be reduced to six, and thereafter the Supreme Court shall consist of a chief justice and six associate justices." By an act of 10th April, 1869 (16 Id. 44), to take effect from the first Monday of December, 1869, it was enacted that the court should consist of a chief justice and eight associates, and that for the purposes of this act there should be appointed an additional judge. Hepburn v. Griswold, it is stated in the opinion of the court in the case, was decided in conference November 27th, 1869 (8 Wallace, 626), there being then eight judges (the chief justice and seven associates) on the bench, the lowest number to which the court had been reduced. One of them, Justice Grier, resigned February 1st, 1870. The judgment in Hepburn v. Griswold was announced from the bench and entered February 7th, 1870. Mr. Justice Strong was appointed February 18th, 1870, and Mr. Justice Bradley March 21st, 1870; and the order for the present argument was made by, and the argument itself heard before, the court of nine, as constituted by the act of 10th April, 1869.

the CHIEF JUSTICE, with NELSON, CLIFFORD, and FIELD, JJ., dissenting.

On the 15th January, 1872,—till which time, in order to promote the convenience of some of the dissentient members of the court, the matter had been deferred,—the opinion of the court, with concurring or dissenting opinions from the Chief Justice and different Associate Justices, was delivered.

Mr. Justice STRONG delivered the opinion of the court.

The controlling questions in these cases are the following: Are the acts of Congress, known as the legal tender acts, constitutional when applied to contracts made before their passage; and, secondly, are they valid as applicable to debts contracted since their enactment? These questions have been elaborately argued, and they have received from the court that consideration which their great importance demands. It would be difficult to overestimate the consequences which must follow our decision. They will affect the entire business of the country, and take hold of the possible continued existence of the government. If it be held by this court that Congress has no constitutional power, under any circumstances, or in any emergency, to make treasury notes a legal tender for the payment of all debts (a power confessedly possessed by every independent sovereignty other than the United States), the government is without those means of self-preservation which, all must admit, may, in certain contingencies, become indispensable, even if they were not when the acts of Congress now called in question were enacted. It is also clear that if we hold the acts invalid as applicable to debts incurred, or transactions which have taken place since their enactment, our decision must cause, throughout the country, great business derangement, widespread distress, and the rankest injustice. The debts which have been contracted since February 25th, 1862, constitute, doubtless, by far the greatest portion of the existing indebtedness of the country. They have been contracted in view of the acts of Congress declaring treasury

notes a legal tender, and in reliance upon that declaration. Men have bought and sold, borrowed and lent, and assumed every variety of obligations contemplating that payment might be made with such notes. Indeed, legal tender treasury notes have become the universal measure of values. If now, by our decision, it be established that these debts and obligations can be discharged only by gold coin; if, contrary to the expectation of all parties to these contracts, legal tender notes are rendered unavailable, the government has become an instrument of the grossest injustice; all debtors are loaded with an obligation it was never contemplated they should assume; a large percentage is added to every debt, and such must become the demand for gold to satisfy contracts, that ruinous sacrifices, general distress, and bankruptcy may be expected. These consequences are too obvious to admit of question. And there is no well-founded distinction to be made between the constitutional validity of an act of Congress declaring treasury notes a legal tender for the payment of debts contracted after its passage and that of an act making them a legal tender for the discharge of all debts, as well those incurred before as those made after its enactment. There may be a difference in the effects produced by the acts, and in the hardship of their operation, but in both cases the fundamental question, that which tests the validity of the legislation, is, can Congress constitutionally give to treasury notes the character and qualities of money? Can such notes be constituted a legitimate circulating medium, having a defined legal value? If they can, then such notes must be available to fulfil all contracts (not expressly excepted) solvable in money, without reference to the time when the contracts were made. Hence it is not strange that those who hold the legal tender acts unconstitutional when applied to contracts made before February, 1862, find themselves compelled also to hold that the acts are invalid as to debts created after that time, and to hold that both classes of debts alike can be discharged only by gold and silver coin.

The consequences of which we have spoken, serious as

they are, must be accepted, if there is a clear incompatibility between the Constitution and the legal tender acts. But we are unwilling to precipitate them upon the country unless such an incompatibility plainly appears. A decent respect for a co-ordinate branch of the government demands that the judiciary should presume, until the contrary is clearly shown, that there has been no transgression of power by Congress—all the members of which act under the obligation of an oath of fidelity to the Constitution. Such has always been the rule. In *Commonwealth* v. *Smith*,* the language of the court was, "It must be remembered that, for weighty reasons, it has been assumed as a principle, in construing constitutions, by the Supreme Court of the United States, by this court, and by every other court of reputation in the United States, that an act of the legislature is not to be declared void unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt;" and, in *Fletcher* v. *Peck*,† Chief Justice Marshall said, "It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to be considered void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." It is incumbent, therefore, upon those who affirm the unconstitutionality of an act of Congress to show clearly that it is in violation of the provisions of the Constitution. It is not sufficient for them that they succeed in raising a doubt.

Nor can it be questioned that, when investigating the nature and extent of the powers conferred by the Constitution upon Congress, it is indispensable to keep in view the objects for which those powers were granted. This is a universal rule of construction applied alike to statutes, wills, contracts, and constitutions. If the general purpose of the instrument is ascertained, the language of its provisions must be construed with reference to that purpose and so as to subserve

---

* 4 Binney, 123.                              † 6 Cranch, 87.

it. In no other way can the intent of the framers of the in-
strument be discovered. And there are more urgent reasons
for looking to the ultimate purpose in examining the powers
conferred by a constitution than there are in construing a
statute, a will, or a contract. We do not expect to find in a
constitution minute details. It is necessarily brief and com-
prehensive. It prescribes outlines, leaving the filling up to
be deduced from the outlines. In *Martin* v. *Hunter*,* it was
said, " The Constitution unavoidably deals in general lan-
guage. It did not suit the purpose of the people in framing
this great charter of our liberties to provide for minute
specifications of its powers, or to declare the means by which
those powers should be carried into execution." And with
singular clearness was it said by Chief Justice Marshall, in
*McCulloch* v. *The State of Maryland*,† "A constitution, to
contain an accurate detail of all the subdivisions of which
its great powers will admit, and of all the means by which
it may be carried into execution, would partake of the pro-
lixity of a political code, and would scarcely be embraced by
the human mind. It would probably never be understood
by the public. Its nature, therefore, requires that only its
great outlines should be marked, its important objects des-
ignated, and the minor ingredients which compose those
objects be deduced from the nature of the objects them-
selves." If these are correct principles, if they are proper
views of the manner in which the Constitution is to be
understood, the powers conferred upon Congress must be
regarded as related to each other, and all means for a
common end. Each is but part of a system, a constituent
of one whole. No single power is the ultimate end for
which the Constitution was adopted. It may, in a very
proper sense, be treated as a means for the accomplishment
of a subordinate object, but that object is itself a means de-
signed for an ulterior purpose. Thus the power to levy
and collect taxes, to coin money and regulate its value, to
raise and support armies, or to provide for and maintain

---

* 1 Wheaton, 326.                                    † 4 Id. 405.

a navy, are instruments for the paramount object, which was to establish a government, sovereign within its sphere, with capability of self-preservation, thereby forming a union more perfect than that which existed under the old Confederacy.

The same may be asserted also of all the non-enumerated powers included in the authority expressly given "to make all laws which shall be necessary and proper for carrying into execution the specified powers vested in Congress, and all other powers vested by the Constitution in the government of the United States, or in any department or officer thereof." It is impossible to know what those non-enumerated powers are, and what is their nature and extent, without considering the purposes they were intended to subserve. Those purposes, it must be noted, reach beyond the mere execution of all powers definitely intrusted to Congress and mentioned in detail. They embrace the execution of all other powers vested by the Constitution in the government of the United States, or in any department or officer thereof. It certainly was intended to confer upon the government the power of self-preservation. Said Chief Justice Marshall, in *Cohens* v. *The Bank of Virginia*,* "America has chosen to be, in many respects and to many purposes, a nation, and for all these purposes her government is complete; for all these objects it is supreme. It can then, in effecting these objects, legitimately control all individuals or governments within the American territory." He added, in the same case: "A constitution is framed for ages to come, and is designed to approach immortality as near as mortality can approach it. Its course cannot always be tranquil. It is exposed to storms and tempests, and its framers must be unwise statesmen indeed, if they have not provided it, as far as its nature will permit, with the means of self-preservation from the perils it is sure to encounter." That would appear, then, to be a most unreasonable construction of the Constitution which denies to the government created by it, the right to

---

* 6 Wheaton, 414.

employ freely every means, not prohibited, necessary for its preservation, and for the fulfilment of its acknowledged duties. Such a right, we hold, was given by the last clause of the eighth section of its first article. The means or instrumentalities referred to in that clause, and authorized, are not enumerated or defined. In the nature of things enumeration and specification were impossible. But they were left to the discretion of Congress, subject only to the restrictions that they be not prohibited, and be necessary and proper for carrying into execution the enumerated powers given to Congress, and all other powers vested in the government of the United States, or in any department or officer thereof.

And here it is to be observed it is not indispensable to the existence of any power claimed for the Federal government that it can be found specified in the words of the Constitution, or clearly and directly traceable to some one of the specified powers. Its existence may be deduced fairly from more than one of the substantive powers expressly defined, or from them all combined. It is allowable to group together any number of them and infer from them all that the power claimed has been conferred. Such a treatment of the Constitution is recognized by its own provisions. This is well illustrated in its language respecting the writ of habeas corpus. The power to suspend the privilege of that writ is not expressly given, nor can it be deduced from any one of the particularized grants of power. Yet it is provided that the privileges of the writ shall not be suspended except in certain defined contingencies. This is no express grant of power. It is a restriction. But it shows irresistibly that somewhere in the Constitution power to suspend the privilege of the writ was granted, either by some one or more of the specifications of power, or by them all combined. And, that important powers were understood by the people who adopted the Constitution to have been created by it, powers not enumerated, and not included incidentally in any one of those enumerated, is shown by the amendments. The first ten of these were suggested in the conventions of

the States, and proposed at the first session of the first Congress, before any complaint was made of a disposition to assume doubtful powers. The preamble to the resolution submitting them for adoption recited that the "conventions of a number of the States had, at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and *restrictive* clauses should be added." This was the origin of the amendments, and they are significant. They tend plainly to show that, in the judgment of those who adopted the Constitution, there were powers created by it, neither expressly specified nor deducible from any one specified power, or ancillary to it alone, but which grew out of the aggregate of powers conferred upon the government, or out of the sovereignty instituted. Most of these amendments are denials of power which had not been expressly granted, and which cannot be said to have been necessary and proper for carrying into execution any other powers. Such, for example, is the prohibition of any laws respecting the establishment of religion, prohibiting the free exercise thereof, or abridging the freedom of speech or of the press.

And it is of importance to observe that Congress has often exercised, without question, powers that are not expressly given nor ancillary to any single enumerated power. Powers thus exercised are what are called by Judge Story in his Commentaries on the Constitution, resulting powers, arising from the aggregate powers of the government. He instances the right to sue and make contracts. Many others might be given. The oath required by law from officers of the government is one. So is building a capitol or a presidential mansion, and so also is the penal code. This last is worthy of brief notice. Congress is expressly authorized "to provide for the punishment of counterfeiting the securities and current coin of the United States, and to define and punish piracies and felonies committed on the high seas and offences against the laws of nations." It is also empowered to declare the punishment of treason, and provision is made for impeachments. This is the extent of power to punish crime

expressly conferred. It might be argued that the expression of these limited powers implies an exclusion of all other subjects of criminal legislation. Such is the argument in the present cases. It is said because Congress is authorized to coin money and regulate its value it cannot declare anything other than gold and silver to be money or make it a legal tender. Yet Congress, by the act of April 30, 1790, entitled "An act more effectually to provide for the punishment of certain crimes against the United States," and the supplementary act of March 3d, 1825, defined and provided for the punishment of a large class of crimes other than those mentioned in the Constitution, and some of the punishments prescribed are manifestly not in aid of any single substantive power. No one doubts that this was rightfully done, and the power thus exercised has been affirmed by this court in *United States* v. *Marigold.* * This case shows that a power may exist as an aid to the execution of an express power, or an aggregate of such powers, though there is another express power given relating in part to the same subject but less extensive. Another illustration of this may be found in connection with the provisions respecting a census. The Constitution orders an enumeration of free persons in the different States every ten years. The direction extends no further. Yet Congress has repeatedly directed an enumeration not only of free persons in the States but of free persons in the Territories, and not only an enumeration of persons but the collection of statistics respecting age, sex, and production. Who questions the power to do this?

Indeed the whole history of the government and of congressional legislation has exhibited the use of a very wide discretion, even in times of peace and in the absence of any trying emergency, in the selection of the necessary and proper means to carry into effect the great objects for which the government was framed, and this discretion has generally been unquestioned, or, if questioned, sanctioned by this court. This is true not only when an attempt has been

---

* 9 Howard, 560.

made to execute a single power specifically given, but equally true when the means adopted have been appropriate to the execution, not of a single authority, but of all the powers created by the Constitution. Under the power to establish post-offices and post-roads Congress has provided for carrying the mails, punishing theft of letters and mail robberies, and even for transporting the mails to foreign countries. Under the power to regulate commerce, provision has been made by law for the improvement of harbors, the establishment of observatories, the erection of lighthouses, breakwaters, and buoys, the registry, enrolment, and construction of ships, and a code has been enacted for the government of seamen. Under the same power and other powers over the revenue and the currency of the country, for the convenience of the treasury and internal commerce, a corporation known as the United States Bank was early created. To its capital the government subscribed one-fifth of its stock. But the corporation was a private one, doing business for its own profit. Its incorporation was a constitutional exercise of congressional power for no other reason than that it was deemed to be a convenient instrument or means for accomplishing one or more of the ends for which the government was established, or, in the language of the first article, already quoted, "necessary and proper" for carrying into execution some or all the powers vested in the government. Clearly this necessity, if any existed, was not a direct and obvious one. Yet this court, in *McCulloch* v. *Maryland*,[*] unanimously ruled that in authorizing the bank, Congress had not transcended its powers. So debts due to the United States have been declared by acts of Congress entitled to priority of payment over debts due to other creditors, and this court has held such acts warranted by the Constitution.[†]

This is enough to show how, from the earliest period of our existence as a nation, the powers conferred by the Constitution have been construed by Congress and by this court whenever such action by Congress has been called in ques-

---

[*] 4 Wheaton, 416.　　[†] Fisher *v.* Blight, 2 Cranch, 358.

tion. Happily the true meaning of the clause authorizing the enactment of all laws necessary and proper for carrying into execution the express powers conferred upon Congress, and all other powers vested in the government of the United States, or in any of its departments or officers, has long since been settled. In *Fisher* v. *Blight*,* this court, speaking by Chief Justice Marshall, said that in construing it "it would be incorrect and would produce endless difficulties if the opinion should be maintained that no law was authorized which was not indispensably necessary to give effect to a specified power. Where various systems might be adopted for that purpose it might be said with respect to each that it was not necessary because the end might be obtained by other means." " Congress," said this court, " must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution. The government is to pay the debt of the Union and must be authorized to use the means which appear to itself most eligible to effect that object. It has, consequently, a right to make remittances by bills or otherwise, and to take those precautions which will render the transaction safe." It was in this case, as we have already remarked, that a law giving priority to debts due to the United States was ruled to be constitutional for the reason that it appeared to Congress to be an eligible means to enable the government to pay the debts of the Union.

It was, however, in *McCulloch* v. *Maryland* that the fullest consideration was given to this clause of the Constitution granting auxiliary powers, and a construction adopted that has ever since been accepted as determining its true meaning. We shall not now go over the ground there trodden. It is familiar to the legal profession, and, indeed, to the whole country. Suffice it to say, in that case it was finally settled that in the gift by the Constitution to Congress of authority to enact laws " necessary and proper" for the execution of all the powers created by it, the necessity spoken

* 2 Cranch, 358.

of is not to be understood as an absolute one. On the contrary, this court then held that the sound construction of the Constitution must allow to the national legislature that discretion with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Said Chief Justice Marshall, in delivering the opinion of the court: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." The case also marks out with admirable precision the province of this court. It declares that "when the law (enacted by Congress) is not prohibited and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department and to tread on legislative ground. This court (it was said) disclaims all pretensions to such a power." It is hardly necessary to say that these principles are received with universal assent. Even in *Hepburn* v. *Griswold*,[*] both the majority and minority of the court concurred in accepting the doctrines of *McCulloch* v. *Maryland* as sound expositions of the Constitution, though disagreeing in their application.

With these rules of constitutional construction before us, settled at an early period in the history of the government, hitherto universally accepted, and not even now doubted, we have a safe guide to a right decision of the questions before us. Before we can hold the legal tender acts unconstitutional, we must be convinced they were not appropriate means, or means conducive to the execution of any or all of the powers of Congress, or of the government, not appropriate in any degree (for we are not judges of the degree of appropriateness), or we must hold that they were prohibited.

---

[*] 8 Wallace, 603.

This brings us to the inquiry whether they were, when enacted, appropriate instrumentalities for carrying into effect, or executing any of the known powers of Congress, or of any department of the government. Plainly to this inquiry, a consideration of the time when they were enacted, and of the circumstances in which the government then stood, is important. It is not to be denied that acts may be adapted to the exercise of lawful power, and appropriate to it, in seasons of exigency, which would be inappropriate at other times.

We do not propose to dilate at length upon the circumstances in which the country was placed, when Congress attempted to make treasury notes a legal tender. They are of too recent occurrence to justify enlarged description. Suffice it to say that a civil war was then raging which seriously threatened the overthrow of the government and the destruction of the Constitution itself. It demanded the equipment and support of large armies and navies, and the employment of money to an extent beyond the capacity of all ordinary sources of supply. Meanwhile the public treasury was nearly empty, and the credit of the government, if not stretched to its utmost tension, had become nearly exhausted. Moneyed institutions had advanced largely of their means, and more could not be expected of them. They had been compelled to suspend specie payments. Taxation was inadequate to pay even the interest on the debt already incurred, and it was impossible to await the income of additional taxes. The necessity was immediate and pressing. The army was unpaid. There was then due to the soldiers in the field nearly a score of millions of dollars. The requisitions from the War and Navy Departments for supplies exceeded fifty millions, and the current expenditure was over one million per day. The entire amount of coin in the country, including that in private hands, as well as that in banking institutions, was insufficient to supply the need of the government three months, had it all been poured into the treasury. Foreign credit we had none. We say nothing of the overhanging paralysis of trade, and of business gener-

ally, which threatened loss of confidence in the ability of the government to maintain its continued existence, and therewith the complete destruction of all remaining national credit.

It was at such a time and in such circumstances that Congress was called upon to devise means for maintaining the army and navy, for securing the large supplies of money needed, and, indeed, for the preservation of the government created by the Constitution. It was at such a time and in such an emergency that the legal tender acts were passed. Now, if it were certain that nothing else would have supplied the absolute necessities of the treasury, that nothing else would have enabled the government to maintain its armies and navy, that nothing else would have saved the government and the Constitution from destruction, while the legal tender acts would, could any one be bold enough to assert that Congress transgressed its powers? Or if these enactments did work these results, can it be maintained now that they were not for a legitimate end, or "appropriate and adapted to that end," in the language of Chief Justice Marshall? That they did work such results is not to be doubted. Something revived the drooping faith of the people; something brought immediately to the government's aid the resources of the nation, and something enabled the successful prosecution of the war, and the preservation of the national life. What was it, if not the legal tender enactments?

But if it be conceded that some other means might have been chosen for the accomplishment of these legitimate and necessary ends, the concession does not weaken the argument. It is urged now, after the lapse of nine years, and when the emergency has passed, that treasury notes without the legal tender clause might have been issued, and that the necessities of the government might thus have been supplied. Hence it is inferred there was no necessity for giving to the notes issued the capability of paying private debts. At best this is mere conjecture. But admitting it to be true, what does it prove? Nothing more than that

Congress had the choice of means for a legitimate end, each appropriate, and adapted to that end, though, perhaps, in different degrees. What then? Can this court say that it ought to have adopted one rather than the other? Is it our province to decide that the means selected were beyond the constitutional power of Congress, because we may think that other means to the same ends would have been more appropriate and equally efficient? That would be to assume legislative power, and to disregard the accepted rules for construing the Constitution. The degree of the necessity for any congressional enactment, or the relative degree of its appropriateness, if it have any appropriateness, is for consideration in Congress, not here. Said Chief Justice Marshall, in *McCulloch* v. *Maryland*, as already stated, "When the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground."

It is plain to our view, however, that none of those measures which it is now conjectured might have been substituted for the legal tender acts, could have met the exigencies of the case, at the time when those acts were passed. We have said that the credit of the government had been tried to its utmost endurance. Every new issue of notes which had nothing more to rest upon than government credit, must have paralyzed it more and more, and rendered it increasingly difficult to keep the army in the field, or the navy afloat. It is an historical fact that many persons and institutions refused to receive and pay those notes that had been issued, and even the head of the treasury represented to Congress the necessity of making the new issues legal tenders, or rather, declared it impossible to avoid the necessity. The vast body of men in the military service was composed of citizens who had left their farms, their workshops, and their business with families and debts to be provided for. The government could not pay them with ordinary treasury notes, nor could they discharge their debts

with such a currency. Something more was needed, something that had all the uses of money. And as no one could be compelled to take common treasury notes in payment of debts, and as the prospect of ultimate redemption was remote and contingent, it is not too much to say that they must have depreciated in the market long before the war closed, as did the currency of the Confederate States. Making the notes legal tenders gave them a new use, and it needs no argument to show that the value of things is in proportion to the uses to which they may be applied.

It may be conceded that Congress is not authorized to enact laws in furtherance even of a legitimate end, merely because they are useful, or because they make the government stronger. There must be some relation between the means and the end; some adaptedness or appropriateness of the laws to carry into execution the powers created by the Constitution. But when a statute has proved effective in the execution of powers confessedly existing, it is not too much to say that it must have had some appropriateness to the execution of those powers. The rules of construction heretofore adopted, do not demand that the relationship between the means and the end shall be direct and immediate. Illustrations of this may be found in several of the cases above cited. The charter of a Bank of the United States, the priority given to debts due the government over private debts, and the exemption of Federal loans from liability to State taxation, are only a few of the many which might be given. The case of *Veazie Bank* v. *Fenno** presents a suggestive illustration. There a tax of ten per cent. on State bank notes in circulation was held constitutional, not merely because it was a means of raising revenue, but as an instrument to put out of existence such a circulation in competition with notes issued by the government. There, this court, speaking through the Chief Justice, avowed that it is the constitutional right of Congress to provide a currency for the whole country; that this might be done by coin, or United States

---

* 8 Wallace, 533.

notes, or notes of National banks; and that it cannot be questioned Congress may constitutionally secure the benefit of such a currency to the people by appropriate legislation. It was said there can be no question of the power of this government to emit bills of credit; to make them receivable in payment of debts to itself; to fit them for use by those who see fit to use them in all the transactions of commerce; to make them a currency uniform in value and description, and convenient and useful for circulation. Here the substantive power to tax was allowed to be employed for improving the currency. It is not easy to see why, if State bank notes can be taxed out of existence for the purposes of indirectly making United States notes more convenient and useful for commercial purposes, the same end may not be secured directly by making them a legal tender.

Concluding, then, that the provision which made treasury notes a legal tender for the payment of all debts other than those expressly excepted, was not an inappropriate means for carrying into execution the legitimate powers of the government, we proceed to inquire whether it was forbidden by the letter or spirit of the Constitution. It is not claimed that any express prohibition exists, but it is insisted that the spirit of the Constitution was violated by the enactment. Here those who assert the unconstitutionality of the acts mainly rest their argument. They claim that the clause which conferred upon Congress power " to coin money, regulate the value thereof, and of foreign coin," contains an implication that nothing but that which is the subject of coinage, nothing but the precious metals can ever be declared by law to be money, or to have the uses of money. If by this is meant that because certain powers over the currency are expressly given to Congress, all other powers relating to the same subject are impliedly forbidden, we need only remark that such is not the manner in which the Constitution has always been construed. On the contrary it has been ruled that power over a particular subject may be exercised as auxiliary to an express power, though there is another express power relat-

ing to the same subject, less comprehensive.* There an express power to punish a certain class of crimes (the only direct reference to criminal legislation contained in the Constitution), was not regarded as an objection to deducing authority to punish other crimes from another substantive and defined grant of power. There are other decisions to the same effect. To assert, then, that the clause enabling Congress to coin money and regulate its value tacitly implies a denial of all other power over the currency of the nation, is an attempt to introduce a new rule of construction against the solemn decisions of this court. So far from its containing a lurking prohibition, many have thought it was intended to confer upon Congress that general power over the currency which has always been an acknowledged attribute of sovereignty in every other civilized nation than our own, especially when considered in connection with the other clause which denies to the States the power to coin money, emit bills of credit, or make anything but gold and silver coin a tender in payment of debts. We do not assert this now, but there are some considerations touching these clauses which tend to show that if any implications are to be deduced from them, they are of an enlarging rather than a restraining character. The Constitution was intended to frame a government as distinguished from a league or compact, a government supreme in some particulars over States and people. It was designed to provide the same currency, having a uniform legal value in all the States. It was for this reason the power to coin money and regulate its value was conferred upon the Federal government, while the same power as well as the power to emit bills of credit was withdrawn from the States. The States can no longer declare what shall be money, or regulate its value. Whatever power there is over the currency is vested in Congress. If the power to declare what is money is not in Congress, it is annihilated. This may indeed have been intended. Some powers that usually belong to sovereignties were extin-

---

* United States v. Marigold, 9 Howard, 560.

guished, but their extinguishment was not left to inference. In most cases, if not in all, when it was intended that governmental powers, commonly acknowledged as such, should cease to exist, both in the States and in the Federal government, it was expressly denied to both, as well to the United States as to the individual States. And generally, when one of such powers was expressly denied to the States only, it was for the purpose of rendering the Federal power more complete and exclusive. Why, then, it may be asked, if the design was to prohibit to the new government, as well as to the States, that general power over the currency which the States had when the Constitution was framed, was such denial not expressly extended to the new government, as it was to the States? In view of this it might be argued with much force that when it is considered in what brief and comprehensive terms the Constitution speaks, how sensible its framers must have been that emergencies might arise when the precious metals (then more scarce than now) might prove inadequate to the necessities of the government and the demands of the people—when it is remembered that paper money was almost exclusively in use in the States as the medium of exchange, and when the great evil sought to be remedied was the want of uniformity in the current value of money, it might be argued, we say, that the gift of power to coin money and regulate the value thereof, was understood as conveying general power over the currency, the power which had belonged to the States, and which they surrendered. Such a construction, it might be said, would be in close analogy to the mode of construing other substantive powers granted to Congress. They have never been construed literally, and the government could not exist if they were. Thus the power to carry on war is conferred by the power to "declare war." The whole system of the transportation of the mails is built upon the power to establish post-offices and post-roads. The power to regulate commerce has also been extended far beyond the letter of the grant. Even the advocates of a strict literal construction of the phrase, "to coin money and regulate the value thereof,"

while insisting that it defines the material to be coined as metal, are compelled to concede to Congress large discretion in all other particulars. The Constitution does not ordain what metals may be coined, or prescribe that the legal value of the metals, when coined, shall correspond at all with their intrinsic value in the market. Nor does it even affirm that Congress may declare anything to be a legal tender for the payment of debts. Confessedly the power to regulate the value of money coined, and of foreign coins, is not exhausted by the first regulation. More than once in our history has the regulation been changed without any denial of the power of Congress to change it, and it seems to have been left to Congress to determine alike what metal shall be coined, its purity, and how far its statutory value, as money, shall correspond, from time to time, with the market value of the same metal as bullion. How then can the grant of a power to coin money and regulate its value, made in terms so liberal and unrestrained, coupled also with a denial to the States of all power over the currency, be regarded as an implied prohibition to Congress against declaring treasury notes a legal tender, if such declaration is appropriate, and adapted to carrying into execution the admitted powers of the government?

We do not, however, rest our assertion of the power of Congress to enact legal tender laws upon this grant. We assert only that the grant can, in no just sense, be regarded as containing an implied prohibition against their enactment, and that, if it raises any implications, they are of complete power over the currency, rather than restraining.

We come next to the argument much used, and, indeed, the main reliance of those who assert the unconstitutionality of the legal tender acts. It is that they are prohibited by the spirit of the Constitution because they indirectly impair the obligation of contracts. The argument, of course, relates only to those contracts which were made before February, 1862, when the first act was passed, and it has no bearing upon the question whether the acts are valid when

applied to contracts made after their passage. The argument assumes two things,—*first*, that the acts do, in effect, impair the obligation of contracts, and *second*, that Congress is prohibited from taking any action which may indirectly have that effect. Neither of these assumptions can be accepted. It is true that under the acts, a debtor, who became such before they were passed, may discharge his debt with the notes authorized by them, and the creditor is compellable to receive such notes in discharge of his claim. But whether the obligation of the contract is thereby weakened can be determined only after considering what was the contract obligation. It was not a duty to pay gold or silver, or the kind of money recognized by law at the time when the contract was made, nor was it a duty to pay money of equal intrinsic value in the market. (We speak now of contracts to pay money generally, not contracts to pay some specifically defined species of money.) The expectation of the creditor and the anticipation of the debtor may have been that the contract would be discharged by the payment of coined metals, but neither the expectation of one party to the contract respecting its fruits, nor the anticipation of the other constitutes its obligation. There is a well-recognized distinction between the expectation of the parties to a contract and the duty imposed by it.* Were it not so the expectation of results would be always equivalent to a binding engagement that they should follow. But the *obligation* of a contract to pay money is to pay that which the law shall recognize as money when the payment is to be made. If there is anything settled by decision it is this, and we do not understand it to be controverted.† No one ever doubted that a debt of one thousand dollars, contracted before 1834, could be paid by one hundred eagles coined after that year, though they contained no more gold than ninety-four eagles such as were coined when the contract was made, and this,

---

* Apsden *v.* Austin, 5 Adolphus & Ellis, N. S. 671; Dunn *v.* Sayles, Ib. 685; Coffin *v.* Landis, 10 Wright, 426.

† Davies, 28; Barrington *v.* Potter, Dyer, 81, b., fol. 67; Faw *v.* Marsteller, 2 Cranch, 29.

not because of the intrinsic value of the coin, but because of its legal value. The eagles coined after 1834, were not money until they were authorized by law, and had they been coined before, without a law fixing their legal value, they could no more have paid a debt than uncoined bullion, or cotton, or wheat. Every contract for the payment of money, simply, is necessarily subject to the constitutional power of the government over the currency, whatever that power may be, and the obligation of the parties is, therefore, assumed with reference to that power. Nor is this singular. A covenant for quiet enjoyment is not broken, nor is its obligation impaired by the government's taking the land granted in virtue of its right of eminent domain. The expectation of the covenantee may be disappointed. He may not enjoy all he anticipated, but the grant was made and the covenant undertaken in subordination to the paramount right of the government.[*] We have been asked whether Congress can declare that a contract to deliver a quantity of grain may be satisfied by the tender of a less quantity. Undoubtedly not. But this is a false analogy. There is a wide distinction between a tender of quantities, or of specific articles, and a tender of legal values. Contracts for the delivery of specific articles belong exclusively to the domain of State legislation, while contracts for the payment of money are subject to the authority of Congress, at least so far as relates to the means of payment. They are engagements to pay with lawful money of the United States, and Congress is empowered to regulate that money. It cannot, therefore, be maintained that the legal tender acts impaired the obligation of contracts.

Nor can it be truly asserted that Congress may not, by its action, indirectly impair the obligation of contracts, if by the expression be meant rendering contracts fruitless, or partially fruitless. Directly it may, confessedly, by passing a bankrupt act, embracing past as well as future transac-

---

[*] Dobbins v. Brown, 2 Jones (Pennsylvania), 75; Workman v. Mifflin, 6 Casey, 352.

tions. This is obliterating contracts entirely. So it may relieve parties from their apparent obligations indirectly in a multitude of ways. It may declare war, or, even in peace, pass non-intercourse acts, or direct an embargo. All such measures may, and must operate seriously upon existing contracts, and may not merely hinder, but relieve the parties to such contracts entirely from performance. It is, then, clear that the powers of Congress may be exerted, though the effect of such exertion may be in one case to annul, and in other cases to impair the obligation of contracts. And it is no sufficient answer to this to say it is true only when the powers exerted were expressly granted. There is no ground for any such distinction. It has no warrant in the Constitution, or in any of the decisions of this court. We are accustomed to speak for mere convenience of the express and implied powers conferred upon Congress. But in fact the auxiliary powers, those necessary and appropriate to the execution of other powers singly described, are as expressly given as is the power to declare war, or to establish uniform laws on the subject of bankruptcy. They are not catalogued, no list of them is made, but they are grouped in the last cluse of section eight of the first article, and granted in the same words in which all other powers are granted to Congress. And this court has recognized no such distinction as is now attempted. An embargo suspends many contracts and renders performance of others impossible, yet the power to enforce it has been declared constitutional.* The power to enact a law directing an embargo is one of the auxiliary powers, existing only because appropriate in time of peace to regulate commerce, or appropriate to carrying on war. Though not conferred as a substantive power, it has not been thought to be in conflict with the Constitution, because it impairs indirectly the obligation of contracts. That discovery calls for a new reading of the Constitution.

If, then, the legal tender acts were justly chargeable with impairing contract obligations, they would not, for that

---

* Gibbons v. Ogden, 9 Wheaton, 1.

reason, be forbidden, unless a different rule is to be applied to them from that which has hitherto prevailed in the construction of other powers granted by the fundamental law. But, as already intimated, the objection misapprehends the nature and extent of the contract obligation spoken of in the Constitution. As in a state of civil society property of a citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority.

Closely allied to the objection we have just been considering is the argument pressed upon us that the legal tender acts were prohibited by the spirit of the fifth amendment, which forbids taking private property for public use without just compensation or due process of law. That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? By the act of June 28, 1834, a new regulation of the weight and value of gold coin was adopted, and about six per cent. was taken from the weight of each dollar. The effect of this was that all creditors were subjected to a corresponding loss. The debts then due became solvable with six per cent. less gold than was required to pay them before. The result was thus precisely what it is contended the legal tender acts worked. But was it ever imagined this was taking private property without compensation or without due process of law? Was the idea ever advanced that the new regulation of gold coin was against the spirit of the fifth amendment? And has any

one in good faith avowed his belief that even a law debasing the current coin, by increasing the alloy, would be taking private property? It might be impolitic and unjust, but could its constitutionality be doubted? Other statutes have, from time to time, reduced the quantity of silver in silver coin without any question of their constitutionality. It is said, however, now, that the act of 1834 only brought the legal value of gold coin more nearly into correspondence with its actual value in the market, or its relative value to silver. But we do not perceive that this varies the case or diminishes its force as an illustration. The creditor who had a thousand dollars due him on the 31st day of July, 1834 (the day before the act took effect), was entitled to a thousand dollars of coined gold of the weight and fineness of the then existing coinage. The day after, he was entitled only to a sum six per cent. less in weight and in market value, or to a smaller number of silver dollars. Yet he would have been a bold man who had asserted that, because of this, the obligation of the contract was impaired, or that private property was taken without compensation or without due process of law. No such assertion, so far as we know, was ever made. Admit it was a hardship, but it is not every hardship that is unjust, much less that is unconstitutional; and certainly it would be an anomaly for us to hold an act of Congress invalid merely because we might think its provisions harsh and unjust.

We are not aware of anything else which has been advanced in support of the proposition that the legal tender acts were forbidden by either the letter or the spirit of the Constitution. If, therefore, they were, what we have endeavored to show, appropriate means for legitimate ends, they were not transgressive of the authority vested in Congress.

Here we might stop; but we will notice briefly an argument presented in support of the position that the unit of money value must possess intrinsic value. The argument is derived from assimilating the constitutional provision respecting a standard of weights and measures to that confer-

ring the power to coin money and regulate its value. It is said there can be no uniform standard of weights without weight, or of measure without length or space, and we are asked how anything can be made a uniform standard of value which has itself no value? This is a question foreign to the subject before us. The legal tender acts do not attempt to make paper a standard of value. We do not rest their validity upon the assertion that their emission is coinage, or any regulation of the value of money; nor do we assert that Congress may make anything which has no value money. What we do assert is, that Congress has power to enact that the government's promises to pay money shall be, for the time being, equivalent in value to the representative of value determined by the coinage acts, or to multiples thereof. It is hardly correct to speak of a standard of value. The Constitution does not speak of it. It contemplates a standard for that which has gravity or extension; but value is an ideal thing. The coinage acts fix its unit as a dollar; but the gold or silver thing we call a dollar is, in no sense, a standard of a dollar. It is a representative of it. There might never have been a piece of money of the denomination of a dollar. There never was a pound sterling coined until 1815, if we except a few coins struck in the reign of Henry VIII, almost immediately debased, yet it has been the unit of British currency for many generations. It is, then, a mistake to regard the legal tender acts as either fixing a standard of value or regulating money values, or making that money which has no intrinsic value.

But, without extending our remarks further, it will be seen that we hold the acts of Congress constitutional as applied to contracts made either before or after their passage. In so holding, we overrule so much of what was decided in *Hepburn* v. *Griswold*,* as ruled the acts unwarranted by the Constitution so far as they apply to contracts made before their enactment. That case was decided by a divided court, and by a court having a less number of judges than the law

---

* 8 Wallace, 603.

then in existence provided this court shall have. These cases have been heard before a full court, and they have received our most careful consideration. The questions involved are constitutional questions of the most vital importance to the government and to the public at large. We have been in the habit of treating cases involving a consideration of constitutional power differently from those which concern merely private right.* We are not accustomed to hear them in the absence of a full court, if it can be avoided. Even in cases involving only private rights, if convinced we had made a mistake, we would hear another argument and correct our error. And it is no unprecedented thing in courts of last resort, both in this country and in England, to overrule decisions previously made. We agree this should not be done inconsiderately, but in a case of such far-reaching consequences as the present, thoroughly convinced as we are that Congress has not transgressed its powers, we regard it as our duty so to decide and to affirm both these judgments.

The other questions raised in the case of *Knox* v. *Lee* were substantially decided in *Texas* v. *White*.†

JUDGMENT IN EACH CASE AFFIRMED.

Mr. Justice BRADLEY, concurring:

I concur in the opinion just read, and should feel that it was out of place to add anything further on the subject were it not for its great importance. On a constitutional question involving the powers of the government it is proper that every aspect of it, and every consideration bearing upon it, should be presented, and that no member of the court should hesitate to express his views. I do not propose, however, to go into the subject at large, but only to make such additional observations as appear to me proper for consideration, at the risk of some inadvertent repetition.

The Constitution of the United States established a gov-

---

* Briscoe *v.* Bank of Kentucky, 8 Peters, 118.      † 7 Wallace, 700.

ernment, and not a league, compact, or partnership.   It was
constituted by the people.   It is called a government.   In
the eighth section of Article I it is declared that Congress
shall have power to make all laws which shall be necessary
and proper for carrying into execution the foregoing powers,
and all other powers vested by this Constitution in *the gov-
ernment of the United States,* or in any department or office
thereof.   As a government it was invested with all the attri-
butes of sovereignty.   It is expressly declared in Article VI
that the Constitution, and the laws of the United States
made in pursuance thereof, and all treaties made under the
authority of the United States, shall be the supreme law of
the land.

The doctrine so long contended for, that the Federal
Union was a mere compact of States, and that the States, if
they chose, might annul or disregard the acts of the Na-
tional legislature, or might secede from the Union at their
pleasure, and that the General government had no power to
coerce them into submission to the Constitution, should be
regarded as definitely and forever overthrown.   This has
been finally effected by the National power, as it had often
been before, by overwhelming argument.

. The United States is not only a government, but it is a
National government, and the only government in this coun-
try that has the character of nationality.   It is invested with
power over all the foreign relations of the country, war,
peace, and negotiations and intercourse with other nations;
all which are forbidden to the State governments.   It has
jurisdiction over all those general subjects of legislation and
sovereignty which affect the interests of the whole people
equally and alike, and which require uniformity of regula-
tions and laws, such as the coinage, weights and measures,
bankruptcies, the postal system, patent and copyright laws,
the public lands, and interstate commerce; all which sub-
jects are expressly or impliedly prohibited to the State gov-
ernments.   It has power to suppress insurrections, as well
as to repel invasions, and to organize, arm, discipline, and
call into service the militia of the whole country.   The Presi-

dent is .charged with the duty and invested with the power to take care that the laws be faithfully executed. The judiciary has jurisdiction to decide controversies between the States, and between their respective citizens, as well as ques-tions of National concern; and the government is clothed with power to guarantee to every State a republican form of government, and to protect each of them against invasion and domestic violence. For the purpose of carrying into effect and executing these and the other powers conferred, and of providing for the common defence and general wel-fare, Congress is further invested with the taxing power in all its forms, except that of laying duties on exports, with the power to borrow money on the National credit, to punish crimes against the laws of the United States and of nations, to constitute courts, and to make all laws necessary and proper for carrying into execution the various powers vested in the government or any department or officer thereof.

Such being the character of the General government, it seems to be a self-evident proposition that it is invested with all those inherent and implied powers which, at the time of adopting the Constitution, were generally considered to belong to every government as such, and as being essential to the exercise of its functions. If this proposition be not true, it certainly is true that the government of the United States has express authority, in the clause last quoted, to make all such laws (usually regarded as inherent and im-plied) as may be necessary and proper for carrying on the government as constituted, and vindicating its authority and existence.

Another proposition equally clear is, that at the time the Constitution was adopted, it was, and had for a long time been, the practice of most, if not all, civilized governments, to employ the public credit as a means of anticipating the national revenues for the purpose of enabling them to exer cise their governmental functions, and to meet the various exigencies to which all nations are subject; and that the mode of employing the public credit was various in different countries, and at different periods—sometimes by the agency

of a national bank, sometimes by the issue of exchequer bills or bills of credit; and sometimes by pledges of the public domain. In this country, the habit had prevailed from the commencement of the eighteenth century, of issuing bills of credit; and the revolution of independence had just been achieved, in great degree, by the means of similar bills issued by the Continental Congress. These bills were generally made a legal tender for the payment of all debts public and private, until, by the influence of English merchants at home, Parliament prohibited the issue of bills with that quality. This prohibition was first exercised in 1751, against the New England colonies; and subsequently, in 1763, against all the colonies. It was one of the causes of discontent which finally culminated in the Revolution. Dr. Franklin endeavored to obtain a repeal of the prohibitory acts, but only succeeded in obtaining from Parliament, in 1773, an act authorizing the colonies to make their bills receivable for taxes and debts due to the colony that issued them. At the breaking out of the war, the Continental Congress commenced the issue of bills of credit, and the war was carried on without other resources for three or four years. It may be said with truth, that we owe our national independence to the use of this fiscal agency. Dr. Franklin, in a letter to a friend, dated from Paris, in April, 1779, after deploring the depreciation which the Continental currency had undergone, said : " The only consolation under the evil is, that the public debt is proportionately diminished by the depreciation; and this by a kind of imperceptible tax, every one having paid a part of it in the fall of value that took place between the receiving and paying such sums as passed through his hands." He adds : " This effect of paper currency is not understood this side the water. And indeed the whole is a mystery even to the politicians, how we have been able to continue a war four years without money, and how we could pay with paper, that had no previously fixed fund appropriated specially to redeem it. This currency, as we manage it, is a wonderful machine. It performs its office when we issue it; it pays and clothes troops, and pro-

vides victuals and ammunition."* In a subsequent letter, of 9th October, 1780, he says: " They [the Congress] issued an immense quantity of paper bills, to pay, clothe, arm, and feed their troops, and fit out ships; and with this paper, without taxes for the first three years, they fought and battled one of the most powerful nations of Europe."† The Continental bills were not made legal tenders at first, but in January, 1777, the Congress passed resolutions declaring that they ought to pass current in all payments, and be deemed in value equal to the same nominal sums in Spanish dollars, and that any one refusing so to receive them ought to be deemed an enemy to the liberties of the United States; and recommending to the legislatures of the several States to pass laws to that effect.‡

Massachusetts and other colonies, on the breaking out of the war, disregarded the prohibition of Parliament, and again conferred upon their bills the quality of legal tender.§

These precedents are cited without reference to the policy or impolicy of the several measures in the particular cases; that is always a question for the legislative discretion. They establish the *historical fact* that when the Constitution was adopted, the employment of bills of credit was deemed a legitimate means of meeting the exigencies of a regularly constituted government, and that the affixing to them of the quality of a legal tender was regarded as entirely discretionary with the legislature. Such a quality was a mere incident that might or might not be annexed. The Continental Congress not being a regular government, and not having the power to make laws for the regulation of private transactions, referred the matter to the State legislatures. The framers of the Constitution were familiar with all this history. They were familiar with the governments which had thus exercised the prerogative of issuing bills having the quality, and intended for the purposes referred to. They had first drawn their breath under these governments; they

---

* Franklin's Works, vol. 8, p. 329.          † Ib. p. 507.
‡ Journals of Congress, vol. 3, p. 19–20; Pitkin's History, vol. 2, p. 155
§ Bancroft's History, vol. 7, p. 324.

had helped to administer them. They had seen the impor-
tant uses to which these securities might be applied.

In view, therefore, of all these facts when we find them
establishing the present government; with all the power
before rehearsed, giving to it, amongst other things, the sole
control of the money of the country and expressly prohibit-
ing the *States* from issuing bills of credit and from making
anything but gold and silver a legal tender, and imposing
no such restriction upon the General government, how can
we resist the conclusion that they intended to leave to it
that power unimpaired, in case the future exigencies of the
nation should require its exercise?

I am aware that according to the report of Mr. Madison
in the original draft of the Constitution, the clause relating
to the borrowing of money read, " to borrow money and
emit bills on the credit of the United States," and that the
words, " and emit bills," were, after some debate, struck
out. But they were struck out with diverse views of mem-
bers, some deeming them useless and others deeming them
hurtful.. The result was that they chose to adopt the Con-
stitution as it now stands, without any words either of grant
or restriction of power, and it is our duty to construe the
instrument by its words, in the light of history, of the gen-
eral nature of government, and the incidents of sovereignty.

The same argument was employed against the creation
of a United States bank. A power to create corporations
was proposed in the Convention and rejected. The power
was proposed with a limited application to cases where the
public good might require them and the authority of a single
State might be incompetent. It was still rejected. It was
then confined to the building of canals, but without effect.
It was argued that such a power was unnecessary and might
be dangerous. Yet Congress has not only chartered two
United States banks, whose constitutionality has been sus-
tained by this court, but several other institutions. As a
means appropriate and conducive to the end of carrying
into effect the other powers of the government, such as that
of borrowing money with promptness and dispatch, and

facilitating the fiscal operations of the government, it was deemed within the power of Congress to create such an institution under the general power given to pass all such laws as might be necessary and proper for carrying into execution the other powers granted. The views of particular members or the course of proceedings in the Convention cannot control the fair meaning and general scope of the Constitution as it was finally framed and now stands. It is a finished document, complete in itself, and to be interpreted in the light of history and of the circumstances of the period in which it was framed.

No one doubts at the present day nor has ever seriously doubted that the power of the government to emit bills exists. It has been exercised by the government without question for a large portion of its history. This being conceded, the incidental power of giving such bills the quality of legal tender follows almost as a matter of course.

I hold it to be the prerogative of every government not restrained by its Constitution to anticipate its resources by the issue of exchequer bills, bills of credit, bonds, stock, or a banking apparatus. Whether those issues shall or shall not be receivable in payment of private debts is an incidental matter in the discretion of such government unless restrained by constitutional prohibition.

This power is entirely distinct from that of coining money and regulating the value thereof. It is not only embraced in the power to make all necessary auxiliary laws, but it is incidental to the power of borrowing money. It is often a necessary means of anticipating and realizing promptly the national resources, when, perhaps, promptness is necessary to the national existence. It is not an attempt to coin money out of a valueless material, like the coinage of leather or ivory or kowrie shells. It is a pledge of the national credit. It is a promise by the government to pay dollars; it is not an attempt to make dollars. The standard of value is not changed. The government simply demands that its credit shall be accepted and received by public and private creditors during the pending exigency. Every government

has a right to demand this when its existence is at stake. The interests of every citizen are bound up with the fate of the government. None can claim exemption. If they cannot trust their government in its time of trial they are not worthy to be its citizens.

But it is said, why not borrow money in the ordinary way? The answer is, the legislative department, being the nation itself, speaking by its representatives, has a choice of methods, and is the master of its own discretion. One mode of borrowing, it is true, is to issue the government bonds, and to invite capitalists to purchase them. But this is not the only mode. It is often too tardy and inefficient. In time of war or public danger, Congress, representing the sovereign power, by its right of eminent domain, may authorize the President to take private property for the public use and give government certificates therefor. This is largely done on such occasions. It is an indirect way of compelling the owner of property to lend to the government. He is forced to rely on the national credit.

Can the poor man's cattle, and horses, and corn be thus taken by the government when the public exigency requires it, and cannot the rich man's bonds and notes be in like manner taken to reach the same end? If the government enacts that the certificates of indebtedness which it gives to the farmer for his cattle and provender shall be receivable by the farmer's creditors in payment of his bonds and notes, is it anything more than transferring the government loan from the hands of one man to the hands of another—perhaps far more able to advance it? Is it anything more than putting the securities of the capitalist on the same platform as the farmer's stock?

No one supposes that these government certificates are never to be paid—that the day of specie payments is never to return. And it matters not in what form they are issued. The principle is still the same. Instead of certificates they may be treasury notes, or paper of any other form. And their payment may not be made directly in coin, but they may be first convertible into government bonds, or other

government securities. Through whatever changes they pass, their ultimate destiny is *to be paid*. But it is the prerogative of the legislative department to determine when the fit time for payment has come. It may be long delayed, perhaps many may think it too long after the exigency has passed. But the abuse of a power, if proven, is no argument against its existence. And the courts are not responsible therefor. Questions of political expediency belong to the legislative halls, not to the judicial forum. It might subserve the present good if we should declare the legal tender act unconstitutional, and a temporary public satisfaction might be the result. But what a miserable consideration would that be for a permanent loss of one of the just and necessary powers of the government; a power which, had Congress failed to exercise it when it did, we might have had no court here to-day to consider the question, nor a government or a country to make it important to do so.

Another ground of the power to issue treasury notes or bills is the necessity of providing a proper currency for the country, and especially of providing for the failure or disappearance of the ordinary currency in times of financial pressure and threatened collapse of commercial credit. Currency is a national necessity. The operations of the government, as well as private transactions, are wholly dependent upon it. The State governments are prohibited from making money or issuing bills. Uniformity of money was one of the objects of the Constitution. The coinage of money and regulation of its value is conferred upon the General government exclusively. That government has also the power to issue bills. It follows, as a matter of necessity, as a consequence of these various provisions, that it is specially the duty of the General government to provide a National currency. The States cannot do it, except by the charter of local banks, and that remedy, if strictly legitimate and constitutional, is inadequate, fluctuating, uncertain, and insecure, and operates with all the partiality to local interests, which it was the very object of the Constitution to avoid. But regarded as a duty of the General government, it is

strictly in accordance with the spirit of the Constitution, as well as in line with the national necessities.

It is absolutely essential to independent national existence that government should have a firm hold on the two great sovereign instrumentalities of the *sword* and the *purse*, and the right to wield them without restriction on occasions of national peril. In certain emergencies government must have at its command, not only the personal services—the bodies and lives—of its citizens, but the lesser, though not less essential, power of absolute control over the resources of the country. Its armies must be filled, and its navies manned, by the citizens in person. Its material of war, its munitions, equipment, and commissary stores must come from the industry of the country. This can only be stimulated into activity by a proper financial system, especially as regards the currency.

A constitutional government, notwithstanding the right of eminent domain, cannot take physical and forcible possession of all that it may need to defend the country, and is reluctant to exercise such a power when it can be avoided. *It must purchase*, and by purchase command materials and supplies, products of manufacture, labor, service of every kind. The government cannot, by physical power, compel the workshops to turn out millions of dollars' worth of manufactures in leather, and cloth, and wood, and iron, which are the very first conditions of military equipment. It must stimulate and set in motion the industry of the country. In other words, it must *purchase*. But it cannot purchase with specie. That is soon exhausted, hidden, or exported. It must purchase by *credit*. It cannot force its citizens to take its bonds. It must be able to lay its hands on the currency—that great instrument of exchange by which the people transact all their own affairs with each other; that thing which they must have, and which lies at the foundation of all industrial effort and all business in the community. When the ordinary currency disappears, as it often does in time of war, when business begins to stagnate and general bankruptcy is imminent, then the government

must have power at the same time to renovate its own re-
sources and to revive the drooping energies of the nation
by supplying it with a circulating medium. What that
medium shall be, what its character and qualities, will de-
pend upon the greatness of the exigency, and the degree of
promptitude which it demands. These are legislative ques-
tions. The heart of the nation must not be crushed out.
The people must be aided to pay their debts and meet their
obligations. The debtor interest of the country represent
its bone and sinew, and must be encouraged to pursue its
avocations. If relief were not afforded universal bankruptcy
would ensue, and industry would be stopped, and govern-
ment would be paralyzed in the paralysis of the people. It
is an undoubted fact that during the late civil war, the ac-
tivity of the workshops and factories, mines and machinery,
shipyards, railroads and canals of the loyal States, caused
by the issue of the legal tender currency, constituted an in-
exhaustible fountain of strength to the National cause.

These views are exhibited, not for the purpose of showing
that the power is a desirable one, and therefore ought to be
assumed; much less for the purpose of giving judgment on
the expediency of its exercise in any particular case; but
for the purpose of showing that it is one of those vital and
essential powers inhering in every national sovereignty and
necessary to its self-preservation.

But the creditor interest will lose some of its gold! Is
gold the one thing needful? Is it worse for the creditor to
lose a little by depreciation than everything by the bank-
ruptcy of his debtor? Nay, is it worse than to lose every-
thing by the subversion of the government? What is it
that protects him in the accumulation and possession of his
wealth? Is it not the government and its laws? and can he
not consent to trust that government for a brief period until
it shall have vindicated its right to exist?. All property and
all rights, even those of liberty and life, are held subject to
the fundamental condition of being liable to be impaired by
providential calamities and national vicissitudes. Taxes
impair my income or the value of my property. The con-

demnation of my homestead, or a valuable part of it for a public improvement, or public defence, will sometimes destroy its value to me; the conscription may deprive me of liberty and destroy my life. So with the power of government to borrow money, a power to be exercised by the consent of the lender, if possible, but to be exercised without his consent, if necessary. And when exercised in the form of legal tender notes or bills of credit, it may operate for the time being to compel the creditor to receive the *credit of the government* in place of the gold which he expected to receive from his debtor. All these are fundamental political conditions on which life, property, and money are respectively held and enjoyed under our system of government, nay, under any system of government. There are times when the exigencies of the state rightly absorb all subordinate considerations of private interest, convenience, or feeling; and at such times, the temporary though compulsory acceptance by a private creditor of the government credit, in lieu of his debtor's obligation to pay, is one of the slightest forms in which the necessary burdens of society can be sustained. Instead of being a violation of such obligation, it merely subjects it to one of those conditions under which it is held and enjoyed.

Another consideration bearing upon this objection is the fact that the power given to Congress to coin money and regulate the value thereof, includes the power to alter the metallic standard of coinage, as was done in 1834; whereby contracts made before the alteration, and payable thereafter, were satisfied by the payment of six per cent. less of pure gold than was contemplated when the contracts were made. This power and this consequence flowing from its exercise, were much discussed in the great case of Mixed Moneys, in Sir John Davies's Reports,* and it was there held to belong to the king's ordinary prerogative over the coinage of money, without any sanction from Parliament. Subsequent acts of Parliament fixed the standard of purity and weight

---

* Page 48.

in the coinage of the realm, which has not been altered for a hundred and fifty years past. But the same authority which fixed it in the time of Queen Anne, is competent at any time to change it. Whether it shall be changed or not is a matter of mere legislative discretion. And such is undoubtedly the public law of this country. Therefore, the mere fact that the value of debts may be depreciated by legal tender laws, is not conclusive against their validity; for that is clearly the effect of other powers which may be exercised by Congress in its discretion.

It follows as a corollary from these views, that it makes no difference in the principle of the thing, that the contract of the debtor is a specific engagement, in terms, to pay gold or silver money, or to pay in specie. So long as the money of the country, in whatever terms described, is in contemplation of the parties, it is the object of the legal tender laws to make the credit of the government a lawful substitute therefor. If the contract is for the delivery of a chattel or a specific commodity or substance, the law does not apply. If it is *bonâ fide* for so many caráts of diamonds or so many ounces of gold as bullion, the specific contract must be performed. But if terms which naturally import such a contract are used by way of evasion, and money only is intended, the law reaches the case. Not but that Congress might limit the operation of the law in any way it pleased. It might make an exception of cases where the contract expressly promises gold and silver money. But if it has not done so; if the enactment is general in its terms, specific promises to pay the money in specie are just as much subject to the operation of the law as a mere promise to pay so many dollars—for that, in contemplation of law, is a promise to pay money in specie.

Hence I differ from my brethren in the decision of one of the cases now before the court, to wit, the case of *Tribilcock* v. *Wilson*,* in which the promise (made in June, 1861), was to pay, one year after date, the sum of nine hundred dollars

---

* See *infra,* 687.

with ten per cent. interest from date, payable in specie. Of course this difference arises from the different construction given to the legal tender acts. I do not understand the majority of the court to decide that an act so drawn as to embrace, in terms, contracts payable in specie, would not be constitutional. Such a decision would completely nullify the power claimed for the government. For it would be very easy, by the use of one or two additional words, to make all contracts payable in specie.

It follows as another corollary from the views which I have expressed that the power to make treasury notes a legal tender, whilst a mere incidental one to that of issuing the notes themselves, and to one of the forms of borrowing money, is nevertheless a power not to be resorted to except upon extraordinary and pressing occasions, such as war or other public exigencies of great gravity and importance; and should be no longer exerted than all the circumstances of the case demand.

I do not say that it is a war power, or that it is only to be called into exercise in time of war; for other public exigencies may arise in the history of a nation which may make it expedient and imperative to exercise it. But of the occasions when, and of the times how long, it shall be exercised and in force, it is for the legislative department of the government to judge. Feeling sensibly the judgments and wishes of the people, that department cannot long (if it is proper to suppose that within its sphere it ever can) misunderstand the business interests and just rights of the community.

I deem it unnecessary to enter into a minute criticism of all the sayings, wise or foolish, that have, from time to time, been uttered on this subject by statesmen, philosophers, or theorists. The writers on political economy are generally opposed to the exercise of the power. The considerations which they adduce are very proper to be urged upon the depositary of the power. The question whether the power exists in a national government, is a great practical question relating to the national safety and independence, and states-

men are better judges of this question than economists can be. Their judgment is ascertained in the history and practice of governments, and in the silence as well as the words of our written Constitution. A parade of authorities would serve but little purpose after Chief Justice Marshall's profound discussion of the powers of Congress in the great case of *McCulloch* v. *The State of Maryland.* If we speak not according to the spirit of the Constitution and authorities, and the incontrovertible logic of events, elaborate extracts cannot add weight to our decision.

Great stress has been laid on the supposed fact that England in all its great wars and emergencies, has never made its exchequer bills a legal tender. This imports a eulogium on British conservatism in relation to contracts, which that nation would hardly regard as flattering. It is well known that for over twenty years, from 1797 to 1820, the most stringent paper money system that ever existed prevailed in England, and lay at the foundation of all her elasticity and endurance. It is true that the Bank of England notes, which the bank was required to issue until they reached an amount then unprecedented, were not technically made legal tenders, except for the purpose of relieving from arrest and imprisonment for debt; but worse than that, the bank was expressly *forbidden* to redeem its notes in specie, except for a certain small amount to answer the purpose of change. The people were obliged to receive them. The government had nothing else wherewith to pay its domestic creditors. The people themselves had no specie, for that was absorbed by the Bank of England, and husbanded for the uses of government in carrying on its foreign wars and paying its foreign subsidies. The country banks depended on the Bank of England for support, and of course they could not redeem their circulation in specie. The result was that the nation was perforce obliged to treat the bank notes as a legal tender or suffer inevitable bankruptcy. In such a state of things it went very hard with any man who demanded specie in fulfilment of his contracts. A man by the name of Grigby tried it, and brought his case into court, and elicited from

Lord Alvanley the energetic expression: "Thank God, few such creditors as the present plaintiff have been found since the passing of the act."\* It is to be presumed that he was the last that ever showed himself in an English court.

It is well known that since the resumption of specie payments, the act of 1833, rechartering the bank, has expressly made the Bank of England notes a legal tender.

It is unnecessary to refer to other examples. France is a notable one. Her assignats, issued at the commencement and during the Revolution, performed the same office as our Continental bills; and enabled the nation to gather up its latent strength and call out its energies. Almost every nation of Europe, at one time or another, has found it necessary, or expedient, to resort to the same method of carrying on its operations or defending itself against aggression.

It would be sad, indeed, if this great nation were now to be deprived of a power so necessary to enable it to protect its own existence, and to cope with the other great powers of the world. No doubt foreign powers would rejoice if we should deny the power. No doubt foreign creditors would rejoice. They have, from the first, taken a deep interest in the question. But no true friend to our government, to its stability and its power to sustain itself under all vicissitudes, can be indifferent to the great wrong which it would sustain by a denial of the power in question—a power to be seldom exercised, certainly; but one, the possession of which is so essential, and as it seems to me, so undoubted.

Regarding the question of power as so important to the stability of the government, I cannot acquiesce in the decision of *Hepburn* v. *Griswold*. I cannot consent that the government should be deprived of one of its just powers by a decision made at the time, and under the circumstances, in which that decision was made. On a question relating to the power of the government, where I am perfectly satisfied that it has the power, I can never consent to abide by a decision denying it, unless made with reasonable una-

---

\* 2 Bosanquet & Puller, 528.

nimity and acquiesced in by the country. Where the decision is recent, and is only made by a bare majority of the court, and during a time of public excitement on the subject, when the question has largely entered into the political discussions of the day, I consider it our right and duty to subject it to a further examination, if a majority of the court are dissatisfied with the former decision. And in this case, with all deference and respect for the former judgment of the court, I am so fully convinced that it was erroneous, and prejudicial to the rights, interest, and safety of the general government, that I, for one, have no hesitation in reviewing and overruling it. It should be remembered, that this court, at the very term in which, and within a few weeks after, the decision in *Hepburn* v. *Griswold* was delivered, when the vacancies on the bench were filled, determined to hear the question reargued. This fact must necessarily have had the effect of apprising the country that the decision was not fully acquiesced in, and of obviating any injurious consequences to the business of the country by its reversal.

In my judgment the decrees in all the cases before us should be affirmed.

The CHIEF JUSTICE, dissenting:

We dissent from the argument and conclusion in the opinion just announced.

The rule, by which the constitutionality of an act of Congress passed in the alleged exercise of an implied power is to be tried, is no longer, in this court, open to question. It was laid down in the case of *McCulloch* v. *Maryland*,* by Chief Justice Marshall, in these words: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consistent with the letter and spirit of the Constitution, are constitutional."

And it is the plain duty of the court to pronounce acts of

---

* 4 Wheaton, 421.

Congress not made in the exercise of an express power nor coming within the reasonable scope of this rule, if made in virtue of an implied power, unwarranted by the Constitution. Acts of Congress not made in pursuance of the Constitution are not laws.

Neither of these propositions was questioned in the case of *Hepburn* v. *Griswold*.* The judges who dissented in that case maintained that the clause in the act of February 25th, 1862, making the United States notes a legal tender in payment of debts was an appropriate, plainly adapted means to a constitutional end, not prohibited but consistent with the letter and spirit of the Constitution. The majority of the court as then constituted, five judges out of eight, felt "obliged to conclude that an act making mere promises to pay dollars a legal tender in payments of debts previously contracted is not a means appropriate, plainly adapted, really calculated to carry into effect any express power vested in Congress, is inconsistent with the spirit of the Constitution, and is prohibited by the Constitution."

In the case of the *United States* v. *De Witt*,† we held unanimously that a provision of the internal revenue law prohibiting the sale of certain illuminating oil in the States was unconstitutional, though it might increase the production and sale of other oils, and consequently the revenue derived from them, because this consequence was too remote and uncertain to warrant the court in saying that the prohibition was an appropriate and plainly adapted means for carrying into execution the power to lay and collect taxes.

We agree, then, that the question whether a law is a necessary and proper means to execution of an express power, within the meaning of these words as defined by the rule—that is to say, a means appropriate, plainly adapted, not prohibited but consistent with the letter and spirit of the Constitution,—is a judicial question. Congress may not adopt any means for the execution of an express power that Congress may see fit to adopt. It must be a necessary and

---

* 8 Wallace, 606.          † 9 Id. 41.

proper means within the fair meaning of the rule. If not such it cannot be employed consistently with the Constitution. Whether the means actually employed in a given case are such or not the court must decide. The court must judge of the fact, Congress of the degree of necessity.

A majority of the court, five to four, in the opinion which has just been read, reverses the judgment rendered by the former majority of five to three, in pursuance of an opinion formed after repeated arguments, at successive terms, and careful consideration; and declares the legal tender clause to be constitutional; that is to say, that an act of Congress making promises to pay dollars legal tender as coined dollars in payment of pre-existing debts is a means appropriate and plainly adapted to the exercise of powers expressly granted by the Constitution, and not prohibited itself by the Constitution but consistent with its letter and spirit. And this reversal, unprecedented in the history of the court, has been produced by no change in the opinions of those who concurred in the former judgment. One closed an honorable judicial career by resignation after the case had been decided,* after the opinion had been read and agreed to in conference,† and after the day when it would have been delivered in court,‡ had not the delivery been postponed for a week to give time for the preparation of the dissenting opinion. The court was then full, but the vacancy caused by the resignation of Mr. Justice Grier having been subsequently filled and an additional justice having been appointed under the act increasing the number of judges to nine, which took effect on the first Monday of December, 1869, the then majority find themselves in a minority of the court, as now constituted, upon the question.

Their convictions, however, remain unchanged. We adhere to the opinion pronounced in *Hepburn* v. *Griswold*. Reflection has only wrought a firmer belief in the soundness of the constitutional doctrines maintained, and in the importance of them to the country.

---

* 27th November, 1869,     † 29th January, 1870.     ‡ 31st January, 1870.

We agree that much of what was said in the dissenting opinion in that case, which has become the opinion of a majority of the court as now constituted, was correctly said. We fully agree in all that was quoted from Chief Justice Marshall. We had indeed accepted, without reserve, the definition of implied powers in which that great judge summed up his argument, of which the language quoted formed a part. But if it was intended to ascribe to us "the doctrine that when an act of Congress is brought to the test of this clause of the Constitution," namely, the clause granting the power of ancillary legislation, "its necessity must be absolute, and its adaptation to the conceded purpose unquestionable," we must be permitted not only to disclaim it, but to say that there is nothing in the opinion of the then majority which approaches the assertion of any such doctrine. We did indeed venture to cite, with approval, the language of Judge Story in his great work on the Constitution, that the words necessary and proper were intended to have "a sense at once admonitory and directory," and to require that the means used in the execution of an express power "should be bonâ fide, appropriate to the end,"* and also ventured to say that the tenth amendment, reserving to the States or the people all powers not delegated to the United States by the Constitution, nor prohibited by it to the States, "was intended to have a like admonitory and directory sense," and to restrain the limited government established by the Constitution from the exercise of powers not clearly delegated or derived by just inference from powers so delegated. In thus quoting Judge Story, and in this expression of our own opinion, we certainly did not suppose it possible that we could be understood as asserting that the clause in question "was designed as a restriction upon the ancillary power incidental to every grant of power in express terms." It was this proposition which "was stated and refuted" in *McCulloch* v. *Maryland*. That refutation touches nothing said by us. We assert only that the

---

* 1 Story on the Constitution, p. 42, § 1251.

words of the Constitution are such as admonish Congress
that impiied powers are not to be rashly or lightly assumed,
and that they are not to be exercised at all, unless, in the
words of Judge Story, they are "*bonà fide* appropriate to the
end," or, in the words of Chief Justice Marshall, "appro-
priate, plainly adapted" to a constitutional and legitimate
end, and "not prohibited, but consistent with the letter and
spirit of the Constitution."

There appears, therefore, to have been no real difference
of opinion in the court as to the rule by which the existence
of an implied power is to be tested, when *Hepburn* v. *Griswold*
was decided, though the then minority seem to have sup-
posed there was. The difference had reference to the appli-
cation of the rule rather than to the rule itself.

The then minority admitted that in the powers relating
to coinage, standing alone, there is not "a sufficient warrant
for the exercise of the power" to make notes a legal tender,
but thought them "not without decided weight, when we
come to consider the question of the existence of this power
as one necessary and proper for carrying into execution
other admitted powers of the government." This weight
they found in the fact that an "express power over the lawful
money of the country was confided to Congress and forbid-
den to the States." It seemed to them not an "unreason-
able inference" that, in a certain contingency, "making the
securities of the government perform the office of money in
the payment of debts would be in harmony with the power
expressly granted to coin money." We perceive no connec-
tion between the express power to coin money and the infer-
ence that the government may, in any contingency, make
its securities perform the functions of coined money, as a
legal tender in payment of debts. We have supposed that
the power to exclude from circulation notes not authorized
by the national government might, perhaps, be deduced
from the power to regulate the value of coin; but that the
power of the government to emit bills of credit was an ex-
ercise of the power to borrow money, and that its power
over the currency was incidental to that power and to the

power to regulate commerce. This was the doctrine of the *Veazie Bank* v. *Fenno*,* although not fully elaborated in that case. The question whether the quality of legal tender can be imparted to these bills depends upon distinct considerations.

Was, then, the power to make these notes of the government—these bills of credit—a legal tender in payments an appropriate, plainly-adapted means to a legitimate and constitutional end? or, to state the question as the opinion of the then minority stated it, "does there exist any power in Congress, or in the government, by express grant, in execution of which this legal tender act was necessary and proper in the sense here defined and under the circumstances of its passage?"

The opinion of the then minority affirmed the power on the ground that it was a necessary and proper means, within the definition of the court, in the case of *McCulloch* v. *Maryland*, to carry on war, and that it was not prohibited by the spirit or letter of the Constitution, though it was admitted to be a law impairing the obligation of contracts, and notwithstanding the objection that it deprived many persons of their property without compensation and without due process of law.

We shall not add much to what was said in the opinion of the then majority on these points.

The reference made in the opinion just read, as well as in the argument at the bar, to the opinions of the Chief Justice, when Secretary of the Treasury, seems to warrant, if it does not require, some observations before proceeding further in the discussion.

It was his fortune at the time the legal tender clause was inserted in the bill to authorize the issue of United States notes and received the sanction of Congress, to be charged with the anxious and responsible duty of providing funds for the prosecution of the war. In no report made by him to Congress was the expedient of making the notes of the

* 8 Wallace, 548.

United States a legal tender suggested. He urged the issue of notes payable on demand in coin or received as coin in payment of duties. When the State banks had suspended specie payments, he recommended the issue of United States notes receivable for all loans to the United States and all government dues except duties on imports. In his report of December, 1862, he said that " United States notes receivable for bonds bearing a secure specie interest are next best to notes convertible into coin," and after stating the financial measures which in his judgment were advisable, he added : " The Secretary recommends, therefore, no mere paper money scheme, but on the contrary a series of measures looking to a safe and gradual return to gold and silver as the only permanent basis, standard, and measure of value recognized by the Constitution." At the session of Congress before this report was made, the bill containing the legal tender clause had become a law. He was extremely and avowedly averse to this clause, but was very solicitous for the passage of the bill to authorize the issue of United States notes then pending. He thought it indispensably necessary that the authority to issue these notes, should be granted by Congress. The passage of the bill was delayed, if not jeoparded, by the difference of opinion which prevailed on the question of making them a legal tender. It was under these circumstances that he expressed the opinion, when called upon by the Committee of Ways and Means, that it was necessary ; * and he was not sorry to find it sustained by the decisions of respected courts, not unanimous indeed, nor without contrary decisions of State courts equally respectable. Examination and reflection under more propitious circumstances have satisfied him that this opinion was erroneous, and he does not hesitate to declare it. He would do so, just as unhesitatingly, if his favor to the legal tender clause had been at that time decided, and his opinion as to the constitutionality of the measure clear.

---

* Letters of the Secretary of the Treasury to the Committee of Ways and Means, January 22 and 29, 1862 ; Spaulding's Financial History, pp. 27, 46, 54.

Was the making of the notes a legal tender necessary to the carrying on the war? In other words, was it necessary to the execution of the power to borrow money? It is not the question whether the issue of notes was necessary, nor whether any of the financial measures of the government were necessary. The issuing of the circulation commonly known as greenbacks was necessary, and was constitutional. They were necessary to the payment of the army and the navy and to all the purposes for which the government uses money. The banks had suspended specie payment, and the government was reduced to the alternative of using their paper or issuing its own.

Now it is a common error, and in our judgment it was the error of the opinion of the minority in *Hepburn* v. *Griswold*, and is the error of the opinion just read, that considerations pertinent to the issue of United States notes have been urged in justification of making them a legal tender. The real question is, was the making them a legal tender a necessary means to the execution of the power to borrow money? If the notes would circulate as well without as with this quality it is idle to urge the plea of such necessity. But the circulation of the notes was amply provided for by making them receivable for all national taxes, all dues to the government, and all loans. This was the provision relied upon for the purpose by the secretary when the bill was first prepared, and his reflections since have convinced him that it was sufficient. Nobody could pay a tax, or any debt, or buy a bond without using these notes. As the notes, not being immediately redeemable, would undoubtedly be cheaper than coin, they would be preferred by debtors and purchasers. They would thus, by the universal law of trade, pass into general circulation. As long as they were maintained by the government at or near par value of specie they would be accepted in payment of all dues, private as well as public. Debtors as a general rule would pay in nothing else unless compelled by suit, and creditors would accept them as long as they would lose less by acceptance than by suit. In new transactions, sellers would demand and purchasers would,

pay the premium for specie in the prices of commodities.
The difference to them, in the currency, whether of coin or
of paper, would be in the fluctuations to which the latter is
subject. So long as notes should not sink so low as to in-
duce creditors to refuse to receive them because they could
not be said to be in any just sense payments of debts due,
a provision for making them a legal tender would be with-
out effect except to discredit the currency to which it was
applied. The real support of note circulation not convertible
on demand into coin, is receivability for debts due the gov-
ernment, including specie loans, and limitation of amount.
If the amount is smaller than is needed for the transactions
of the country, and the law allows the use in these transac-
tions of but one description of currency, the demand for that
description will prevent its depreciation. But history shows
no instance of paper issues so restricted. An approximation
in limitation is all that is possible, and this was attempted
when the issues of United States notes were restricted to
one hundred and fifty millions. But this limit was soon ex-
tended to four hundred and fifty millions, and even this was
soon practically removed by the provision for the issue of
notes by the national banking associations without any pro-
vision for corresponding reduction in the circulation of
United States notes; and still further by the laws authoriz-
ing the issue of interest-bearing securities, made a tender
for their amount, excluding interest.

The best support for note circulation is not limitation,
but receivability, especially for loans bearing coin interest.
This support was given until the fall of 1864, when a loan
bearing increased currency interest, payable in three years
and convertible into a loan bearing less coin interest, was
substituted for the six per cent. and five per cent. loans
bearing specie interest, for which the notes had been pre-
viously received.

It is plain that a currency so supported cannot depreciate
more than the loans; in other words, below the general
credit of the country. It will rise or fall with it. At the
present moment, if the notes were received for five per cent.

bonds, they would be at par. In other words, specie payments would be resumed.

Now, does making the notes a legal tender increase their value? It is said that it does, by giving them a new use. The best political economists say that it does not. When the government compels the people to receive its notes, it virtually declares that it does not expect them to be received without compulsion. It practically represents itself insolvent. This certainly does not improve the value of its notes. It is an element of depreciation. In addition, it creates a powerful interest in the debtor class and in the purchasers of bonds to depress to the lowest point the credit of the notes. The cheaper these become, the easier the payment of debts, and the more profitable the investments in bonds bearing coin interest.

On the other hand, the higher prices become, for everything the government needs to buy, and the greater the accumulation of public as well as private debt. It is true that such a state of things is acceptable to debtors, investors in bonds, and speculators. It is their opportunity of relief or wealth. And many are persuaded by their representations that the forced circulation is not only a necessity but a benefit. But the apparent benefit is a delusion and the necessity imaginary. In their legitimate use, the notes are hurt not helped by being made a legal tender. The legal tender quality is only valuable for the purposes of dishonesty. Every honest purpose is answered as well and better without it.

We have no hesitation, therefore, in declaring our conviction that the making of these notes a legal tender, was not a necessary or proper means to the carrying on war or to the exercise of any express power of the government.

But the absence of necessity is not our only, or our weightiest objection to this legal tender clause. We still think, notwithstanding the argument adduced to the contrary, that it does violate an express provision of the Constitution, and the spirit, if not the letter, of the whole instrument. It cannot be maintained that legislation justly

obnoxious to such objections can be maintained as the exercise of an implied power. There can be no implication against the Constitution. Legislation to be warranted as the exercise of implied powers must not be "prohibited, but consistent with the letter and spirit of the Constitution."

The fifth amendment provides that no person shall be deprived of life, liberty, or property without compensation or due process of law. The opinion of the former minority says that the argument against the validity of the legal tender clause, founded on this constitutional provision, is "too vague for their perception." It says that a "declaration of war would be thus unconstitutional," because it might depreciate the value of property; and "the abolition of tariff on sugar, or iron," because it might destroy the capital employed in those manufactures; and "the successive issues of government bonds," because they might make those already in private hands less valuable. But it seems to have escaped the attention of the then minority that to declare war, to lay and repeal taxes, and to borrow money, are all express powers, and that the then majority were opposing the prohibition of the Constitution to the claim of an implied power. Besides, what resemblance is there between the effect of the exercise of these express powers and the operation of the legal tender clause upon pre-existing debts? The former are indirect effects of the exercise of undisputed powers. The latter acts directly upon the relations of debtor and creditor. It violates that fundamental principle of all just legislation that the legislature shall not take the property of A. and give it to B. It says that B., who has purchased a farm of A. for a certain price, may keep the farm without paying for it, if he will only tender certain notes which may bear some proportion to the price, or be even worthless. It seems to us that this is a manifest violation of this clause of the Constitution.

We think also that it is inconsistent with the spirit of the Constitution in that it impairs the obligation of contracts. In the opinion of the then minority it is frankly said: "Undoubtedly it is a law impairing the obligation of contracts made

before its passage," but it is immediately added: "While the Constitution forbids the States to pass such laws, it does not forbid Congress," and this opinion, as well as the opinion just read, refers to the express authority to establish a uniform system of bankruptcy as a proof that it was not the intention of the Constitution to withhold that power. It is true that the Constitution grants authority to pass a bankrupt law, but our inference is, that in this way only can Congress discharge the obligation of contracts. It may provide for ascertaining the inability of debtors to perform their contracts, and, upon the surrender of all their property may provide for their discharge. But this is a very different thing from providing that they may satisfy contracts without payment, without pretence of inability, and without any judicial proceeding.

That Congress possesses the general power to impair the obligation of contracts is a proposition which, to use the language of Chief Justice Marshall,* " must find its vindication in a train of reasoning not often heard in courts of justice." "It may well be added," said the same great judge,† " whether the nature of society and of government does not prescribe some limits to legislative power; and, if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, can be seized without compensation? To the legislature all legislative power is granted, but the question whether the act of transferring the property of an individual to the public is in the nature of a legislative power is well worthy of serious reflection."

And if the property of an individual cannot be transferred to the public, how much less to another individual?

These remarks of Chief Justice Marshall were made in a case in which it became necessary to determine whether a certain act of the legislature of Georgia was within the constitutional prohibition against impairing the obligation of contracts. And they assert fundamental principles of society and government in which that prohibition had its origin.

---

* Fletcher v. Peck  6 Cranch, 132.                    † Ibid. 135.

They apply with great force to the construction of the Constitution of the United States. In like manner and spirit Mr. Justice Chase had previously declared* that "an act of the legislature contrary to the great first principles of the social compact cannot be considered a rightful exercise of legislative authority." Among such acts he instances "a law that destroys or impairs the lawful private contracts of citizens." Can we be mistaken in saying that such a law is contrary to the spirit of a Constitution ordained to establish justice? Can we be mistaken in thinking that if Marshall and Story were here to pronounce judgment in this case they would declare the legal tender clause now in question to be prohibited by and inconsistent with the letter and spirit of the Constitution?

It is unnecessary to say that we reject wholly the doctrine, advanced for the first time, we believe, in this court, by the present majority, that the legislature has any "powers under the Constitution which grow out of the aggregate of powers conferred upon the government, or out of the sovereignty instituted by it." If this proposition be admitted, and it be also admitted that the legislature is the sole judge of the necessity for the exercise of such powers, the government becomes practically absolute and unlimited.

Our observations thus far have been directed to the question of the constitutionality of the legal tender clause and its operation upon contracts made before the passage of the law. We shall now consider whether it be constitutional in its application to contracts made after its passage. In other words, whether Congress has power to make anything but coin a legal tender.

And here it is well enough again to say that we do not question the authority to issue notes or to fit them for a circulating medium, or to promote their circulation by providing for their receipt in payment of debts to the government, and for redemption either in coin or in bonds; in short, to adapt them to use as currency. Nor do we question the

* Calder v. Bull, 3 Dallas, 388.

lawfulness of contracts stipulating for payment in such notes, or the propriety of enforcing the performance of such contracts by holding the tender of such currency, according to their terms, sufficient.    The question is, has Congress power to make the notes of the government, redeemable or irredeemable, a legal tender without contract and against the will of the person to whom they are tendered?    In considering this question we assume as a fundamental proposition that it is the duty of every government to establish a standard of value.    The necessity of such a standard is indeed universally acknowledged.    Without it the transactions of society would become impossible.    All measures, whether of extent, or weight, or value, must have certain proportions of that which they are intended to measure.    The unit of extent must have certain definite length, the unit of weight certain definite gravity, and the unit of value certain definite value.    These units, multiplied or subdivided, supply the standards by which all measures are properly made.    The selection, therefore, by the common consent of all nations, of gold and silver as the standard of value was natural, or, more correctly speaking, inevitable.    For whatever definitions of value political economists may have given, they all agree that gold and silver have more value in proportion to weight and size, and are less subject to loss by wear or abrasion than any other material capable of easy subdivision and impression, and that their value changes less and by slower degrees, through considerable periods of time, than that of any other substance which could be used for the same purpose.    And these are qualities indispensable to the convenient use of the standard required.    In the construction of the constitutional grant of power to establish a standard of value *every presumption* is, therefore, against that which would authorize the adoption of any other materials than those sanctioned by universal consent.

But the terms of the only express grant in the Constitution of power to establish such a standard leave little room for presumptions.    The power conferred is the power to coin money, and these words must be understood as they were

used at the time the Constitution was adopted. And we have been referred to no authority which at that time defined coining otherwise than as minting or stamping metals for money; or money otherwise than as metal coined for the purposes of commerce. These are the words of Johnson, whose great dictionary contains no reference to money of paper.

It is true that notes issued by banks, both in England and America, were then in circulation, and were used in exchanges, and in common speech called money, and that bills of credit, issued both by Congress and by the States, had been recently in circulation under the same general name; but these notes and bills were never regarded as real money, but were always treated as its represensatives only, and were described as currency. The legal tender notes themselves do not purport to be anything else than promises to pay money. They have been held to be securities, and therefore exempt from State taxation;* and the idea that it was ever designed to make such notes a standard of value by the framers of the Constitution is wholly new. It seems to us impossible that it could have been entertained. Its assertion seems to us to ascribe folly to the framers of our fundamental law, and to contradict the most conspicuous facts in our public history.

The power to coin money was a power to determine the fineness, weight, and denominations of the metallic pieces by which values were to be measured; and we do not perceive how this meaning can be extended without doing violence to the very words of the Constitution by imposing on them a sense they were never intended to bear. This construction is supported by contemporaneous and all subsequent action of the legislature; by all the recorded utterances of statesmen and jurists, and the unbroken tenor of judicial opinion until a very recent period, when the excitement of the civil war led to the adoption, by many, of different views.

---

* Bank *v.* Supervisors, 7 Wallace, 31.

The sense of the Convention which framed the Constitution is clear, from the account given by Mr. Madison of what took place when the power to emit bills of credit was stricken from the reported draft. He says distinctly that he acquiesced in the motion to strike out, because the government would not be disabled thereby from the use of public notes, so far as they would be safe and proper, while it cut off the pretext for a paper currency, and particularly for making the bills a tender either for public or private debts.* The whole discussion upon bills of credit proves, beyond all possible question, that the Convention regarded the power to make notes a legal tender as absolutely excluded from the Constitution.†

The papers of the Federalist, widely circulated in favor of the ratification of the Constitution, discuss briefly the power to coin money, as a power to fabricate metallic money, without a hint that any power to fabricate money of any other description was given to Congress;‡ and the views which it promulgated may be fairly regarded as the views of those who voted for adoption.

Acting upon the same views, Congress took measures for the establishment of a mint, exercising thereby the power to coin money, and has continued to exercise the same power, in the same way, until the present day. It established the dollar as the money unit, determined the quantity and quality of gold and silver of which each coin should consist, and prescribed the denominations and forms of all coins to be issued.§ Until recently no one in Congress ever suggested that that body possessed power to make anything else a standard of value.

Statesmen who have disagreed widely on other points have agreed in the opinion that the only constitutional measures of value are metallic coins, struck as regulated by the authority of Congress. Mr. Webster expressed not only his opinion but the universal and settled conviction of

---

* 3 Madison's Papers, 1346.          † See *infra*, pp. 653, 656.—REP.

‡ Dawson's Federalist, 294.

§ 1 Stat. at Large, 225, 246, and subsequent acts.

the country when he said : * " Most unquestionably there is
no legal tender and there can be no legal tender in this
country, under the authority of this government or any
other, but gold, and silver, either the coinage of our mints
or foreign coin at rates regulated by Congress. This is a
constitutional principle perfectly plain and of the very highest
importance. The States are prohibited from making any-
thing but gold and silver a tender in payment of debts, and
although no such express prohibition is applied to Congress,
*yet as Congress has no power granted to it in this respect but to
coin money and regulate the value of foreign coin*, it clearly has
no power to substitute paper or anything else for coin as a
tender in payment of debts and in discharge of contracts."

And this court, in *Gwin* v. *Breedlove*,† said : " *By the Con-
stitution of the United States gold and silver coin* made current
by law *can only be tendered* in payment of debts." And in
*The United States* v. *Marigold*,‡ this court, speaking of the
trust and duty of maintaining a uniform and pure metallic
standard of uniform value throughout the Union, said : " The
power of coining money and regulating its value *was dele-
gated to Congress by the Constitution for the very purpose*, as
assigned by the framers of that instrument, *of creating and
preserving the uniformity and purity of such a standard of value.*"

The present majority of the court say that legal tender
notes " have become the universal measure of values," and
they hold that the legislation of Congress, substituting such
measures for coin by making the notes a legal tender in
payment, is warranted by the Constitution.

But if the plain sense of words, if the contemporaneous
exposition of parties, if common consent in understanding,
if the opinions of courts avail anything in determining the
meaning of the Constitution, it seems impossible to doubt
that the power to coin money is a power to establish a uni-
form standard of value, and that no other power to establish
such a standard, by making notes a legal tender, is conferred
upon Congress by the Constitution.

---

* 4 Webster's Works, 271, 280.     † 2 Howard, 38.     ‡ 9 Id. 567.

My brothers CLIFFORD and FIELD concur in these views, but in consideration of the importance of the principles involved will deliver their separate opinions. My brother NELSON also dissents.

Mr. Justice CLIFFORD, dissenting:

Money, in the constitutional sense, means coins of gold and silver fabricated and stamped by authority of law as a measure of value, pursuant to the power vested in Congress by the Constitution.*

Coins of copper may also be minted for small fractional circulation, as authorized by law and the usage of the government for eighty years, but it is not necessary to discuss that topic at large in this investigation.†

Even the authority of Congress upon the general subject does not extend beyond the power to coin money, regulate the value thereof and of foreign coin.‡

Express power is also conferred upon Congress to fix the standard of weights and measures, and of course that standard, as applied to future transactions, may be varied or changed to promote the public interest, but the grant of power in respect to the standard of value is expressed in more guarded language, and the grant is much more restricted.

Power to fix the standard of weights and measures is evidently a power of comparatively wide discretion, but the power to regulate the value of the money authorized by the Constitution to be coined is a definite and precise grant of power, admitting of very little discretion in its exercise, and is not equivalent, except to a very limited extent, to the power to fix the standard of weights and measures, as the money authorized by that clause of the Constitution is coined money, and as a necessary consequence must be money of actual value, fabricated from the precious metals generally used for that purpose at the period when the Constitution was framed.

---

* Walker's Science of Wealth, 124; Liverpool on Coins, 8.
† 7 Jefferson's Works, 462.          ‡ Constitution, art. 8, clause 5.

Coined money, such as is authorized by that clause of the instrument, consists only of the coins of the United States fabricated and stamped by authority of law, and is the same money as that described in the next clause of the same section as the current coins of the United States, and is the same money also as "the gold and silver coins" described in the tenth section of the same article, which prohibits the States from coining money, emitting bills of credit, or making "anything but gold and silver coin a tender in payment of debts."

Intrinsic value exists in gold and silver, as well before as after it is fabricated and stamped as coin, which shows conclusively, that the principal discretion vested in Congress under that clause of the Constitution consists in the power to determine the denomination, fineness, or value and description of the coins to be struck, and the relative proportion of gold or silver, whether standard or pure, and the proportion of alloy to be used in minting the coins, and to prescribe the mode in which the intended object of the grant shall be accomplished and carried into practical effect.

Discretion, to some extent, in prescribing the value of the coins minted, is beyond doubt vested in Congress, but the plain intent of the Constitution is that Congress, in determining that matter, shall be governed chiefly by the weight and intrinsic value of the coins, as it is clear that if the stamped value of the same should much exceed the real value of gold and silver not coined, the minted coins would immediately cease to be either current coins or a standard of value as contemplated by the Constitution.*   Commercial transactions imperiously require a standard of value, and the commercial world, at a very early period in civilization, adopted gold and silver as the true standard for that purpose, and the standard originally adopted has ever since continued to be so regarded by universal consent to the present time.

Paper emissions have, at one time or another, been authorized and employed as currency by most commercial nations,

---

* Huskisson on Depreciation of Currency.   22 Financial Pamphlets, 579.

and by no government, past or present, more extensively than by the United States, and yet it is safe to affirm that all experience in its use as a circulating medium has demonstrated the proposition that it cannot by any legislation, however stringent, be made a standard of value or the just equivalent of gold and silver.    Attempts of the kind have always failed, and no body of men, whether in public or private stations, ever had more instructive teachings of the truth of that remark than the patriotic men who framed the Federal Constitution, as they had seen the power to emit bills of credit freely exercised during the war of the Revolution, not only by the Confederation, but also by the States, and knew from bitter experience its calamitous effects and the utter worthlessness of such a circulating medium as a standard of value.    Such men so instructed could not have done otherwise than they did do, which was to provide an irrepealable standard of value, to be coined from gold and silver, leaving as little upon the subject to the discretion of Congress as was consistent with a wise forecast and an invincible determination that the essential principles of the Constitution should be perpetual as the means to secure the blessings of liberty to themselves and their posterity.

Associated as the grant to coin money and regulate the value thereof is with the grant to fix the standard of weights and measures, the conclusion, when that fact is properly weighed in connection with the words of the grant, is irresistible that the purpose of the framers of the Constitution was to provide a permanent standard of value which should, at all times and under all circumstances, consist of coin, fabricated and stamped, from gold and silver, by authority of law, and that they intended at the same time to withhold from Congress, as well as from the States, the power to substitute any other money as a standard of value in matters of finance, business, trade, or commerce.

Support to that view may also be drawn from the last words of the clause giving Congress the unrestricted power to regulate the value of foreign coin, as it would be difficult if not impossible to give full effect to the standard of value

prescribed by the Constitution, in times of fluctuation, if the circulating medium could be supplied by foreign coins not subject to any congressional regulation as to their value.

Exclusive power to regulate the alloy and value of the coin struck by their own authority, or by the authority of the States, was vested in Congress under the Confederation, but the Congress was prohibited from enacting any regulation as to the value of the coins unless nine States assented to the proposed regulation.

Subject to the power of Congress to pass such regulations it is unquestionably true that the States, under the Confederation as well as the United States, possessed the power to coin money, but the Constitution, when it was adopted, denied to the States all authority upon the subject, and also ordained that they should not make anything but gold and silver coin a tender in payment of debts.

Beyond all doubt the framers of the Constitution intended that the money unit of the United States, for measuring values, should be one dollar, as the word dollar in the plural form is employed in the body of the Constitution, and also in the seventh amendment, recommended by Congress at its first session after the Constitution was adopted. Two years before that, to wit, July 6, 1785, the Congress of the Confederation enacted that the money unit of the United States should "be one dollar," and one year later, to wit, August 8, 1786, they established the standard for gold and silver, and also provided that the money of account of the United States should correspond with the coins established by law.*

On the 4th of March, 1789, Congress first assembled under the Constitution, and proceeded without unnecessary delay to enact such laws as were necessary to put the government in operation which the Constitution had ordained and established. Ordinances had been passed during the Confedera-

* 1 Laws of the U. S., 1st ed., 646 ; 1 Curtis's History of the Constitution, 443 ; 10 Journals of Congress (Dunlap's ed.), 225 ; 1 Life of Gouverneur Morris, 273 ; 11 Journals of Congress, 179.

tion to organize the executive departments, and for the establishment of a mint, but the new Constitution did not perpetuate any of those laws, and yet Congress continued to legislate for a period of three years before any new law was passed prescribing the money unit or the money of account, either for " the public offices " or for the courts. Throughout that period it must have been understood that those matters were impliedly regulated by the Constitution, as tariffs were enacted, tonnage duties imposed, laws passed for the collection of duties, the several executive departments created, and the judiciary of the United States organized and empowered to exercise full jurisdiction under the Constitution.

Duties of tonnage and import duties were required, by the act of the 31st of July, 1789, to be paid " in gold and silver coin," and Congress in the same act adopted comprehensive regulations as to the value of foreign coin, but no provision was made for coining money or for a standard of value, except so far as that subject is involved in the regulation as to the value of foreign coin, or for a money unit, nor was any regulation prescribed as to the money of account. Revenue for the support of the government, under those regulations, was to be derived solely from duties of tonnage and import duties, and the express provision was that those' duties should be collected in gold and silver coin.*

Legislation under the Constitution had proceeded thus far before the Treasury Department was created. Treasury regulations for the collection, safe-keeping, and disbursement of the public moneys became indispensable, and Congress, on the 2d September, 1789, passed the act to establish the Treasury Department, which has ever since remained in force.† By that act, the Secretary of the Treasury is declared to be the head of the department, and it is made his duty, among other things, to digest and prepare plans for the improvement and management of the public finances

---

* 1 Stat. at Large, 24; Ib. 29.                    † Ib. 65.

and for the support of the public credit; to prepare and report estimates of the public revenue and of the public expenditures; to superintend the collection of the revenue; to prescribe forms of keeping and stating accounts and for making returns; to grant all warrants for moneys to be issued from the treasury, in pursuance of appropriations by law, and to perform all such services relative to the finances as he shall be directed to perform.

Moneys collected from duties of tonnage and from import duties constituted at that period the entire resources of the national treasury, and the antecedent act of Congress, providing for the collection of those duties, imperatively required that all such duties should be paid in gold and silver coin, from which it follows that the moneys mentioned in the act creating the Treasury Department were moneys of gold and silver coin which were collected as public revenue from the duties of tonnage and import duties imposed by the before-mentioned prior acts of Congress. Appropriations made by Congress were understood as appropriations of moneys in the treasury, and all warrants issued by the Secretary of the Treasury were understood to be warrants for the payment of gold and silver coin. Forms for keeping and stating accounts, and for making returns and for warrants for moneys to be issued from the treasury were prescribed, and in all those forms the Secretary of the Treasury adopted the money unit recognized in the Constitution, and which had been ordained four years before by the Congress of the Confederation.

Argument to show that the national treasury was organized on the basis that the gold and silver coins of the United States were to be the standard of value is unnecessary, as it is a historical fact which no man or body of men can ever successfully contradict. Public attention had been directed to the necessity of establishing a mint for the coinage of gold and silver, several years before the Convention met to frame the Constitution, and a committee was appointed by the Congress of the Confederation to consider and report upon the subject. They reported on the 21st February,

1782, more than a year before the treaty of peace, in favor of creating such an establishment, and on the 16th of October, 1786, the Congress adopted an ordinance providing that a mint should be established for the coinage of gold, silver, and copper, agreeably to the resolves of Congress previously mentioned, which prescribed the standard of gold and silver, and recognized the money unit established by the resolves passed in the preceding year.*

Congressional legislation organizing the new government had now progressed to the point where it became necessary to re-examine that subject and to make provision for the exercise of the power to coin money, as authorized by the Constitution. Pursuant to that power Congress, on April 2d, 1792, passed the act establishing a mint for the purpose of a national coinage, and made provision, among other things, that coins of gold and silver, of certain fineness and weight, and of certain denominations, value and descriptions, should be from time to time struck and coined at the said mint. Specific provision is there made for coining gold and silver coins, as follows: First, gold coins, to wit: Eagles of the value of ten dollars or units; half-eagles of the value of five dollars; quarter-eagles of the value of two and a half dollars, the act specifying in each case the number of grains and fractions of a grain the coin shall contain, whether fabricated from pure or standard gold. Second, silver coins, to wit: "DOLLARS OR UNITS," each to contain 371 grains and $\frac{4}{16}$ths parts of a grain of pure silver, or 416 grains of standard silver. Like provision is also made for the coinage of half-dollars, quarter-dollars, dimes, and half-dimes, and also for the coinage of certain copper coins, but it is not necessary to enter much into those details in this case.

Provision, it must be conceded, is not there made, in express terms, that the money unit of the United States shall be one dollar, as in the ordinance passed during the Confederation, but the act under consideration assumes throughout that the

---

* 1 Laws of the U. S. 647; 10 Journals of Congress, 225; 11 Id. 254; 8 Stat. at Large, 80.

coin called dollar is the coin employed for that purpose, as is obvious from the fact that the words dollars and units are treated as synonymous, and that all the gold coins previously described in the same section are measured by that word as the acknowledged money unit of the Constitution. Very strong doubts are entertained whether an act of Congress is absolutely necessary to constitute the gold and silver coins of the United States, fabricated and stamped as such by the proper executive officers of the mint, a legal tender in payment of debts. Constituted as such coins are by the Constitution, the standard of value, the better opinion would seem to be that they become legal tender for that purpose, if minted of the required weight and fineness, as soon as they are coined and put in circulation by lawful authority, but it is unnecessary to decide that question in this case, as the Congress, by the 16th section of the act establishing a mint, provided that all the gold and silver coins which shall have been struck at, and issued from, the said mint shall be a lawful tender in all payments whatsoever—those of full weight "according to the respective values herein declared, and those of less than full weight at values proportioned to their respective weights." Such a regulation is at all events highly expedient, as all experience shows that even gold and silver coins are liable to be diminished in weight by wear and abrasion, even if it is not absolutely necessary in order to constitute the coins, if of full weight, a legal tender.

Enough has already been remarked to show that the money unit of the United States is the coined dollar, described in the act establishing the mint, but if more be wanted it will be found in the 20th section of that act, which provides that the money of account of the United States shal be expressed in dollars or units, dimes or tenths, &c., and that all accounts in the public offices and all proceedings in the Federal courts shall be kept and had in conformity to that regulation.*

Completed, as the circle of measures adopted by Congress

---

* 1 Stat. at Large, 248, 250.

were, to put the new government into successful operation, by the passage of that act, it will be instructive to take a brief review of the important events which occurred within the period of ten years next preceding its passage, or of the ten years next following the time when that measure was first proposed in the Congress of the Confederation. Two reasons suggest the 21st of February, 1782, as the time to commence the review, in addition to the fact that it was on that day that the committee of Congress made their report approving of the project to establish a national mint.*  They are as follows : (1) Because that date just precedes the close of the War of the Revolution ; and (2), because the date at the same time extends back to a period when all America had come to the conclusion that all the paper currency in circulation was utterly worthless, and that nothing was fit for a standard of value but gold and silver coin fabricated and stamped by the national authority.  Discussion upon the subject was continued, and the ordinance was passed, but the measure was not put in operation, as the Convention met the next year, and the Constitution was framed, adopted, and ratified, the President and the members of Congress were elected, laws were passed, the judicial system was organized, the executive departments were created, the revenue system established, and provision was made to execute the power vested in Congress to coin money and provide a standard of value, as ordained by the Constitution.

Perfect consistency characterizes the measures of that entire period in respect to the matter in question, and it would be strange if it had been otherwise, as the whole series of measures were to a very large extent the doings of the same class of men, whether the remark is applied to the old Congress, or the Convention which framed the Constitution, or to the first and second sessions of the new Congress which passed the laws referred to and put the new system of government under the Constitution into full operation.  Wise and complete as those laws were, still some

---

* 7 Journals of Congress, 286.

difficulties arose, as the several States had not adopted the money unit of the United States, nor the money of account prescribed by the twentieth section of the act establishing the mint. Such embarrassments, however, were chiefly felt in the Federal courts, and they were not of long continuance, as the several States, one after another, in pretty rapid succession, adopted the new system established by Congress both as to the money unit and the money of account. Virginia, December 19th, 1792, re-enacted that section in the act of Congress without any material alteration, and New Hampshire, on the 20th of February, 1794, passed a similar law.* Massachusetts adopted the same provision the next year, and so did Rhode Island and South Carolina.† Georgia concurred on the 22d of February, 1796, and New York on the 27th of January, 1797, and all the other States adopted the same regulation in the course of a few years.‡ State concurrence was essential in those particulars to the proper working of the new system, and it was cheerfully accorded by the State legislatures without unnecessary delay.

Congress established as the money unit the coin mentioned in the Constitution, and the one which had been adopted as such seven years before in the resolve passed by the Congress of the Confederation. Dollars, and decimals of dollars, were adopted as the money of account by universal consent, as may be inferred from the unanimity exhibited by the States in following the example of Congress. Nothing remained for Congress to do to perfect the new system but to execute the power to coin money and regulate the value thereof, as it is clear that the Constitution makes no provision for a standard of value unless the power to establish it is conferred by that grant.

Power to fix the standard of weights and measures is vested in Congress by the Constitution in plain and unam-

---

* 13 Hening's Statutes (Va.), 478; Laws of New Hampshire, 240.

† 2 Laws of Massachusetts, 657; Revised Laws of Rhode Island, p. 319; 5 Statutes of South Carolina, 262.

‡ M. & C. Dig. (Ga.), 83; 3 Laws of New York, Greeln. ed. 363.

biguous terms, and it was never doubted, certainly not until within a recent period, that the power conferred to coin money or to fabricate and stamp coins from gold and silver, which in the constitutional sense is the same thing, together with the power to determine the fineness, weight, and denominations of the moneys coined, was intended to accomplish the same purpose as to values. Indubitably it was so understood by Congress in prescribing the various regulations contained in the act establishing the national mint, and it continued to be so understood by all branches of the government—executive, legislative, and judicial—and by the whole people of the United States, for the period of seventy years, from the passage of that act.

New regulations became necessary, and were passed in the meantime increasing slightly the proportion of alloy used in fabricating the gold coins, but if those enactments are carefully examined it will be found that no one of them contains anything inconsistent in principle with the views here expressed. Gold, at the time the act establishing the mint became a law, was valued 15 to 1 as compared with silver, but the disparity in value gradually increased, and to such an extent that the gold coins began to disappear from circulation, and to remedy that evil Congress found it necessary to augment the *relative* proportion of alloy by diminishing the required amount of gold, whether pure or standard. Eagles coined under that act were required to contain each 232 grains of pure gold, or 258 grains of standard gold.* Three years later Congress enacted that the standard for both gold and silver coins should thereafter be such that, of 1000 parts by weight, 900 should be of pure metal and 100 of alloy, by which the gross weight of the dollar was reduced to 412½ grains, but the fineness of the coins was correspondingly increased, so that the money unit remained of the same intrinsic value as under the original act. Apply that rule to the eagle and it will be seen that its gross weight would be increased, as it was in fact by that act, but it con-

---

* 4 Stat. at Large, 699.

tinued to contain, as under the preceding act, 232 grains of pure gold and no more, showing conclusively that no change was made in the value of the coins.*

Double eagles and gold dollars were authorized to be "struck and coined" at the mint, by the act of March 3d, 1849, but the standard established for other gold coins was not changed, and the provision was that the new coins should also be legal tender for their coined value.†

Fractional silver coins were somewhat reduced in value by the act of February 21st, 1853, but the same act provided to the effect that the silver coins issued in conformity thereto should not be a legal tender for any sum exceeding five dollars, showing that the purpose of the enactment was to prevent the fractional coins, so essential for daily use, from being hoarded or otherwise withdrawn from circulation.‡

Suppose it be conceded, however, that the effect of that act was slightly to debase the fractional silver coins struck and coined under it, still it is quite clear that the amount was too inconsiderable to furnish any solid argument against the proposition that the standard of value in the United States was fixed by the Constitution, and that such was the understanding, both of the government and of the people of the United States, for a period of more than seventy years from the time the Constitution was adopted and put in successful operation under the laws of Congress. Throughout that period the value of the money unit was never diminished, and it remains to-day, in respect to value, what it was when it was defined in the act establishing the mint, and it is safe to affirm that no one of the changes made in the other coins, except perhaps the fractional silver coins, ever extended one whit beyond the appropriate limit of constitutional regulation.

Treasury notes, called United States notes, were authorized to be issued by the act of February 25th, 1862, to the amount of $150,000,000, on the credit of the United States, but they were not to bear interest, and were to be made

---

\* 5 Stat. at Large, 137.     † 9 Id. 397.     ‡ 10 Id. 160

payable to bearer at the treasury.  They were to be issued by the Secretary of the Treasury, and the further provision was that the notes so issued should be lawful money and legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest upon bonds and notes of the United States, which the act provides "shall be paid in coin."*  Subsequent acts passed for a similar purpose also except " certificates of indebtedness and of deposit," but it will not be necessary to refer specially to the other acts, as the history of that legislation is fully given in the prior decision of this court upon the same subject.†

Strictly examined it is doubtful whether either of the cases before the court present any such questions as those which have been discussed in the opinion of the majority of the court just read; but suppose they do, which is not admitted, it then becomes necessary to inquire in the first place whether those questions are not closed by the recorded decisions of this court.  Two questions are examined in the opinion of the majority of the court: (1.) Whether the legal tender acts are constitutional as to contracts made before the acts were passed.  (2.) Whether they are valid if applied to contracts made since their passage.

Assume that the views here expressed are correct, and it matters not whether the contract was made before or after the act of Congress was passed, as it necessarily follows that Congress cannot, under any circumstances, make paper promises, of any kind, a legal tender in payment of debts. Prior to the decision just pronounced it is conceded that the second question presented in the record was never determined by this court, except as it is involved in the first question, but it is admitted by the majority of the court that the first question, that is the question whether the acts under consideration are constitutional as to contracts made before their passage, was fully presented in the case of *Hepburn* v.

---

* 12 Stat. at Large, 345.

† Hepburn v. Griswold, 8 Wallace, 618; 12 Stat. at Large, 370, 532, 710, 822.

*Griswold*, and that the court decided that an act of Congress making mere paper promises to pay dollars a legal tender in payment of debts previously contracted is unconstitutional and void.

Admitted or not, it is as clear as anything in legal decision can be that the judgment of the court in that case controls the first question presented in the cases before the court, unless it be held that the judgment in that case was given for the wrong party and that the opinion given by the Chief Justice ought to be overruled.

Attempt is made to show that the second question is an open one, but the two, in my judgment, involve the same considerations, as Congress possesses no other power upon the subject than that which is derived from the grant to coin money, regulate the value thereof and of foreign coin. By that remark it is not meant to deny the proposition that Congress in executing the express grants may not pass all laws which shall be necessary and proper for carrying the same into execution, as provided in another clause of the same section of the Constitution. Much consideration of that topic is not required, as the discussion was pretty nearly exhausted by the Chief Justice in the case of *Hepburn* v. *Griswold*,* which arose under the same act and in which he gave the opinion. In that case the contract bore date prior to the passage of the law, and he showed conclusively that it could never be necessary and proper, within the meaning of the Constitution, that Congress, in executing any of the express powers, should pass laws to compel a creditor to accept paper promises as fulfilling a contract for the payment of money expressed in dollars. Obviously the decision was confined to the case before the court, but I am of the opinion that the same rule must be applied whether the contract was made before or after the passage of the law, as the contract for the payment of money, expressed in dollars, is a contract to make the payment in such money as the Constitution recognizes and establishes as a standard of value. Money

---

* 8 Wallace, 614, 625.

values can no more be measured without a standard of value than distances without a standard of extent, or quantities without a standard of weights or measures, and it is as necessary that there should be a money unit as that there should be a unit of extent, or of weight, or quantity.*

Credit currency, whether issued by the States or the United States, or by private corporations or individuals, is not recognized by the Constitution as a standard of value, nor can it be made such by any law which Congress or the States can pass, as the laws of trade are stronger than any legislative enactment. Commerce requires a standard of value, and all experience warrants the prediction that commerce will have it, whether the United States agree or disagree; as the laws of commerce in that respect are stronger than the laws of any single nation of the commercial world.†  Values cannot be measured without a standard any more than time or duration, or length, surface, or solidity, or weight, gravity, or quantity. Something in every such case must be adopted as a unit which bears a known relation to that which is to be measured, as the dollar for values, the hour for time or duration, the foot of twelve inches for length, the yard for cloth measure, the square foot or yard for surface, the cubic foot for solidity, the gallon for liquids, and the pound for weights; the pound avoirdupois being used in most commercial transactions and the pound troy "for weighing gold and silver and precious stones, except diamonds."‡

Unrestricted power "to fix the standard of weights and measures" is vested in Congress, but until recently Congress had not enacted any general regulations in execution of that power.§  Regulations upon the subject existed in the States at the adoption of the Constitution, the same as those

---

* 7 Jefferson's Works, 472; 22 Financial Pamphlets, 417; Horner's Bullion Report.

† McCullock, Commercial Dictionary, edition of 1869, 330.

‡ 2 Bouvier's Law Dictionary, 648; 7 Jefferson's Works, 472; · Jefferon's Correspondence, 133.

§ 4 Stat. at Large, 278; 5 Id. 133; 14 Id. 339.

which prevailed at that time in the parent country, and Judge Story says that the understanding was that those regulations remained in full force and that the States, until Congress should legislate, possessed the power to fix their own weights and measures.*

Power to coin money and regulate the value of domestic and foreign coin was vested in the national government to produce uniformity of value and to prevent the embarrassments of a perpetually fluctuating and variable currency.†

Money, says the same commentator, is the universal medium *or common standard* by a comparison with which the value of all merchandise may be ascertained; and he also speaks of it as "a sign which represents the respective values of all other commodities."‡  Such a power, that is the power to coin money, he adds, is one of the ordinary prerogatives of sovereignty, and is almost universally exercised in order to preserve a proper circulation of good coin, of a known value, in the home market.§

Interests of such magnitude and pervading importance as those involved in providing for a uniform standard of value throughout the Union were manifestly entitled to the protection of the national authority, and in view of the evils experienced for the want of such a standard during the war of the Revolution, when the country was inundated with floods of depreciated paper, the members of the Convention who framed the Constitution did not hesitate to confide the power to Congress not only to coin money and regulate the value thereof, but also the power to regulate the value of foreign coin, which was denied to the Congress of the Confederation.‖

Influenced by these considerations and others expressed

---

* 2 Story on the Constitution (3d ed.), ? 1122;  Rawle on the Constitution, 102;  Cooley on Constitutional Limitations, 596;  Pomeroy on the Constitution, 263.

† 2 Story on the Constitution, ? 1122.

‡ 2 Story on the Constitution, ? 1118.

? Mill, Political Economy, 294.

‖ 2 Phillips's Paper Currency, 135;  9 Jefferson's Works, 254, 289;  6 Sparks, Washington's Letters, 321.

in the opinion of the Chief Justice, this court decided in the case referred to, that the act of Congress making the notes in question "lawful money and a legal tender in payment of debts" could not be vindicated as necessary and proper means for carrying into effect the power vested in Congress to coin money and regulate the value thereof, or any other express power vested in Congress under the Constitution. Unless that case, therefore, is overruled, it is clear in my judgment, that both the cases before the court are controlled by that decision. Controversies determined by the Supreme Court are finally and conclusively settled, as the decisions are numerous that the court cannot review and reverse their own judgments.*

But where the parties are different, it is said the court, in a subsequent case, may overrule a former decision, and it must be admitted that the proposition, in a technical point of view, is correct. Such examples are to be found in the reported decisions of the court, but they are not numerous, and it seems clear that the number ought never to be increased, especially in a matter of so much importance, unless the error is plain and upon the clearest convictions of judicial duty.

Judgment was rendered for the plaintiff in that case on the 17th of September, 1864, in the highest court of the State, and on the 23d of June in the succeeding year the defendants sued out a writ of error, and removed the cause into this court for re-examination.† Under the regular call of the docket the case was first argued at the December Term, 1867, but at the suggestion of the Attorney-General an order was passed that it be re-argued, and the case was accordingly continued for that purpose. Able counsel appeared at the next term, and it was again elaborately argued on both sides. Four or five other cases were also on the calendar, supposed at that time to involve the same consti-

---

* Sibbald v. United States, 12 Peters, 492; Bridge Co. v. Stewart, 3 Howard, 424; Peck v. Sanderson, 18 Id. 42; Noonan v. Bradley, 12 Wallace, 121.

† Griswold v. Hepburn, 2 Duvall, 20.

tutional questions, and those cases were also argued, bringing to the aid of the court an unusual array of counsel of great learning and eminent abilities. Investigation and deliberation followed, authorities were examined, and oft-repeated consultations among the justices ensued, and the case was held under advisement as long as necessary to the fullest examination by all the justices of the court, before the opinion of the court was delivered. By law the Supreme Court at that time consisted of the Chief Justice and seven associate justices, the act of Congress having provided that no vacancy in the office of associate justice should be filled until the number should be reduced to six.* Five of the number, including the Chief Justice, concurred in the opinion in that case, and the judgment of the State court was affirmed, three of the associate justices dissenting. Since that time one of the justices who concurred in that opinion of the court has resigned, and Congress having increased the number of the associate justices to eight, the two cases before the court have been argued, and the result is that the opinion delivered in the former case is overruled, five justices concurring in the present opinion and four dissenting. Five justices concurred in the first opinion, and five have overruled it.† Persuaded that the first opinion was right, for the reasons already assigned, it is not possible that I should concur in the second, even if it were true that no other reasons of any weight could be given in support of the judgment in the first case, and that the conclusion there reached must stand or fall without any other support. Many other reasons, however, may be invoked to fortify that conclusion, equally persuasive and convincing with those to which reference has been made.

All writers upon political economy agree that money is the universal standard of value, and the measure of exchange, foreign and domestic, and that the power to coin and regulate the value of money is an essential attribute of national sovereignty. Goods and chattels were directly bar-

---

* 14 Stat. at Large, 209.          † 16 Id. 44.

tered, one for another, when the division of labor was first introduced, but gold and silver were adopted to serve the purpose of exchange by the tacit concurrence of all nations at a very early period in the history of commercial transactions.*   Commodities of various kinds were used as money at different periods in different countries, but experience soon showed the commercial nations that gold and silver embodied the qualities desirable in money in a much greater degree than any other known commodity or substance.†   Daily experience shows the truth of that proposition, and supersedes the necessity of any remarks to enforce it, as all admit that a commodity to serve as a standard of value and a medium of exchange must be easily divisible into small portions; that it must admit of being kept for an indefinite period without deteriorating; that it must possess great value in small bulk, and be capable of being easily transported from place to place; that a given denomination of money should always be equal in weight and quality, or fineness to other pieces of money of the same denomination, and that its value should be the same or as little subject to variation as possible.‡   Such qualities, all agree, are united in a much greater degree in gold and silver than in any other known commodity, which was as well known to the members of the Convention who framed the Constitution as to any body of men since assembled, and intrusted to any extent with the public affairs.   They not only knew that the money of the commercial world was gold and silver, but they also knew, from bitter experience, that paper promises, whether issued by the States or the United States, were utterly worthless as a standard of value for any practical purpose.

Evidence of the truth of these remarks, of the most convincing character, is to be found in the published proceedings of that Convention.   Debate upon the subject first arose when an amendment was proposed to prohibit the States

* Walker's Science of Wealth, 127.

† 1 Smith's Wealth of Nations, 35.

‡ McCullock's Commercial Dictionary (ed. 1869), 894; Mill's Political Economy, 294; 7 Jefferson's Works, 490.

from emitting bills of credit or making anything but gold and silver coin a tender in payment of debts, and from the character of that debate, and the vote on the amendment, it became apparent that paper money had but few, if any friends in the Convention.* Article seven of the draft of the Constitution, as reported to the Convention, contained the clause, "and emit bills on the credit of the United States," appended to the grant of power vested in Congress to borrow money, and it was on the motion to strike out that clause that the principal discussion in respect to paper money took place. Mr. Madison inquired if it would not be sufficient to prohibit the making such bills a tender, as that would remove the temptation to emit them with unjust views. Promissory notes, he said, in that shape, that is when not a tender, "may in some emergencies be best." Some were willing to acquiesce in the modification suggested by Mr. Madison, but Mr. Morris, who submitted the motion, objected, insisting that if the motion prevailed there would still be room left for the notes of a responsible minister, which, as he said, "would do all the good without the mischief." Decided objections were advanced by Mr. Ellsworth, who said he thought the moment a favorable one "to shut and bar the door against paper money;" and others expressed their opposition to the clause in equally decisive language, even saying that they would sooner see the whole plan rejected than retain the three words, "and emit bills." Suffice it to say, without reproducing the discussion, that the motion prevailed—nine States to two—and the clause was stricken out and no attempt was ever made to restore it. Paper money, as legal tender, had few or no advocates in the Convention, and it never had more than one open advocate throughout the period the Constitution was under discussion, either in the Convention which framed it, or in the conventions of the States where it was ratified. Virginia voted in the affirmative on the motion to strike out that clause, Mr. Madison being satisfied that if the motion pre-

* 3 Madison Papers, 1442.

vailed it would not have the effect to disable the government from the use of treasury notes, and being himself in favor of cutting "*off the pretext for a paper currency, and particularly for making the bills a tender, either for public or private debts.*"\* When the draft for the Constitution was reported the clause prohibiting the States from making anything but gold and silver a tender in payment of debts contained an' exception, "in case Congress consented," but the Convention, struck out the exception, and made the prohibition absolute, one of the members remarking that it was a favorable moment to crush out paper money, and all or nearly all of the Convention seemed to concur in the sentiment.†

Contemporaneous acts are certainly evidence of intention, and if so, it is difficult to see what more is needed to show that the members of that Convention intended to withhold from the States, and from the United States, all power to make anything but gold and silver a standard of value, or a tender in payment of debts. Equally decisive proof to the same effect is found in the debates which subsequently occurred in the conventions of the several States, to which the Constitution, as adopted, was submitted for ratification.‡ Mr. Martin thought that the States ought not to be totally deprived of the right to emit bills of credit, but he says " that the Convention was so smitten with the paper money dread that they insisted that the prohibition should be absolute."§

Currency is a word much more comprehensive than the word money, as it may include bank bills and even bills of exchange as well as coins of gold and silver, but the word money, as employed in the grant of power under consideration, means the coins of gold and silver, fabricated and stamped as required by law, which, by virtue of their intrinsic value, as universally acknowledged, and their official origin, become the medium of exchange and the standard

---

\* 3 Madison Papers, 1344; 5 Elliott's Debates, 434, 485.

† 2 Curtis's History of the Constitution, 364.

‡ 1 Elliott's Debates, 492; 2 Id. 486; 4 Id. 184; Ib. 334, 336; 8 Id. 290, 472, 478; 1 Id. 369, 370.          § 1 Id. 376.

by which all other values are expressed and discharged. Support to the proposition that the word money, as employed in that clause, was intended to be used in the sense here supposed is also derived from the language employed in certain numbers of the Federalist, which, as is well known, were written and published during the period the question whether the States would ratify the Constitution was pending in their several conventions. Such men as the writers of those essays never could have employed such language if they had entertained the remotest idea that Congress possessed the power to make paper promises a legal tender.*

Like support is also derived from the language of Mr. Hamilton in his celebrated report recommending the incorporation of a national bank. He first states the objection to the proposed measure, that banks tend to banish the gold and silver of the country; and secondly he gives the answer to that objection made by the advocates of the bank, that it is immaterial what serves the purpose of money, and then says that the answer is not entirely satisfactory, as the permanent increase or decrease of the precious metals in a country can hardly ever be a matter of indifference. "As the commodity taken in lieu of every other, it (coin) is a species of the most effective wealth, and as the money of the world it is of great concern to the state that it possesses a sufficiency of it to face any demands which the protection of its external interests may create." He favored the incorporation of a national bank, with power to issue bills and notes *payable on demand in gold and silver,* but he expressed himself as utterly opposed to paper emissions by the United States, characterizing them as so liable to abuse and even so certain of being abused that the government ought never to trust itself "with the use of so seducing and dangerous an element."† Opposed as he was to paper emissions by the United States, under any circumstances, it is past belief that he could ever have concurred in the proposition to make

---

* Federalist, No. 44; Ibid. No. 42.
† Hist. of the Bank of the United States, 21, 24, 32.

such emissions a tender in payment of debts, either as a member of the Convention which framed the Constitution or as the head of the Treasury Department. Treasury notes, however, have repeatedly been authorized by Congress, commencing with the act of 30th of June, 1812, but it was never supposed before the time when the several acts in question were passed that Congress could make such notes a legal tender in payment of debts.* Such notes, it was enacted, should be received in payment of all duties and taxes laid, and in payment for public lands sold, by the Federal authority. Provision was also made in most or all of the acts that the Secretary of the Treasury, with the approbation of the President, might cause treasury notes to be issued, at the par value thereof, in payment of services, of supplies, or of debts for which the United States were or might be answerable by law, to such person or persons as should be *willing to accept the same* in payment, but it never occurred to the legislators of that day that such notes could be made a legal tender in discharge of such indebtedness, or that the public creditor could be compelled to accept them in payment of his just demands.†

Financial embarrassments, second only in their disastrous consequences to those which preceded the adoption of the Constitution, arose towards the close of the last war with Great Britain, and it is matter of history that those embarrassments were too great and pervading to be overcome by the use of treasury notes or any other paper emissions without a specie basis. Expedients of various kinds were suggested, but it never occurred either to the executive or to Congress that a remedy could be found by making treasury notes, as then authorized, a legal tender, and the result was that the second Bank of the United States was incorporated.‡ Paper currency, it may be said, was authorized by that act, which is undoubtedly true; and it is also true that the bills or notes of the bank were made receivable in all payments to the United States, if the same were at the time

---

* 2 Stat at Large, 766; 3 Id. 100.      † 3 Id. 315.      ‡ Ib. 266.

payable on demand, but the act provided that the corporation should not refuse, under a heavy penalty, the payment in gold and silver, of any of its notes, bills, or obligations, nor of any moneys received upon deposit in the bank or in any of its offices of discount and deposit.

Serious attempt is made, strange to say, to fortify the proposition that the acts in question are constitutional from the fact that Congress, in providing for the use of treasury notes, and in granting the charters to the respective national banks, made the notes and bills receivable in payment of duties and taxes, but the answer to the suggestion is so obvious that it is hardly necessary to pause to suggest its refutation.* Creditors may exact gold and silver or they may waive the right to require such money, and accept credit currency, or commodities, other than gold and silver, and the United States, as creditors, or in the exercise of their express power to lay and collect taxes, duties, imposts, and excises, may, if they see fit, accept the treasury notes or bank bills in such payments as substitutes for the constitutional currency. Further discussion of the proposition is unnecessary, as it is plainly destitute of any merit whatever.†

Resort was also had to treasury notes in the revulsion of 1837, and during the war with Mexico, and also in the great revulsion of 1857, but the new theory that Congress could make treasury notes a legal tender was not even suggested, either by the President or by any member of Congress.‡

Seventy years are included in this review, even if the computation is only carried back to the passage of the act establishing the mint, and it is clear that there is no trace of any act, executive or legislative, within that period, which affords the slightest support to the new constitutional theory that Congress can by law constitute paper emissions a tender in payment of debts. Even Washington, the father of our country, refused to accept paper money in payment of debts, contracted before the War of Independence, and the proof

---

* Metropolitan Bank v. Van Dyck, 27 New York, 42.

† 4 Webster's Works, 271; Thorndike v. United States, 2 Mason, 18.

‡ 5 Stat. at Large, 201; Ib. 469; 9 Id. 118; 11 Id. 257.

is full to the point that Hamilton, as well as Jefferson and Madison, was opposed to paper emissions by the national authority.*

Sufficient also is recorded in the reports of the decisions of this court to show that the court, from the organization of the judicial system to the day when the judgments in the cases before the court were announced,† held opinions utterly opposed to such a construction of the Constitution as would authorize Congress to make paper promises a legal tender as between debtor and creditor. Throughout that period the doctrine of the court has been, and still is, unless the opinion of the court just read constitutes an exception, that the government of the United States, as ordained and established by the Constitution, is a government of enumerated powers; that all the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people; that every power vested in the Federal government under the Constitution is in its nature sovereign, and that Congress may pass all laws necessary and proper to carry the same into execution, or, in other words, that the power being sovereign includes, by force of the term, the requisite means, fairly applicable to the attainment of the contemplated end, which are not precluded by restrictions or exceptions expressed or necessarily implied, and not contrary to the essential ends of political society.‡

Definitions slightly different have been given by different jurists to the words "necessary and proper," employed in the clause of the Constitution conferring upon Congress the power to pass laws for carrying the express grants of power into execution, but no one ever pretended that a construction or definition could be sustained that the general clause would authorize the employment of such means in the execution of one express grant as would practically

* 2 Phillips's Paper Currency, 135; 6 Sparks's Letters of Washington, 821.

† Legal Tender Cases, 11 Wallace, 682.

‡ History of the Bank of the United States, 95.

nullify another or render another utterly nugatory. Circumstances made it necessary that Mr. Hamilton should examine that phrase at a very early period after the Constitution was adopted, and the definition he gave to it is as follows: "All the means requisite and fairly applicable to the attainment of the end of such power which are not precluded by restrictions and exceptions specified in the Constitution, and not contrary to the essential ends of political society." Twenty-five years later the question was examined by the Supreme Court* and authoritatively settled, the Chief Justice giving the opinion. His words were: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, and which are not prohibited but consistent with the letter and spirit of the Constitution, are constitutional."

Substantially the same definition was adopted by the present Chief Justice in the former case, in which he gave the opinion of the court, and there is nothing contained in the Federal reports giving the slightest sanction to any broader definition of those words. Take the definition given by Mr. Hamilton, which, perhaps, is the broadest, if there is any difference, and still it is obvious that it would give no countenance whatever to the theory that Congress, in passing a law to execute one express grant of the Constitution, could authorize means which would nullify another express grant, or render it nugatory for the attainment of the end which the framers of the Constitution intended it should accomplish.

Authority to coin money was vested in Congress to provide a permanent national standard of value, everywhere the same, and subject to no variation except what Congress shall make under the power to regulate the value thereof, and it is not possible to affirm, with any hope that the utterance will avail in the argument, that the power to coin money is not an express power, and if those premises are

---

* McCulloch *v.* Maryland, 4 Wheaton, 421.

conceded it cannot be shown that Congress can so expand any other express power by implication as to nullify or defeat the great purposes which the power to coin money and establish a standard of value was intended to accomplish.

Government notes, it is conceded, may be issued as a means of borrowing money, because the act of issuing the notes may be, and often is, a requisite means to execute the granted power, and being fairly applicable to the attainment of the end, the notes, as means, may be employed, as they are not precluded by any restrictions or exceptions, and are not repugnant to any other express grant contained in the Constitution. Light-houses, buoys, and beacons may be erected under the power to regulate commerce, but Congress cannot authorize an officer of the government to take private property for such a purpose without just compensation, as the exercise of such a power would be repugnant to the fifth amendment. Power to lay and collect taxes is conferred upon Congress, but the Congress cannot tax the salaries of the State judges, as the exercise of such a power is incompatible with the admitted power of the States to create courts, appoint judges, and provide for their compensation.*

Congress may also impose duties, imposts, and excises to pay the debts and provide for the common defence and general welfare, but the Congress cannot lay any tax or duty on articles exported from any State, nor can Congress give any preference by any regulation of commerce or revenue to the ports of one State over those of another, as the exercise of any such power is prohibited by the Constitution. Exclusive power is vested in Congress to declare war, to raise and support armies, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces. Appropriations to execute those powers may be made by Congress, but no appropriations of money to that use can be made for a longer term than two years, as an appropriation for a longer term is expressly

---

* Collector v. Day, 11 Wallace, 113; Ward v. Maryland, 12 Id. 418.

prohibited by the same clause which confers the power to raise and support armies. By virtue of those grants of power Congress may erect forts and magazines, may construct navy-yards and dock-yards, manufacture arms and munitions of war, and may establish depots and other needful buildings for their preservation, but the Congress cannot take private property for that purpose without making compensation to the owner, as the Constitution provides that private property shall not be taken for public use without just compensation.

Legislative power under the Constitution can never be rightfully extended to the exercise of a power not granted nor to that which is prohibited, and it makes no difference whether the prohibition is express or implied, as an implied prohibition, when once ascertained, is as effectual to negative the right to legislate as one that is expressed; the rule being that Congress, in passing laws to carry the express powers granted into execution, cannot select any means as requisite for that purpose or as fairly applicable to the attainment of the end, which are precluded by restrictions or exceptions contained in the Constitution, or which are contrary to the essential ends of political society.*

Concede these premises, and it follows that the acts of Congress in question cannot be regarded as valid unless it can be held that the power to make paper emissions a legal tender in payment of debts can properly be implied from the power to coin money, and that such emissions, when enforced by such a provision, become the legal standard of value under the Constitution. Extended discussion of the first branch of the proposition would seem to be unnecessary, as the dissenting justices in the former case abandoned that point and frankly stated in the dissenting opinion delivered that they were not able to see in those clauses, " standing alone, a sufficient warrant for the exercise of this power." Through their organ on the occasion they referred to the power to declare war, to suppress insurrection, to

---

* History of the Bank of the United States, 95.

raise and support armies, to provide and maintain a navy, to borrow money, to pay the debts of the Union, and to provide for the common defence and general welfare, as grants of power conferred in separate clauses of the Constitution. Reference was then made in very appropriate terms to the exigencies of the treasury during that period and the conclusion reached, though expressed interrogatively, appears to be that the provision making the notes a legal tender was a necessary and proper one as conducing " towards the purpose of borrowing money, of paying debts, of raising armies, of suppressing insurrection," or, as expressed in another part of the same opinion, the provision was regarded as " necessary and proper to enable the government to borrow money to carry on the war."*

Suggestions or intimations are made in one or more of the opinions given in the State courts that the power assumed by Congress may be vindicated as properly implied from the power to coin money, but inasmuch as that assumption was not the ground of the dissent in the former case, and as the court is not referred to any case where a court affirming the validity of the acts of Congress in question has ventured to rest their decision upon that theory, it does not appear to be necessary to protract the discussion upon that point.

Such notes are not declared in the acts of Congress to be a standard of value, and if they were the provision would be as powerless to impart that quality to the notes as were the processes of the alchemist to convert chalk into gold, or the contrivances of the mechanic to organize a machine and give it perpetual motion. Gold and silver were adopted as the standard of value, even before civil governments were organized, and they have always been regarded as such to the present time, and it is safe to affirm that they will continue to be such by universal consent, in spite of legislative enactments and of judicial decisions. Treasury notes, or the notes in question, called by what name they may be, never

---

Hepburn *v.* Griswold, 8 Wallace, 632.

performed that office, even for a day, and it may be added that neither legislative enactments nor judicial decisions can compel the commercial world to accept paper emissions of any kind as the standard of value by which all other values are to be measured.* Nothing but money will in fact perform that office, and it is clear that neither legislative enactments nor judicial decisions can perform commercial impossibilities. Commodities undoubtedly may be exchanged as matter of barter, or the seller may accept paper promises instead of money, but it is nevertheless true, as stated by Mr. Huskisson, that money is not only the *common measure* and *common representative* of all other commodities, but also the common and universal equivalent. Whoever buys, gives, whoever sells, receives such a quantity of pure gold or silver as is equivalent to the article bought or sold; or if he gives or receives paper instead of money, he gives or receives that which is valuable only as it stipulates the payment of a given quantity of gold or silver.†

"Most unquestionably," said Mr. Webster,‡ "there is no legal tender, and there can be no legal tender, in this country, under the authority of this government, or any other, but gold and silver. . . . This is a constitutional principle, perfectly plain and of the very highest importance." He admitted that no such express prohibition was contained in the Constitution, and then proceeded to say: "As Congress has no power granted to it in this respect but to coin money and to regulate the value of foreign coins, *it clearly has no power to substitute paper* or anything else for coin as a tender in payment of debts and in discharge of contracts," adding that "Congress has exercised the power fully in both its branches. It has coined money and still coins it, it has regulated the value of foreign coins and still regulates their value. The legal tender, therefore, THE CONSTITUTIONAL STANDARD OF VALUE, IS ESTABLISHED AND CANNOT BE OVERTHROWN." Beyond peradventure he was of the opinion that gold and silver, at rates fixed by Congress, constituted the

---

* Hepburn *v.* Griswold, 8 Wallace, 608.

† 22 Financial Pamphlets, 580.　　　　‡ 4 Webster's Works, 271.

legal standard of value, and that neither Congress nor the States had authority to establish any other standard in its place.*

Views equally decisive have been expressed by this court in a case where the remarks were pertinent to the question presented for decision.† Certain questions were certified here which arose in the Circuit Court in the trial of an indictment in which the defendant was charged with having brought into the United States from a foreign place, with intent to pass, utter, publish, and sell certain false, forged, and counterfeit coins, made, forged, and counterfeited in the resemblance and similitude of the coins struck at the mint. Doubts were raised at the trial whether Congress had the power to pass the law on which the indictment was founded. Objection was made that the acts charged were only a fraud in traffic, and, as such, were punishable, if at all, under the State law. Responsive to that suggestion the court say that the provisions of the section " appertain rather to the execution of an important trust invested by the Constitution, and to the obligation to fulfil that trust on the part of the government, namely, the trust and the duty of creating and maintaining *a uniform and pure metallic standard of value throughout the Union;* that the power of coining money and of regulating its value was delegated to Congress by the Constitution for the very purpose of *creating and preserving the uniformity and purity of such a standard of value,* and on account of the impossibility which was foreseen of otherwise preventing the inequalities and the confusion necessarily incident to different views of policy which in different communities would be brought to bear on this subject. The power to coin money being thus given to Congress, founded on public necessity, it must carry with it the correlative power of protecting the creature and object of that power." Appropriate suggestions follow as to the right of the government to adopt measures to exclude counterfeits and prevent the true coin from being substituted by others

* 4 Id. 280.       † United States *v.* Marigold, 9 Howard, 567.

of no intrinsic value, and the justice delivering the opinion then proceeds to say, that Congress " having emitted a circulating medium, *a standard of value indispensable for the purposes of the community* and for the action of the government itself, the Congress is accordingly authorized and bound in duty to prevent its debasement and expulsion and the destruction of the general confidence and convenience by the influx and substitution of a spurious coin in lieu of the constitutional currency.".

Equally decisive views were expressed by the court six years earlier, in the case of *Gwin* v. *Breedlove*,* in which the opinion of the court was delivered by the late Mr. Justice Catron, than whom no justice who ever sat in the court was more opposed to the expression of an opinion on a point not involved in the record.

No State shall coin money, emit bills of credit, or make anything but gold and silver a tender in payment of debts. These prohibitions, said Mr. Justice Washington,† associated with the powers granted to Congress to coin money and regulate the value thereof and of foreign coin, most obviously constitute members of the same family, being upon the same subject and governed by the same policy. This policy, said the learned justice, was to provide a fixed and uniform standard of value throughout the United States, by which the commercial and other dealings between the citizens thereof, or between them and foreigners, as well as the moneyed transactions of the government, should be regulated. Language so well chosen and so explicit cannot be misunderstood, and the views expressed by Mr. Justice Johnson in the same case are even more decisive. He said the prohibition in the Constitution to make anything but gold or silver coin a tender in payment of debts is *express and universal.* The framers of the Constitution regarded it as an evil to be repelled without modification, and that they have therefore left nothing to be inferred or deduced from construction on the subject.‡

---

* 2 Howard, 38.   † Ogden *v.* Saunders, 12 Wheaton, 265.   ‡ Ib. 288.

Recorded as those opinions have been for forty-five years, and never questioned, they are certainly entitled to much weight, especially as the principles which are there laid down were subsequently affirmed in two cases by the unanimous opinion of this court.*

Strong support to the view here taken is also derived from the case of *Craig* v. *Missouri,* last cited, in which the opinion was given by the Chief Justice. Loan certificates issued by the State were the consideration of the note in suit in that case, and the defence was that the certificates were bills of credit and that the consideration of the note was illegal. Responsive to that defence the plaintiff insisted that the certificates were not bills of credit, because they had not been made a legal tender, to which the court replied, that the emission of bills of credit and the enactment of tender laws were distinct operations, independent of each other; that both were forbidden by the Constitution; that the evils of paper money did not result solely from the quality of its being made a tender in payment of debts; that that quality might be the *most pernicious* one, but that it was not an essential quality of bills of credit nor the only mischief resulting from such emissions.†

Remarks of the Chief Justice in the case of *Sturges* v. *Crowninshield*‡ may also be referred to as even more explicit and decisive to the same conclusion than anything embodied in the other cases. He first describes, in vivid colors, the general distress which followed the war in which our independence was established. Paper money, he said, was issued, worthless lands and other property of no use to the creditor were made a tender in payment of debts, and the time of payment stipulated in the contract was extended by law. Mischief to such an extent was done, and so much more was apprehended, that general distrust prevailed and all

---

* United States *v.* Marigold, 9 Howard, 567; Gwin *v.* Breedlove, 2 Id 88; Craig *v.* Missouri, 4 Peters, 434.

† Briscoe *v.* Bank of Kentucky, 11 Peters, 317; Fox *v.* Ohio, 5 Howard, 433.

‡ 4 Wheaton, 204.

confidence between man and man was destroyed. Special reference was made to those grievances by the Chief Justice because it was insisted that the prohibition to pass laws impairing the obligation of contracts ought to be confined by the court to matters of that description, but the court was of a different opinion, and held that the Convention intended to establish a great principle, that contracts should be inviolable, that the provision was intended "to prohibit the use of any means by which the same mischief might be produced." He admitted that that provision was not intended to prevent the issue of paper money, as that evil was remedied and the practice prohibited by the clause forbidding the States to "emit bills of credit;" inserted in the Constitution expressly for that purpose, and he also admitted that the prohibition to emit bills of credit was not intended to restrain the States from enabling debtors to discharge their debts by the tender of property of no real value to the creditor, "because for that subject also particular provision is made" in the Constitution; but he added, "Nothing but gold and silver coin can be made a tender in payment of debts."[*]

Utterances of the kind are found throughout the reported decisions of this court, but there is not a sentence or word to be found within those volumes, from the organization of the court to the passage of the acts of Congress in question, to support the opposite theory.

Power, as before remarked, was vested in the Congress under the Confederation to borrow money and emit bills of credit, and history shows that the power to emit such bills had been exercised, before the Convention which framed the Constitution assembled, to an amount exceeding $350,000,000.[†] Still the draft of the Constitution, as reported, contained the words "and to emit bills" appended

---

[*] Sturges v. Crowninshield, 4 Wheaton, 205.

[†] 2 Story on the Constitution, 3d ed. 249; Briscoe v. Bank of Kentucky, 11 Peters, 337; 1 Jefferson's Correspondence, 401; American Almanac for 1830, p. 183.

to the clause authorizing Congress to borrow money. When that clause was reached, says Mr. Martin, a motion was made to strike out the words "to emit *bills of credit;*" and his account of what followed affords the most persuasive and convincing evidence that the Convention, and nearly every member of it, intended to put an end to the exercise of such a power. Against the motion, he says, we urged that it would be improper to deprive the Congress of that power; that it would be a novelty unprecedented to establish a government which should not have such authority; that it was impossible to look forward into futurity so far as to decide that events might not happen that would render the exercise of such a power absolutely necessary, &c. But a majority of the Convention, he said, being wise beyond every event, and being willing to risk any political evil rather than admit the idea of a paper emission *in any possible case,* refused to trust the authority to a government to which they were lavishing the most unlimited powers of taxation, and to the mercy of which they were willing blindly to trust the liberty and property of the citizens of every State in the Union, and " *they erased that clause from the system.*"[*]

More forcible vindication of the action of the Convention could hardly be made than is expressed in the language of the Federalist,[†] and the authority of Judge Story warrants the statement that the language there employed is "justified by almost every contemporary writer," and is " attested in its truth by facts" beyond the influence of every attempt at contradiction. Having adverted to those facts the commentator proceeds to say, " that the same reasons which show the necessity of denying to the States the power of regulating coin, prove with equal force that they ought not to be at liberty to substitute a paper medium instead of coin."

Emissions of the kind were not declared by the Continental Congress to be a legal tender, but Congress passed a resolution declaring that they ought to be a tender in payment of all private and public debts, and that a refusal to

---

[*] 1 Elliott's Debates, 369.        [†] Federalist, No. 44.

receive the tender ought to be an extinguishment of the debt, and recommended the States to pass such laws. They even went further and declared that whoever should refuse to receive the paper as gold or silver should be deemed an enemy to the public liberty; but our commentator says that these measures of violence and terror, so far from aiding the circulation of the paper, led on to still further depreciation.* New emissions followed and new measures were adopted to give the paper credit by pledging the public faith for its redemption. Effort followed effort in that direction until the idea of redemption at par was abandoned. Forty for one was offered and the States were required to report the bills under that regulation, but few of the old bills were ever reported, and of course few only of the contemplated new notes were issued, and the bills in a brief period ceased to circulate, and in the course of that year quietly died in the hands of their possessors.†

Bills of credit were made a tender by the States, but all such, as well as those issued by the Congress, were dead in the hands of their possessors before the Convention assembled to frame the Constitution. Intelligent and impartial belief in the theory that such men, so instructed, in framing a government for their posterity as well as for themselves, would deliberately vest such a power, either in Congress or the States, as a part of their perpetual system, can never in my judgment be secured in the face of the recorded evidences to the contrary which the political and judicial history of our country affords. Such evidence, so persuasive and convincing as it is, must ultimately bring all to the conclusion that neither the Congress nor the States can make anything but gold or silver coin a tender in payment of debts.

Exclusive power to coin money is certainly vested in Congress, but " no amount of reasoning can show that executing a promissory note and ordering it to be taken in pay-

---

* 2 Journals of Congress, 21; 3 Id. 20; 2 Pitkin's History, 155-6.

† 2 Story on the Constitution, 3d ed., §§ 1359, 1360; 2 Pitkin's History, 157; 1 Jefferson's Correspondence, 402.

ment of public and private debts is a species of coining money."*

Complete refutation of such theory is also found in the dissenting opinion in the former case, in which the justice who delivered the opinion states that he is not able to deduce the power to pass the laws in question from that clause of the Constitution, and in which he admits, without qualification, that the provision making such notes a legal tender does undoubtedly impair the "obligation of contracts made before its passage." Extended argument, therefore, to show that the acts in question impair the obligation of contracts made before their passage is unnecessary, but the admission stops short of the whole truth, as it leaves the implication to be drawn that the obligation of subsequent contracts is not impaired by such legislation. Contracts for the payment of money, whether made before or after. the passage of such a provision, are contracts, if the promise is expressed in dollars, to pay the specified amount in the money recog nized and established by the Constitution as the standard or value, and any act of Congress which in theory compels the creditor to accept paper emissions, instead of the money so recognized and established, impairs the obligation of such a contract, no matter whether the contract was made before or after the act compelling the creditor to accept such payment, as the Constitution in that respect is a part of the contract, and by its terms entitles the creditor to demand payment in the medium which the Constitution recognizes and establishes as the standard of value.

Evidently the word dollar, as employed in the Constitution, means the money recognized and established in the express power vested in Congress to coin money, regulate the value thereof and of foreign coin, the framers of the Constitution having borrowed and adopted the word as used by the Continental Congress in the ordinance of the 6th of July, 1785, and of the 8th August, 1786, in which it was enacted that the money unit of the United States should be

---

* Pomeroy on the Constitution, § 409.

" one dollar," and that the money of account should be dollars and fractions of dollars, as subsequently provided in the ordinance establishing a mint.*

Repeated decisions of this court, of recent date,† have established the rule that contracts to pay coined dollars can only be satisfied by the payment of such money, which is precisely equivalent to a decision that such notes as those described in the acts of Congress in question are not the money recognized and established by the Constitution as the standard of value, as the money so recognized and established, if the contract is expressed in dollars, will satisfy any and every contract between party and party.   Beyond all question the cases cited recognize " the fact accepted by all men throughout the world, that value is inherent in the precious metals; that gold and silver are in themselves values, and being such, and being in other respects best adapted to the purpose, are *the only proper measures of value;* that these values are determined by weight and purity, and that form and impress are simply certificates of value, worthy of absolute reliance only because of the known integrity and good faith of the government which " put them in circulation.‡

When the intent of the parties as to the medium of payment is clearly expressed in a contract, the court decide, in *Butler* v. *Horwitz*, above cited, that damages for the breach of it, whether made before or since the enactment of these laws, may be properly assessed so as to give effect to that intent, and no doubt is entertained that that rule is correct. Parties may contract to accept payment in treasury notes, or specific articles, or in bank bills, and if they do so they are bound to accept the medium for which they contracted, provided the notes, specific articles, or bills are tendered on the day the payment under the contract becomes due, and it is clear that such a tender, if seasonable and sufficient in

---

* 10 Journals of Congress, 225; 11 Id. 179.

† Bronson *v* Rodes, 7 Wallace, 248; Butler *v.* Horwitz, Ib. 259; Bank *v.* Supervisors, Ib. 28.

‡ Dewing *v.* Sears, 11 Id. 379; Lane Co. *v.* Oregon, 7 Id. 78; Willard *v* Tayloe, 8 Id. 568.

amount, is a good defence to the action.　Decided cases also carry the doctrine much further, and hold, even where the contract is payable in money and the promise is expressed in dollars, that a tender of bank bills is a good tender if the party to whom it was made placed his objections to receiving it wholly upon the ground that the amount was not sufficient.*

Grant all that, and still it is clear that where the contract is for the payment of a certain sum of money, and the promise is expressed in dollars, or in coined dollars, the promisee, if he sees fit, may lawfully refuse to accept payment in any other medium than gold and silver, made a legal tender by act of Congress passed in pursuance of that provision of the Constitution which vests in Congress the power to coin money, regulate the value thereof and of foreign coin.

Foreign coin of gold and silver may be made a legal tender, as the power to regulate the value thereof is vested in Congress as well as the power to regulate the value of the coins fabricated and stamped at the mint.

Opposed, as the new theory is by such a body of evidence, covering the whole period of our constitutional history, all tending to the opposite conclusion, and unsupported as the theory is by a single historical fact, entitled to any weight, it would seem that the advocates of the theory ought to be able to give it a fixed domicile in the Constitution, or else be willing to abandon it as a theory without any solid constitutional foundation.　Vagrancy in that behalf, if conceded, is certainly a very strong argument at this day, that the power does not reside in the Constitution at all, as if the fact were otherwise, the period of eighty-five years which has elapsed since the Constitution was adopted is surely long enough to have enabled its advocates to discover its locality and to be able to point out its home to those whose researches have been less successful and whose conscientious

* Bank of the United States v. Bank of Georgia, 10 Wheaton, 347; Thompson v. Riggs, 5 Wallace, 678; Robinson v. Noble, 8 Peters, 198; Wright v. Reid, 3 Term, 554; Snow v. Perry, 9 Pickering, 542; 2 Greenleaf on Evidence, § 601.

convictions lead them to the conclusion that, as applied to the Constitution, it is a myth without a habitation or a name.

Unless the power to enact such a provision can be referred to some one or more of the express grants of power to Congress, as the requisite means, or as necessary and proper for carrying such express power or powers into execution, it is usually conceded that the provision must be regarded as unconstitutional, as it is not pretended that the Constitution contains any express grant of power authorizing such legislation. Powers not granted cannot be exercised by Congress, and certainly all must agree that no powers are granted except what are expressed or such as are fairly applicable as requisite means to attain the end of a power which is granted, or, in other words, are necessary and proper to carry those which are expressed into execution.*

Pressed by these irrepealable rules of construction, as applied to the Constitution, those who maintain the affirmative of the question under discussion are forced to submit a specification. Courts in one or more cases have intimated that the power in question may be implied from the express power to coin money, but inasmuch as no decided case is referred to where the judgment of the court rests upon that ground, the suggestion will be dismissed without further consideration, as one involving a proposition too latitudinous to require refutation. Most of the cases referred to attempt to deduce the power to make such paper emissions a legal tender from the express power to borrow money, or from the power to declare war, or from the two combined, as in the dissenting opinion in the case which is now overruled.

Authority, it is conceded, exists in Congress to pass laws providing for the issue of treasury notes, based on the national credit, as necessary and proper means for fulfilling the end of the express power to borrow money, nor can it be doubted at this day, that such notes, when issued by the

---

* Martin *v.* Hunter's Lessee, 1 Wheaton, 326; McCulloch *v.* Maryland, 4 Id. 405; 1 Story on the Constitution (3d ed.), § 417.

proper authority, may lawfully circulate as credit currency, and that they may, in that conventional character, be lawfully employed, if the act authorizing their issue so provides, to pay duties, taxes, and all the public exactions required to be paid into the national treasury. Public creditors may also be paid in such currency by their own consent, and they may be used in all other cases, where the payment in such notes comports with the terms of the contract. Established usage founded upon the practice of the government, often repeated, has sanctioned these rules, until it may now be said that they are not open to controversy, but the question in the cases before the court is whether the Congress may declare such notes to be lawful money, make them a legal tender, and impart to such a currency the quality of being a standard of value, and compel creditors to accept the payment of their debts in such a currency as the equivalent of the money recognized and established by the Constitution as the standard of value by which the value of all other commodities is to be measured. Financial measures, of various kinds, for borrowing money to supply the wants of the treasury, beyond the receipts from taxation and the sales of the public lands, have been adopted by the government since the United States became an independent nation. Subscriptions for a loan of twelve millions of dollars were, on the 4th of August, 1790, directed to be opened at the treasury, to be made payable in certificates issued for the debt according to their specie value.* Measures of the kind were repeated in rapid succession for several years, and laws providing for loans in one form or another appear to have been the preferred mode of borrowing money, until the 30th of June, 1812, when the first act was passed " to authorize the issue of treasury notes."†

Loans had been previously authorized in repeated instances, as will be seen by the following references, to which many more might be added.‡

---

* 1 Stat. at Large, 139.                    † 2 Stat at Large, 766
‡ 1 Id 142; Ib. 187; Ib. 345; Ib. 433; Ib. 607, 2 Id. 60; Ib. 245; Ib. 349; Ib. 610; Ib. 656; Ib. 694.

Earnest opposition was made to the passage of the first act of Congress authorizing the issue of treasury notes, but the measure prevailed, and it may be remarked that the vote on the occasion was ever after regarded as having settled the question as to the constitutionality of such an act. Five millions of dollars were directed to be issued by that act, and the Secretary of the Treasury, with the approbation of the President, was empowered to cause such portion of the notes as he might deem expedient to be issued at par " to such public creditors *or other persons as may choose to receive such notes in payment,*" it never having occurred to any one that even a public creditor could be compelled to receive such notes in payment except by his own consent.    Twenty other issues of such notes were authorized by Congress in the course of the fifty years next after the passage of that act and before the passage of the acts making such notes a legal tender, and every one of such prior acts, being twenty in all, contains either in express words or by necessary implication, an equally decisive negation to the new constitutional theory that Congress can make paper emissions, either a standard of value or a legal tender.*    Superadded to the conceded fact that the Constitution contains no express words to support such a theory, this long and unbroken usage, that treasury notes shall not be constituted a standard of value nor be made a tender in payment of debts, is entitled to great weight, and when taken in connection with the persuasive and convincing evidence, derived from the published proceedings of the Convention, that the framers of the Constitution never intended to grant any such power, and from the recorded sentiments of the great men whose arguments in favor of the reported draft procured its ratification, and supported as that view is by the repeated decisions of this court, and by the infallible rule of interpretation that the language of one express power shall not be

* 5 Id. 202; 9 Id. 64; 4 Id. 765; 2 Id. 766; Ib. 801; 3 Id. 161; Ib. 213, 5 Id. 201; Ib. 228; Ib. 323; Ib. 469; Ib. 474; Ib. 581; Ib. 614; 9 Id. 89; Ib. 118; 11 Id. 257; 12 Id. 121; Ib. 179; Ib. 259; Ib. 313; Ib. 338.

so expanded as to nullify the force and effect of another express power in the same instrument, it seems to me that it ought to be deemed final and conclusive that Congress cannot constitute such notes or any other paper emissions a constitutional standard of value, or make them a legal tender in payment of debts—especially as it covers the period of two foreign wars, the creation of the second national bank, and the greatest financial revulsions through which our country has ever passed.

Guided by the views expressed in the dissenting opinion in the former case it must be taken for granted that the legal tender feature in the acts in question was placed emphatically, by those who enacted the provision, upon the necessity of the measure to the further borrowing of money and maintaining the army and navy, and such appears to be the principal ground assumed in the present opinion of the court. Enough also appears in some of the interrogative sentences of the dissenting opinion to show that the learned justice who delivered it intended to place the dissent very largely upon the same ground.

Nothing need be added, it would seem, to show that the power to make such notes a standard of value and a legal tender cannot be derived from the power to borrow money, without so expanding it by implication as to nullify the power to coin money and regulate its value, nor without extending the scope and operation of the power to borrow money to an object never contemplated by the framers of the Constitution; and if so, then it only remains to inquire whether it may be implied from the power to declare war, to raise and support armies; or to provide and maintain a navy, or "to enable the government to borrow money to carry on the war," as the phrase is in the dissenting opinion in the former case.

Money is undoubtedly the sinews of war, but the power to raise money to carry on war, under the Constitution, is not an implied power, and whoever adopts that theory commits a great constitutional error. Congress may declare war and Congress may appropriate all moneys in the treas-

ury to carry on the war, or Congress may coin money for that purpose, or borrow money to any amount for the same purpose, or Congress may lay and collect taxes, duties, imposts, and excises to replenish the treasury, or may dispose of the public lands or other property belonging to the United States, and may in fact, by the exercise of the express powers of the Constitution, command the whole wealth and substance of the people to sustain the public credit and prosecute the war to a successful termination. Two foreign wars were successfully conducted by means derived from those sources, and it is not doubted that those express powers will always enable Congress to maintain the national credit and defray the public expenses in every emergency which may arise, even though the national independence should be assailed by the combined forces of all the rest of the civilized world.    All remarks, therefore, in the nature of entreaty or appeal, in favor of an implied power to fulfil the great purpose of national defence or to raise money to prosecute a war, are a mere waste of words, as the most powerful and comprehensive means to accomplish the purpose for which the appeal is made are found in the express powers vested in Congress to lay and collect taxes, duties, imposts, and excises without limitation as to amount, to borrow money also without limitation, and to coin money, dispose of the public lands, and to appropriate all moneys in the public treasury to that purpose.

Weighed in the light of these suggestions, as the question under discussion should be, it is plain, not only that the exercise of such an implied power is unnecessary to supply the sinews of war, but that the framers of the Constitution never intended to trust a matter of such great and vital importance as that of raising means for the national defence or for the prosecution of a war to any implication whatever, as they had learned from bitter experience that the great weakness of the Confederation during the war for independence consisted in the want of such express powers.    Influenced by those considerations the framers of the Constitution not only authorized Congress to lay and collect taxes, duties,

imposts, and excises to any and every extent, but also to coin money and to borrow money without any limitation as to amount, showing that the argument that to deny the implied power to make paper emissions a legal tender will be to cripple the government, is a mere chimera, without any solid constitutional foundation for its support.

Comprehensive, however, as the power of Federal taxation is, being without limitation as to amount, still there are some restrictions as to the manner of its exercise, and some exceptions as to the objects to which it may be applied. Bills for raising revenue must originate in the House of Representatives; duties, imposts, and excises must be uniform throughout the United States; direct taxes must be apportioned according to numbers; regulations of commerce and revenue shall not give any preference to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another; nor shall any tax or duty be laid on articles exported from any State.

Preparation for war may be made in peace, but neither the necessity for such preparation nor the actual existence of war can have the effect to abrogate or supersede those restrictions, or to empower Congress to tax the articles excepted from taxation by the Constitution. Implied exceptions also exist, limiting the power of Federal taxation as well as that of the States, and when an exception of that character is ascertained the objects falling within it are as effectually shielded from taxation as those falling within an express exception, for the plain reason that the " government of the United States is acknowledged by all to be one of enumerated powers," from which it necessarily follows that powers not granted cannot be exercised.*

Moneys may be raised by taxes, duties, imposts, and excises to carry on war as well as to pay the public debt or to provide for the common defence and general welfare, but no appropriation of money to that use can be made for a

---

* McCulloch v. Maryland, 4 Wheaton, 405.

period longer than two years, nor can Congress, in exercising the power to levy taxes for that purpose, or any other, abrogate or supersede those restrictions, exceptions, and limitations, as they are a part of the Constitution, and as such are as obligatory in war as in peace, as any other rule would subvert, in time of war, every restriction, exception, limitation, and prohibition in the Constitution, and invest Congress with unlimited power, even surpassing that possessed by the British Parliament.

Congress may also borrow money to carry on war, without limitation, and in exercising that express power may issue treasury notes as the requisite means for carrying the express power into execution, but Congress cannot constitute such notes a standard of value nor make them a legal tender, neither in time of war nor in time of peace, for at least two reasons, either of which is conclusive that the exercise of such a power is not warranted by the Constitution : (1) Because the published proceedings of the Convention which adopted the Constitution, and of the State conventions which ratified it, show that those who participated in those deliberations never intended to confer any such power. (2) Because such a power, if admitted to exist, would nullify the effect and operation of the express power to coin money, regulate the value thereof and of foreign coin ; as it would substitute a paper medium in the place of gold and silver coin, which in itself, as compared with coin, possesses no value, is not money, either in the constitutional or commercial sense, but only a promise to pay money, is never worth par, and often much less, even as domestic exchange, and is always fluctuating and never acknowledged either as a medium of exchange or a standard of value in any foreign market known to American commerce.

Power to issue such notes, it is conceded, exists without limitation, but the question is whether the framers of the Constitution intended that Congress, in the exercise of that power or the power to borrow money, whether in peace or war, should be empowered to constitute paper emissions, of any kind, a standard of value, and make the same a legal

tender in payment of debts.   Mere convenience, or even a financial necessity in a single case, cannot be the test, but the question is what did the framers of the Constitution intend at the time the instrument was adopted and ratified?

Constitutional powers, of the kind last mentioned—that is, the power to ordain a standard of value and to provide a circulating medium for a legal tender—are subject to no mutations of any kind.   They are the same in peace and in war.   What the grants of power meant when the Constitution was adopted and ratified they mean still, and their meaning can never be changed except as described in the fifth article providing for amendments, as the Constitution " is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men and under all circumstances."*

Delegated power ought never to be enlarged beyond the fair scope of its terms, and that rule is emphatically applicable. in the construction of the Constitution.   Restrictions may at times be inconvenient, or even embarrassing, but the power to remove the difficulty by amendment is vested in the people, and if they do not exercise it the presumption is that the inconvenience is a less evil than the mischief to be apprehended if the restriction should be removed and the power extended, or that the existing inconvenience is the least of the two evils; and it should never be forgotten that the government ordained and established by the Constitution is a government " of limited and enumerated powers," and that to depart from the true import and meaning of those powers is to establish a new Constitution or to do for the people what they have not chosen to do for themselves, and to usurp the functions of a legislator and desert those of an expounder of the law.,  Arguments drawn from impolicy or inconvenience, says Judge Story, ought here to be of no weight, as " the only sound principle is to declare *ita lex scripta est*, to follow and to obey."†

---

* Ex parte Milligan, 4 Wallace, 120.
† 1 Story on the Constitution, 3d ed., § 426.

For these reasons I am of the opinion that the judgment in each of the cases before the court should be reversed.

Mr. Justice FIELD, dissenting:

Whilst I agree with the Chief Justice in the views expressed in his opinion in these cases, the great importance which I attach to the question of legal tender induces me to present some further considerations on the subject.

Nothing has been heard from counsel in these cases, and nothing from the present majority of the court, which has created a doubt in my mind of the correctness of the judgment rendered in the case of *Hepburn* v. *Griswold*,* or of the conclusions expressed in the opinion of the majority of the court as then constituted. That judgment was reached only after repeated arguments were heard from able and eminent counsel, and after every point raised on either side had been the subject of extended deliberation.

The questions presented in that case were also involved in several other cases, and had been elaborately argued in them. It is not extravagant to say that no case has ever been decided by this court since its organization, in which the questions presented were more fully argued or more maturely considered. It was hoped that a judgment thus reached would not be lightly disturbed. It was hoped that it had settled forever that under a Constitution ordained, among other things, "to establish justice," legislation giving to one person the right to discharge his obligations to another by nominal instead of actual fulfilment, could never be justified.

I shall not comment upon the causes which have led to a reversal of that judgment. They are patent to every one. I will simply observe that the Chief Justice and the associate justices, who constituted the majority of the court when that judgment was rendered, still adhere to their former convictions. To them the reasons for the original decision are as cogent and convincing now as they were when that

---

* 8 Wallace, 603.

decision was pronounced; and to them its justice, as applied to past contracts, is as clear to-day as it was then.

In the cases now before us the questions stated, by order of the court, for the argument of counsel, do not present with entire accuracy the questions actually argued and decided. As stated, the questions are: 1st. Is the act of Congress, known as the legal tender act, constitutional as to contracts made before its passage? 2d. Is it valid as applicable to transactions since its passage?

The act thus designated as the legal tender act is the act of Congress of February 25th, 1862, authorizing the issue of United States notes, and providing for their redemption or funding, and for funding the floating debt of the United States;* and the questions, as stated, would seem to draw into discussion the validity of the entire act; whereas, the only questions intended for argument, and actually argued and decided, relate—1st, to the validity of that provision of the act which declares that these notes shall be a legal tender in payment of debts, as applied to private debts and debts of the government contracted previous to the passage of the act; and 2d, to the validity of the provision as applied to similar contracts subsequently made. The case of *Parker* v. *Davis* involves the consideration of the first question; and the case of *Knox* v. *Lee* is supposed by a majority of the court to present the second question.

No question was raised as to the validity of the provisions of the act authorizing the issue of the notes, and making them receivable for dues to the United States; nor do I perceive that any objection could justly be made at this day to these provisions. The issue of the notes was a proper exercise of the power to borrow money, which is granted to Congress without limitation. The extent to which the power may be exercised depends, in all cases, upon the judgment of that body as to the necessities of the government. The power to borrow includes the power to give evidences of indebtedness and obligations of repayment. ,

---

* 12 Stat. at Large, 345.

Instruments of this character are among the securities of the United States mentioned in the Constitution. These securities are sometimes in the form of certificates of indebtedness, but they may be issued in any other form, and in such form and in such amounts as will fit them for general circulation, and to that end may be made payable to bearer and transferable by delivery. The form of notes, varying in amounts to suit the convenience or ability of the lender, has been found by experience a convenient form, and the one best calculated to secure the readiest acceptance and the largest loan. It has been the practice of the government to use notes of this character in raising loans and obtaining supplies from an early period in its history, their receipt by third parties being in all cases optional.

In June, 1812, Congress passed an act which provided for the issue of treasury notes, and authorized the Secretary of the Treasury, with the approbation of the President, "to borrow from time to time, not under par, such sums" as the President might think expedient, "on the credit of such notes."[*]

In February, 1813, Congress passed another act for the issue of treasury notes, declaring "that the amount of money borrowed or obtained by virtue of the notes" issued under its second section should be a part of the money authorized to be borrowed under a previous act of the same session.[†] There are numerous other acts of a similar character on our statute-books. More than twenty, I believe, were passed previous to the legal tender act.[‡]

---

[*] 2 Stat. at Large, 766.                    [†] 2 Stat. at Large, 801.

[‡] Acts of Congress authorizing the issue of treasury notes: 2 Stat. at Large, 766, approved June 30, 1812; Id. 801, approved February 25, 1813; 3 Stat. at Large, 100, approved March 4, 1814; Id. 161, approved December 26, 1814; Id. 213, approved February 24, 1815; 5 Stat. at Large, 201, approved October 12, 1837; Id 228, approved May 21, 1838; Id 323, approved March 2, 1839; Id. 370, approved March 31, 1840; Id. 411, approved February 15, 1841; Id. 469, approved January 31, 1842; Id. 473, approved April 15, 1842; Id. 581, approved August 31, 1842; Id. 614, approved March 3, 1843; 9 Stat. at Large, 39, approved July 22, 1846; Id. 64, approved August 6, 1846; Id. 118, approved January 28, 1847; 11 Stat at Large, 257, approved December 23, 1857; Id. 430, approved March 3d, 1859.

In all of them the issue of the notes was authorized as a means of borrowing money, or obtaining supplies, or paying the debts of the United States, and in all of them the receipt of the notes by third parties was purely voluntary. Thus, in the first act, of June, 1812, the Secretary of the Treasury was authorized, not only to borrow on the notes, but to issue such notes as the President might think expedient "in payment of supplies or debts due by the United States to such public creditors or other persons" as might " *choose to receive such notes in payment at par.*" Similar provisions are found in all the acts except where the notes are authorized simply to take up previous loans.

The issue of the notes for supplies purchased or services rendered at the request of the United States is only giving their obligations for an indebtedness thus incurred; and the same power which authorizes the issue of notes for money must also authorize their issue for whatever is received as an equivalent for money. The result to the United States is the same as if the money were actually received for the notes and then paid out for the supplies or services.

The notes issued under the act of Congress of February 25th, 1862, differ from the treasury notes authorized by the previous acts to which I have referred, in the fact that they do not bear interest and do not designate on their face a period at which they shall be paid, features which may affect their value in the market but do not change their essential character. There cannot be, therefore, as already stated, any just objection at this day to the issue of the notes, nor to their adaptation in form for general circulation.

Nor can there be any objection to their being made receivable for dues to the United States. Their receivability in this respect is only the application to the demands of the government, and demands against it, of the just principle which is applied to the demands of individuals against each other, that cross-demands shall offset and satisfy each other to the extent of their respective amounts. No rights of third parties are in any respect affected by the application of the rule here, and the purchasing and borrowing power

of the notes are greatly increased by making them thus receivable for the public dues. The objection to the act does not lie in these features; it lies in the provision which declares that the notes shall be "a legal tender in payment of all debts, public and private," so far as that provision applies to private debts, and debts owing by the United States.

In considering the validity and constitutionality of this provision, I shall in the first place confine myself to the provision in its application to private debts. Afterwards I shall have something to say of the provision in its application to debts owing by the government.

In the discussions upon the subject of legal tender the advocates of the measure do not agree as to the power in the Constitution to which it shall be referred; some placing it upon the power to borrow money, some on the coining power, and some on what is termed a resulting power from the general purposes of the government; and these discussions have been accompanied by statements as to the effect of the measure, and the consequences which must have followed had it been rejected, and which will now occur if its validity be not sustained, which rest upon no solid foundation, and are not calculated to aid the judgment in coming to a just conclusion.

In what I have to say I shall endeavor to avoid any such general and loose statements, and shall direct myself to an inquiry into the nature of these powers to which the measure is referred, and the relation of the measure to them.

Now if Congress can, by its legislative declaration, make the notes of the United States a legal tender in payment of private debts—that is, can make them receivable against the will of the creditor in satisfaction of debts due to him by third parties—its power in this respect is not derived from its power to borrow money, under which the notes were issued. That power is not different in its nature or essential incidents from the power to borrow possessed by individuals, and is not to receive a larger definition. Nor is it different from the power often granted to public and private corporations. The grant, it is true, is usually accompanied in these

latter cases with limitations as to the amount to be borrowed, and a designation of the objects to which the money shall be applied—limitations which in no respect affect the nature of the power. The terms " power to borrow money " have the same meaning in all these cases, and not one meaning when used by individuals, another when granted to corporations, and still a different one when possessed by Congress. They mean only a power to contract for a loan of money upon considerations to be agreed between the parties. The amount of the loan, the time of repayment, the interest it shall bear, and the form in which the obligation shall be expressed are simply matters of arrangement between the parties. They concern no one else. It is no part or incident of a contract of this character that the rights or interests of third parties, strangers to the matter, shall be in any respect affected. The transaction is completed when the lender has parted with his money, and the borrower has given his promise of repayment at the time, and in the manner, and with the securities stipulated between them.

As an inducement to the loan, and security for its repayment, the borrower may of course pledge such property or revenues, and annex to his promises such rights and privileges as he may possess. His stipulations in this respect are necessarily limited to his own property, rights, and privileges, and cannot extend to those of other persons.

Now, whether a borrower—be the borrower an individual, a corporation, or the government—can annex to the bonds, notes, or other evidences of debt given for the money borrowed, any quality by which they will serve as a means of satisfying the contracts of other parties, must necessarily depend upon the question whether the borrower possesses any right to interfere with such contracts, and determine how they shall be satisfied. The right of the borrower in this respect rests upon no different foundation than the right to interfere with any other property of third parties. And if it will not be contended, as I think I may assume it will not be, that the borrower possesses any right, in order to make a loan, to interfere with the tangible and visible property of

third parties, I do not perceive how it can be contended that he has any right to interfere with their property when it exists in the form of contracts. A large part of the property of every commercial people exists in that form, and the principle which excludes a stranger from meddling with another's property which is visible and tangible, equally excludes him from meddling with it when existing in the form of contracts.

That an individual or a corporation borrowing possesses no power to annex to his evidences of indebtedness any quality by which the holder will be enabled to change his contracts with third parties, strangers to the loan, is admitted; but it is contended that Congress possesses such power because, in addition to the express power to borrow money, there is a clause in the Constitution which authorizes Congress to make all laws "necessary and proper" for the execution of the powers enumerated. This clause neither augments nor diminishes the expressly designated powers. It only states in terms what Congress would equally have had the right to do without its insertion in the Constitution. It is a general principle that a power to do a particular act includes the power to adopt all the ordinary and appropriate means for its execution. "Had the Constitution," says Hamilton, in the Federalist, speaking of this clause, "been silent on this head, there can be no doubt that all the particular powers requisite as a means of executing the general powers would have resulted to the government by unavoidable implication. No axiom is more clearly established in law or in reason, that whenever the end is required the means are authorized; whenever a general power to do a thing is given, every particular power necessary for doing it is included."*

The subsidiary power existing without the clause in question, its insertion in the Constitution was no doubt intended, as observed by Mr. Hamilton, to prevent "all cavilling refinements" in those who might thereafter feel a disposition

---

* The Federalist, No. 44.

to curtail and evade the legitimate authorities of the Union; and also, I may add, to indicate the true sphere and limits of the implied powers.

But though the subsidiary power would have existed without this clause, there would have been the same perpetually recurring question as now, as to what laws are necessary and proper for the execution of the expressly enumerated powers.

The particular clause in question has at different times undergone elaborate discussion in Congress, in cabinets, and in the courts. Its meaning was much debated in the first Congress upon the proposition to incorporate a national bank, and afterwards in the cabinet of Washington, when that measure was presented for his approval. Mr. Jefferson, then Secretary of State, and Mr. Hamilton, then Secretary of the Treasury, differed widely in their construction of the clause, and each gave his views in an elaborate opinion. Mr. Jefferson held that the word " necessary " restricted the power of Congress to the use of those means, without which the grant would be nugatory, thus making necessary equivalent to indispensable.

Mr. Hamilton favored a more liberal, and in my judgment, a more just interpretation, and contended that the terms " necessary and proper " meant no more than that the measures adopted must have an obvious relation as a means to the end intended. " If the end," he said, " be clearly comprehended within any of the specified powers, and if the measure have an obvious relation to that end, and is not forbidden by any particular provision of the Constitution, it may safely be deemed to come within the compass of the national authority." " There is also," he added, " this further criterion which may materially assist the decision. Does the proposed measure abridge a pre-existing right of any State, or of any individual? If it does not, there is a strong presumption in favor of its constitutionality; and slighter relations to any declared object may be permitted to turn the scale." From the criterion thus indicated it

would seem that the distinguished statesman was of opinion that a measure which did interfere with a pre-existing right of a State or an individual would not be constitutional.

The interpretation given by Mr. Hamilton was substantially followed by Chief Justice Marshall, in *McCulloch v. The State of Maryland*, when, speaking for the court, he said that if the end to be accomplished by the legislation of Congress be legitimate, and within the scope of the Constitution, "all the means which are appropriate, which are plainly adapted to that end, and which are not prohibited, but are consistent with the letter and spirit of the Constitution, are constitutional." The Chief Justice did not, it is true, in terms declare that legislation which is not thus appropriate, and plainly adapted to a lawful end, is unconstitutional, but such is the plain import of the argument advanced by him; and that conclusion must also follow from the principle that, when legislation of a particular character. is specially authorized, the opposite of such legislation is inhibited.

Tested by the rule given by Mr. Hamilton, or by the rule thus laid down by this court through Mr. Chief Justice Marshall, the annexing of a quality to the promises of the government for money borrowed, which will enable the holder to use them as a means of satisfying the demands of third parties, cannot be sustained as the exercise of an appropriate means of borrowing. That is only appropriate which has some relation of fitness to an end. Borrowing, as already stated, is a transaction by which, on one side, the lender parts with his money, and on the other the borrower agrees to repay it in such form and at such time as may be stipulated. Though not a necessary part of the contract of borrowing, it is usual for the borrower to offer securities for the repayment of the loan. The fitness which would render a means appropriate to this transaction thus considered must have respect to the terms which are essential to the contract, or to the securities which the borrower may furnish as an inducement to the loan. The quality of legal tender does not touch the terms of the contract of borrowing, nor does it stand as a security for the loan. A security supposes

some right or interest in the thing pledged, which is subject to the disposition of the borrower.

There has been much confusion on this subject from a failure to distinguish between the adaptation of particular means to an end and the effect, or supposed effect, of those means in producing results desired by the government. The argument is stated thus: the object of borrowing is to raise funds; the annexing of the quality of legal tender to the notes of the government induces parties the more readily to loan upon them; the result desired by the government—the acquisition of funds—is thus accomplished; therefore, the annexing of the quality of legal tender is an appropriate means to the execution of the power to borrow. But it is evident that the same reasoning would justify, as appropriate means to the execution of this power, any measures which would result in obtaining the required funds. The annexing of a provision by which the notes of the government should serve as a free ticket in the public conveyances of the country, or for ingress into places of public amusement, or which would entitle the holder to a percentage out of the revenues of private corporations, or exempt his entire property, as well as the notes themselves, from State and municipal taxation, would produce a ready acceptance of the notes. But the advocate of the most liberal construction would hardly pretend that these measures, or similar measures touching the property of third parties, would be appropriate as a means to the execution of the power to borrow. Indeed, there is no invasion by government of the rights of third parties which might not thus be sanctioned upon the pretence that its allowance to the holder of the notes would lead to their ready acceptance and produce the desired loan.

The actual effect of the quality of legal tender in inducing parties to receive them was necessarily limited to the amount required by existing debtors, who did not scruple to discharge with them their pre-existing liabilities. For moneys desired from other parties, or supplies required for the use of the army or navy, the provision added nothing to the value of the notes. Their borrowing power or purchasing

power depended, by a general and a universal law of currency, not upon the legal tender clause, but upon the confidence which the parties receiving the notes had in their ultimate payment. Their exchangeable value was determined by this confidence, and every person dealing in them advanced his money and regulated his charges accordingly.

The inability of mere legislation to control this universal law of currency is strikingly illustrated by the history of the bills of credit issued by the Continental Congress during our Revolutionary War. From June, 1775, to March, 1780, these bills amounted to over $300,000,000. Depreciation followed as a natural consequence, commencing in 1777, when the issues only equalled $14,000,000. Previous to this time, in January, 1776, when the issues were only $5,000,000, Congress had, by resolution, declared that if any person should be " so lost to all virtue and regard to his country " as to refuse to receive the bills in payment, he should, on conviction thereof by the committee of the city, county, or district, or, in case of appeal from their decision, by the assembly, convention, council, or committee of safety of the colony where he resided, be " deemed, published, and treated as an enemy of his country, and precluded from all trade or intercourse with the inhabitants " of the colonies.*

And in January, 1777, when as yet the issues were only $14,000,000, Congress passed this remarkable resolution :

"*Resolved*, That all bills of credit emitted by authority of Congress ought to pass current in all payments, trade, and dealings in these States, and be deemed in value equal to the same nominal sums in Spanish milled dollars, and that whosoever shall offer, ask, or receive more in the said bills for any gold or silver coins, bullion, or any other species of money whatsoever, than the nominal sum or amount thereof in Spanish milled dollars, or more in the said bills for any lands, houses, goods, or commodities whatsoever than the same could be purchased at of the same person or persons in gold, silver, or any other species of money whatsoever,

---

* 2 Journals of Congress, 21.

or shall offer to sell any goods or commodities for gold or silver coins or any other species of money whatsoever and refuse to sell the same for the said continental bills, every such person ought to be deemed an enemy to the liberty of these United States and to forfeit the value of the money so exchanged, or house, land, or commodity so sold or offered for sale. And it is recommended to the legislatures of the respective States to enact laws inflicting such forfeitures and other penalties on offenders as aforesaid as will prevent such pernicious practices. That it be recommended to the legislatures of the United States to pass laws to make the bills of credit issued by the Congress a lawful tender in payments of public and private debts, and a refusal thereof an extinguishment of such debts; that debts payable in sterling money be discharged with continental dollars at the rate of 4s. 6d. sterling per dollar, and that in discharge of all other debts and contracts continental dollars pass at the rate fixed by the respective States for the value of Spanish milled dollars.".

The several States promptly responded to the recommendations of Congress and made the bills a legal tender for debts and the refusal to receive them an extinguishment of the debt.

Congress also issued, in September, 1779, a circular addressed to the people on the subject, in which they showed that the United States would be able to redeem the bills, and they repelled with indignation the suggestion that there could be any violation of the public faith. "The pride of America," said the address, "revolts from the idea; her citizens know for what purposes these emissions were made, and have repeatedly plighted their faith for the redemption of them; they are to be found in every man's possession, and every man is interested in their being redeemed; they must, therefore, entertain a high opinion of American credulity who suppose the people capable of believing, on due reflection, that all America will, against the faith, the honor, and the interest of all America, be ever prevailed upon to countenance, support, or permit so ruinous, so disgraceful a

measure.   We are convinced that the efforts and arts of our enemies will not be wanting to draw us into this humiliating and contemptible situation.   Impelled by malice and the suggestions of chagrin and disappointment at not being able to bend our necks to the yoke, they will endeavor to force or seduce us to commit this unpardonable sin in order to subject us to the punishment due to it, and that we may thenceforth be a reproach and a byword among the nations: Apprised of these consequences, knowing the value of national character, and impressed with a due sense of the immutable laws of justice and honor, it is impossible that America should think without horror of such an execrable deed."*

Yet in spite of the noble sentiments contained in this address, which bears the honored name of John Jay, then President of Congress and afterwards the first Chief Justice of this court, and in spite of legal tender provisions and harsh penal statutes, the universal law of currency prevailed. Depreciation followed until it became so great that the very idea of redemption at par was abandoned.

Congress then proposed to take up the bills by issuing new bills on the credit of the several States, guaranteed by the United States, not exceeding one-twentieth of the amount of the old issue, the new bills to draw interest and be redeemable in six years.   But the scheme failed and the bills became, during 1780, of so little value that they ceased to circulate and " quietly died," says the historian of the period, " in the hands of their possessors."†

And it is within the memory of all of us that during the late rebellion the notes of the United States issued under the Legal Tender Act rose in value in the market as the successes of our arms gave evidence of an early termination of the war, and that they fell in value with every triumph of the Confederate forces.   No legislation of Congress declaring these notes to be money instead of representatives

---

* 5 Journals of Congress, p. 351.   This address was written by Mr. Jay (See Flanders's Lives and Times of the Chief Justices, vol. 1, p. 256.)

† Pitkin's History, vol. 2, p. 157.

of money or credit could alter this result one jot or tittle. Men measured their value not by congressional declaration, which could not alter the nature of things, but by the confidence reposed in their ultimate payment.

Without the legal tender provision the notes would have circulated equally well and answered all the purposes of government—the only direct benefit resulting from that provision arising, as already stated, from the ability it conferred upon unscrupulous debtors to discharge with them previous obligations. The notes of State banks circulated without possessing that quality and supplied a currency for the people just so long as confidence in the ability of the banks to redeem the notes continued. The notes issued by the national bank associations during the war, under the authority of Congress, amounting to $300,000,000, which were never made a legal tender, circulated equally well with the notes of the United States. Neither their utility nor their circulation was diminished in any degree by the absence of a legal tender quality. They rose and fell in the market under the same influences and precisely to the same extent as the notes of the United States, which possessed this quality.

It is foreign, however, to my argument to discuss the utility of the legal tender clause. The utility of a measure is not the subject of judicial cognizance, nor, as already intimated, the test of its constitutionality. But the relation of the measure as a means to an end, authorized by the Constitution, is a subject of such cognizance, and the test of its constitutionality, when it is not prohibited by any specific provision of that instrument, and is consistent with its letter and spirit. "The degree," said Hamilton, "in which a measure is necessary can never be a test of the *legal right* to adopt it. That must be a matter of opinion, and can only be a test of expediency. The relation between the means and the end, between the nature of a *means* employed toward the execution of the power and the *object* of that power, must be the criterion of unconstitutionality; not the more or less of necessity or utility."

If this were not so, if Congress could not only exercise, as it undoubtedly may, unrestricted liberty of choice among the means which are appropriate and plainly adapted to the execution of an express power, but could also judge, without its conclusions being subject to question in cases involving private rights, what means are thus appropriate and adapted, our government would be, not what it was intended to be, one of limited, but one of unlimited powers.

Of course Congress must inquire in the first instance and determine for itself not only the expediency, but the fitness to the end intended, of every measure adopted by its legislation. But the power of this tribunal to revise these determinations in cases involving private rights has been uniformly asserted, since the formation of the Constitution to this day, by the ablest statesmen and jurists of the country.

I have thus dwelt at length upon the clause of the Constitution investing Congress with the power to borrow money on the credit of the United States, because it is under that power that the notes of the United States were issued, and it is upon the supposed enhanced value which the quality of legal tender gives to such notes, as the means of borrowing, that the validity and constitutionality of the provision annexing this quality are founded. It is true that, in the arguments of counsel, and in the several opinions of different State courts, to which our attention has been called, and in the dissenting opinion in *Hepburn* v. *Griswold*, reference is also made to other powers possessed by Congress, particularly to declare war, to suppress insurrection, to raise and support armies, and to provide and maintain a navy; all of which were called into exercise and severely taxed at the time the Legal Tender Act was passed. 'But it is evident that the notes have no relation to these-powers, or to any other powers of Congress, except as they furnish a convenient means for raising money for their execution. The existence of the war only increased the urgency of the government for funds. It did not add to its powers to raise such funds, or change, in any respect, the nature of those powers or the transactions which they authorized. If the

power to engraft the quality of legal tender upon the notes existed at all with Congress, the occasion, the extent, and the purpose of its exercise were mere matters of legislative discretion; and the power may be equally exerted when a loan is made to meet the ordinary expenses of government in time of peace, as when vast sums are needed to raise armies and provide navies in time of war. The wants of the government can never be the measure of its powers.

The Constitution has specifically designated the means by which funds can be raised for the uses of the government, either in war or peace. These are taxation, borrowing, coining, and the sale of its public property. Congress is empowered to levy and collect taxes, duties, imposts, and excises to any extent which the public necessities may require. Its power to borrow is equally unlimited. It can convert any bullion it may possess into coin, and it can dispose of the public lands and other property of the United States or any part of such property. The designation of these means exhausts the powers of Congress on the subject of raising money. The designation of the means is a negation of all others, for the designation would be unnecessary and absurd if the use of any and all means were permissible without it. These means exclude a resort to forced loans, and to any compulsory interference with the property of third persons, except by regular taxation in one of the forms mentioned.

But this is not all. The power "to coin money" is, in my judgment, inconsistent with and repugnant to the existence of a power to make anything but coin a legal tender. To coin money is to mould metallic substances having intrinsic value into certain forms convenient for commerce, and to impress them with the stamp of the government indicating their value. Coins are pieces of metal, of definite weight and value, thus stamped by national authority. Such is the natural import of the terms "to coin money" and "coin;" and if there were any doubt that this is their meaning in the Constitution, it would be removed by the language which immediately follows the grant of the "power

to coin," authorizing Congress to regulate the value of the money thus coined, and also " of foreign coin," and by the distinction made in other clauses between coin and the obligations of the General government and of the several States.

The power of regulation conferred is the power to determine the weight and purity of the several coins struck, and their consequent relation to the monetary unit which might be established by the authority of the government—a power which can be exercised with reference to the metallic coins of foreign countries, but which is incapable of execution with reference to their obligations or securities.

Then, in the clause of the Constitution immediately following, authorizing Congress " to provide for the punishment of counterfeiting the securities and current coin of the United States," a distinction between the obligations and coins of the General government is clearly made. And in the tenth section, which forbids the States to " coin money, emit bills of credit, and make anything but gold and silver coin a tender in payment of debts," a like distinction is made between coin and the obligations of the several States. The terms gold and silver as applied to the coin exclude the possibility of any other conclusion.

Now, money in the true sense of the term is not only a medium of exchange, but it is a standard of value by which all other values are measured. Blackstone says, and Story repeats his language, " Money is a universal medium or common standard, by a comparison with which the value of all merchandise may be ascertained, or it is a sign which represents the respective values of all commodities."\* Money being such standard, its coins or pieces are necessarily a legal tender to the amount of their respective values for all contracts or judgments payable in money, without any legislative enactment to make them so. The provisions in the different coinage acts that the coins to be struck shall be such legal tender, are merely declaratory of their effect when offered in payment, and are not essential to give them that character.

---

\* 1 Blackstone's Commentaries, 276; 1 Story on the Constitution, § 1118.

The power to coin money is, therefore, a power to fabricate coins out of metal as money, and thus make them a legal tender for their declared values as indicated by their stamp.   If this be the true import and meaning of the language used, it is difficult to see how Congress can make the paper of the government a legal tender.   When the Constitution says that Congress shall have the power to make metallic coins a legal tender, it declares in effect that it shall make nothing else such tender.   The affirmative grant is here a negative of all other power over the subject.

Besides this, there cannot well be two different standards of value, and consequently two kinds of legal tender for the discharge of obligations arising from the same transactions. The standard or tender of the lower actual value would in such case inevitably exclude and supersede the other, for no one would use the standard or tender of higher value when his purpose could be equally well accomplished by the use of the other.   A practical illustration of the truth of this principle we have all seen in the effect upon coin of the act of Congress making the notes of the United States a legal tender.   It drove coin from general circulation, and made it, like bullion, the subject of sale and barter in the market.

The inhibition upon the States to coin money and yet to make anything but gold and silver coin a tender in payment of debts, must be read in connection with the grant of the coinage power to Congress.   The two provisions taken together indicate beyond question that the coins which the National government was to fabricate, and the foreign coins, the valuation of which it was to regulate, were to consist principally, if not entirely, of gold and silver.

The framers of the Constitution were considering the subject of money to be used throughout the entire Union when these provisions were inserted, and it is plain that they intended by them that metallic coins fabricated by the National government, or adopted from abroad by its authority, composed of the precious metals, should everywhere be the standard and the only standard of value by which exchanges could be regulated and payments made.

At that time gold and silver moulded into forms conveni-ent for use, and stamped with their value by public authority, constituted, with the exception of pieces of copper for small values, the money of the entire civilized world.   Indeed these metals divided up and thus stamped always have con-stituted money with all people having any civilization, from the earliest periods in the history of the world down to the present time.   It was with "four hundred shekels of silver, current money with the merchant," that Abraham bought the field of Máchpelah, nearly four thousand years ago.* This adoption of the precious metals as the subject of coin-age,—the material of money by all peoples in all ages of the world,—has not been the result of any vagaries of fancy, but is attributable to the fact that they of all metals alone pos-sess the properties which are essential to a circulating me-dium of uniform value.

"The circulating medium of a commercial community," says Mr. Webster, "must be that which is also the circulat-ing medium of other commercial communities, or must be capable of being converted into that medium without loss. It must also be able not only to pass in payments and re-ceipts among individuals of the same society and nation, but to adjust and discharge the balance of exchanges be-tween different nations.   It must be something which has a value abroad as well as at home, by which foreign as well as domestic debts can be satisfied.   The precious metals alone answer these purposes.   They alone, therefore, are money, and whatever else is to perform the functions of money must be their representative and capable of being turned into them at will.   So long as bank paper retains this quality it is a substitute for money.   Divested of this nothing can give it that character."†

The statesmen who framed the Constitution understood this principle as well as it is understood in our day.   They had seen in the experience of the Revolutionary period the demoralizing tendency, the cruel injustice, and the intoler-

---

* Genesis 23 : 16.          † Webster's Works, vol. 3, page 41.

able oppression of a paper currency not convertible on demand into money, and forced into circulation by legal tender provisions and penal enactments.    When they therefore were constructing a government for a country, which they could not fail to see was destined to be a mighty empire, and have commercial relations with all nations, a government which they believed was to endure for ages, they determined to recognize in the fundamental law as the standard of value, that which ever has been and always must be recognized by the world as the true standard, and thus facilitate commerce, protect industry, establish justice, and prevent the possibility of a recurrence of the evils which they had experienced and the perpetration of the injustice which they had witnessed.    " We all know," says Mr. Webster, " that the establishment of a sound and uniform currency was one of the greatest ends contemplated in the adoption of the present Constitution.    If we could now fully explore all the motives of those who framed and those who supported that Constitution, perhaps we should hardly find a more powerful one than this."*

And how the framers of the Constitution endeavored to establish this " sound and uniform currency" we have already seen in the clauses which they adopted providing for a currency of gold and silver coins.    Their determination to sanction only a metallic currency is further evident from the debates in the Convention upon the proposition to authorize Congress to emit bills on the credit of the United States.    By bills of credit, as the terms were then understood, were meant paper issues, intended to circulate through the community for its ordinary purposes as money, bearing upon their face the promise of the government to pay the sums specified thereon at a future day.    The original draft contained a clause giving to Congress power " to borrow money and emit bills on the credit of the United States," and when the clause came up for consideration, Mr. Morris moved to strike out the words " and emit bills on the credit

* Webster's Works, vol. 3, p. 395.

of the United States," observing that " if the United States had credit, such bills would be unnecessary; if they had not, unjust and useless." Mr. Madison inquired whether it would not be " sufficient to prohibit the making them a legal tender." " This will remove," he said, " the temptation to emit them with unjust views, and promissory notes in that shape may in some emergencies be best." Mr. Morris replied that striking out the words would still leave room for " notes of a responsible minister," which would do " all the good without the mischief." Mr. Gorham was for striking out the words without inserting any prohibition. If the words stood, he said, they might " suggest and lead to the measure," and that the power, so far as it was necessary or safe, was " involved in that of borrowing." Mr. Mason said he was unwilling " to tie the hands of Congress," and thought Congress " would not have the power unless it were expressed." Mr. Ellsworth thought it " a favorable moment to shut and bar the door against paper money." " The mischiefs," he said, " of the various experiments which had been made were now fresh in the public mind and had excited the disgust of all the respectable part of America. By withholding the power from the new government, more friends of influence would be gained to it than by almost anything else. Paper money can in no case be necessary. Give the government credit, and other resources will offer. The power may do harm, never good." Mr. Wilson thought that " it would have a most salutary influence on the credit of the United States to remove the possibility of paper money." " This expedient," he said, " can never succeed whilst its mischiefs are remembered, and as long as it can be resorted to it will be a bar to other resources." Mr. Butler was urgent for disarming the government of such a power, and remarked " that paper was a legal tender in no country in Europe." Mr. Mason replied that if there was no example in Europe there was none in which the government was restrained on this head, and he was averse " to tying up the hands of the legislature altogether." Mr. Langdon preferred to reject the whole plan than retain the words.

Of those who participated in the debates, only one, Mr. Mercer, expressed an opinion favorable to paper money, and none suggested that if Congress were allowed to issue the bills their acceptance should be compulsory—that is, that they should be made a legal tender. But the words were stricken out by a vote of nine States to two. Virginia voted for the motion, and Mr. Madison has appended a note to the debates, stating that her vote was occasioned by his acquiescence, and that he " became satisfied that striking out the words would not disable the government from the use of public notes, as far as they could be safe and proper; and would only cut off the pretext for a *paper currency* and particularly for making the bills *a tender* either for public or private debts."*

If anything is manifest from these debates it is that the members of the Convention intended to withhold from Congress the power to issue bills to circulate as money—that is, to be receivable in compulsory payment, or, in other words, having the quality of legal tender—and that the express power to issue the bills was denied, under an apprehension that if granted it would give a pretext to Congress, under the idea of declaring their effect, to annex to them that quality. The issue of notes simply as a means of borrowing money, which of course would leave them to be received at the option of parties, does not appear to have been seriously questioned. The circulation of notes thus issued as a voluntary currency and their receipt in that character in payment of taxes, duties, and other public expenses, was not subject to the objections urged.

I am aware of the rule that the opinions and intentions of individual members of the Convention, as expressed in its debates and proceedings, are not to control the construction of the plain language of the Constitution or narrow down the powers which that instrument confers. Members, it is said, who did not participate in the debate may have entertained different views from those expressed. The several

---

* Madison Papers, vol. 3, page 1346.

State conventions to which the Constitution was submitted may have differed widely from each other and from its framers in their interpretation of its clauses. We all know that opposite opinions on many points were expressed in the conventions, and conflicting reasons were urged both for the adoption and the rejection of that instrument. All this is very true, but it does not apply in the present case, for on the subject now under consideration there was everywhere, in the several State conventions and in the discussions before the people, an entire uniformity of opinion, so far as we have any record of its expression, and that concurred with the intention of the Convention, as disclosed by its debates, that the Constitution withheld from Congress all power to issue bills to circulate as money, meaning by that bills made receivable in compulsory payment, or, in other words, having the quality of legal tender. Every one appears to have understood that the power of making paper issues a legal tender, by Congress or by the States, was absolutely and forever prohibited.

Mr. Luther Martin, a member of the Convention, in his speech before the Maryland legislature, as reported in his letter to that body, states the arguments urged against depriving Congress of the power to emit bills of credit, and then says that a " majority of the Convention, being wise beyond every event and being willing to risk any political evil rather than admit the idea of a paper emission in any possible case, refused to trust this authority to a government to which they were lavishing the most unlimited powers of taxation and to the mercy of which they were willing blindly to trust the liberty and property of the citizens of every State in the Union, *and they erased that clause from the system.*"

Not only was this construction given to the Constitution by its framers and the people in their discussions at the time it was pending before them, but until the passage of the act of 1862, a period of nearly three-quarters of a century, the soundness of this construction was never called in question by any legislation of Congress or the opinion of any judicial tribunal. Numerous acts, as already stated,

were passed during this period, authorizing the issue of notes for the purpose of raising funds or obtaining supplies, but in none of them was the acceptance of the notes made compulsory. Only one instance have I been able to find in the history of congressional proceedings where it was even suggested that it was within the competency of Congress to annex to the notes the quality of legal tender, and this occurred in 1814. The government was then greatly embarrassed from the want of funds to continue the war existing with Great-Britain, and a member from Georgia introduced into the House of Representatives several resolutions directing an inquiry into the expediency of authorizing the Secretary of the Treasury to issue notes convenient for circulation and making provision for the purchase of supplies in each State. Among the resolutions was one declaring that the notes to be issued should be a legal tender for debts due or subsequently becoming due between citizens of the United States and between citizens and foreigners. The House agreed to consider all the resolutions but the one containing the legal tender provision. That it refused to consider by a vote of more than two to one.*

As until the act of 1862 there was no legislation making the acceptance of notes issued on the credit of the United States compulsory, the construction of the clause of the Constitution containing the grant of the coinage power never came directly before this court for consideration, and the attention of the court was only incidentally drawn to it. But whenever the court spoke on the subject, even incidentally, its voice was in entire harmony with that of the Convention.

Thus, in *Gwin* v. *Breedlove*,† where a marshal of Mississippi, commanded to collect a certain amount of dollars on execution, received the amount in bank notes, it was held that he was liable to the plaintiff in gold and silver. "By the Constitution of the United States," said the court, "gold or silver coin made current by law can only be tendered in payment of debts."

---

* Benton's Abridg., vol. 5, p. 361.        † 2 Howard, 38.

And in the case of the *United States* v. *Marigold*,* where the question arose whether Congress had power to enact certain provisions of law for the punishment of persons bringing into the United States counterfeit coin with intent to pass it, the court said : These provisions " appertain to the execution of an important trust invested by the Constitution, and to the obligation to fulfil that trust on the part of the government, namely, the trust and the duty of creating and maintaining a uniform and pure metallic standard of value throughout the Union. The power of coining money and of regulating its value was delegated to Congress by the Constitution for the very purpose, as assigned by the framers of that instrument, of creating and preserving the uniformity and purity of such a standard of value, and on account of the impossibility which was foreseen of otherwise preventing the inequalities and the confusion necessarily incident to different views of policy, which in different communities would be brought to bear on this subject. The power to coin money being thus given to Congress, founded on public necessity, it must carry with it the correlative power of protecting the creature and object of that power."

It is difficult to perceive how the trust and duty here designated, of " creating and maintaining a uniform and metallic standard of value throughout the Union," is discharged, when another standard of lower value and fluctuating character is authorized by law, which necessarily operates to drive the first from circulation.

In addition to all the weight of opinion I have mentioned we have, to the same purport, from the adoption of the Constitution up to the passage of the act of 1862, the united testimony of the leading statesmen and jurists of the country. Of all the men who, during that period, participated with any distinction in the councils of the nation, not one can be named who ever asserted any different power in Congress than what I have mentioned. As observed by the Chief Justice, statesmen who disagreed widely on other points agreed on this.

* 9 Howard, 567.

Mr. Webster, who has always been regarded by a large portion of his countrymen as one of the ablest and most enlightened expounders of the Constitution, did not seem to think there was any doubt on the subject, although he belonged to the class who advocated the largest exercise of powers by the General government. From his first entrance into public life, in 1812, he gave great consideration to the subject of the currency, and in an elaborate speech in the Senate, in 1836, he said: "Currency, in a large and perhaps just sense, includes not only gold and silver and bank bills, but bills of exchange also. It may include all that adjusts exchanges and settles balances in the operations of trade and business; but if we understand by currency the legal money of the country, and that which constitutes a lawful tender for debts, and is the statute measure of value, then undoubtedly nothing is included but gold and silver. Most unquestionably there is no legal tender, and there can be no legal tender in this country, under the authority of this government or any other, but gold and silver—either the coinage of our own mints or foreign coins, at rates regulated by Congress. This is a constitutional principle perfectly plain, and of the very highest importance. The States are expressly prohibited from making anything but gold and silver a tender in payment of debts, and, although no such express prohibition is applied to Congress, yet, as Congress has no power granted to it in this respect but to coin money, and to regulate the value of foreign coins, it clearly has no power to substitute paper, or anything else, for coin as a tender in payment of debts and in discharge of contracts. Congress has exercised this power fully in both its branches. It has coined money, and still coins it; it has regulated the value of foreign coins, and still regulates their value. The legal tender, therefore, the constitutional standard of value, is established and cannot be overthrown. To overthrow it would shake the whole system."

If, now, we consider the history of the times when the Constitution was adopted; the intentions of the framers of that instrument, as shown in their debates; the contempora-

neous exposition of the coinage power in the State conventions assembled to consider the Constitution, and in the public discussions before the people; the natural meaning of the terms used; the nature of the Constitution itself as creating a government of enumerated powers; the legislative exposition of nearly three-quarters of a century; the opinions of judicial tribunals, and the recorded utterances of statesmen, jurists, and commentators, it would seem impossible to doubt that the only standard of value authorized by the Constitution was to consist of metallic coins struck or regulated by the direction of Congress, and that the power to establish any other standard was denied by that instrument.

There are other considerations besides those I have stated, which are equally convincing against the constitutionality of the legal tender provision of the act of February 25th, 1862, so far as it applies to private debts and debts by the government contracted previous to its passage. That provision operates directly to impair the obligation of such contracts. In the dissenting opinion, in the case of *Hepburn* v. *Griswold*, this is admitted to be its operation, and the position is taken that, while the Constitution forbids the States to pass such laws, it does not forbid Congress to do this, and the power to establish a uniform system of bankruptcy, which is expressly conferred, is mentioned in support of the position. In some of the opinions of the State courts, to which our attention has been directed, it is denied that the provision in question impairs the obligation of previous contracts, it being asserted that a contract to pay money is satisfied, according to its meaning, by the payment of that which is money when the payment is made, and that if the law does not interfere with this mode of satisfaction, it does not impair the obligation of the contract. This position is true so long as the term money represents the same thing in both cases or their actual equivalents, but it is not true when the term has different meanings. Money is a generic term, and contracts for money are not made without a specification of the coins or denominations of money, and the

number of them intended, as eagles, dollars, or cents; and it will not be pretended that a contract for a specified number of eagles can be satisfied by a delivery of an equal number of dollars, although both eagles and dollars are money; nor would it thus be contended, though at the time the contract matured the legislature had determined to call dollars eagles. Contracts are made for things, not names or sounds, and the obligation of a contract arises from its terms and the means which the law affords for its enforcement.

A law which changes the terms of the contract, either in the time or mode of performance, or imposes new conditions, or dispenses with those expressed, or authorizes for its satisfaction something different from that provided, is a law which impairs its obligation, for such a law relieves the parties from the moral duty of performing the original stipulations of the contract, and it prevents their legal enforcement.

The notion that contracts for the payment of money stand upon any different footing in this respect from other contracts appears to have had its origin in certain old English cases, particularly that of mixed money,* which were decided upon the force of the prerogative of the king with respect to coin, and have no weight as applied to powers possessed by Congress under our Constitution. The language of Mr. Chief Justice Marshall in *Faw* v. *Marsteller*,† which is cited in support of this notion, can only be made to express concurrence with it when detached from its context and read separated from the facts in reference to which it was used.

It is obvious that the act of 1862 changes the terms of contracts for the payment of money made previous to its passage, in every essential particular. All such contracts had reference to metallic coins, struck or regulated by Congress, and composed principally of gold and silver, which constituted the legal money of the country. The several

---

* Davies's Reports, 48.    † 2 Cranch, 20.

coinage acts had fixed the weight, purity, forms, impressions, and denominations of these coins, and had provided that their value should be certified by the form and impress which they received at the mint.

They had established the dollar as the money unit, and prescribed the grains of silver it should contain, and the grains of gold which should compose the different gold coins. Every dollar was therefore a piece of gold or silver certified to be of a specified weight and purity, by its form and impress. A contract to pay a specified number of dollars was then a contract to deliver the designated number of pieces of gold or silver of this character; and by the laws of Congress and of the several States the delivery of such dollars could be enforced by the holder.

The act of 1862 changes all this; it declares that gold or silver dollars need not be delivered to the creditor according to the stipulations of the contract; that they need not be delivered at all; that promises of the United States, with which the creditor has had no relations, to pay these dollars, at some uncertain future day, shall be received in discharge of the contracts—in other words, that the holder of such contracts shall take in substitution for them different contracts with another party, less valuable to him, and surrender the original.

Taking it, therefore, for granted that the law plainly impairs the obligation of such contracts, I proceed to inquire whether it is for that reason subject to any constitutional objection. In the dissenting opinion in *Hepburn* v. *Griswold*, it is said, as already mentioned, that the Constitution does not forbid legislation impairing the obligation of contracts.

It is true there is no provision in the Constitution forbidding in express terms such legislation. And it is also true that there are express powers delegated to Congress, the execution of which necessarily operates to impair the obligation of contracts. It was the object of the framers of that instrument to create a National government competent to represent the entire country in its relations with foreign nations and to accomplish by its legislation measures of

common interest to all the people, which the several States in their independent capacities were incapable of effecting, or if capable, the execution of which would be attended with great difficulty and embarrassment. They, therefore, clothed Congress with all the powers essential to the successful accomplishment of these ends, and carefully withheld the grant of all other powers. Some of the powers granted, from their very nature, interfere in their execution with contracts of parties. Thus war suspends intercourse and commerce between citizens or subjects of belligerent nations; it renders during its continuance the performance of contracts previously made, unlawful. These incidental consequences were contemplated in the grant of the war power. So the regulation of commerce and the imposition of duties may so affect the prices of articles imported or manufactured as to essentially alter the value of previous contracts respecting them; but this incidental consequence was seen in the grant of the power over commerce and duties. There can be no valid objection to laws passed in execution of express powers that consequences like these follow incidentally from their execution. But it is otherwise when such consequences do not follow incidentally, but are directly enacted.

The only express authority for any legislation affecting the obligation of contracts is found in the power to establish a uniform system of bankruptcy, the direct object of which is to release insolvent debtors from their contracts upon the surrender of their property. From this express grant in the Constitution I draw a very different conclusion from that drawn in the dissenting opinion in *Hepburn v. Griswold*, and in the opinion of the majority of the court just delivered. To my mind it is a strong argument that there is no general power in Congress to interfere with contracts, that a special grant was regarded as essential to authorize a uniform system of bankruptcy. If such general power existed the delegation of an express power in the case of bankrupts was unnecessary. As very justly observed by counsel, if this sovereign power could be taken in any case without express

grant, it could be taken in connection with bankruptcies, which might be regarded in some respects as a regulation of commerce made in the interest of traders.

The grant of a limited power over the subject of contracts necessarily implies that the framers of the Constitution did not intend that Congress should exercise unlimited power, or any power less restricted. The limitation designated is the measure of congressional power over the subject. This follows from the nature of the instrument as one of enumerated powers.

The doctrine that where a power is not expressly forbidden it may be exercised, would change the whole character of our government. As I read the writings of the great commentators and the decisions of this court, the true doctrine is the exact reverse, that if a power is not in terms granted, and is not necessary and proper for the exercise of a power thus granted, it does not exist.

The position that Congress possesses some undefined power to do anything which it may deem expedient, as a resulting power from the general purposes of the government, which is advanced in the opinion of the majority, would of course settle the question under consideration without difficulty, for it would end all controversy by changing our government from one of enumerated powers to one resting in the unrestrained will of Congress.

"The government of the United States," says Mr. Chief Justice Marshall, speaking for the court in *Martin* v. *Hunter's Lessee*,* "can claim no powers which are not granted to it by the Constitution, and the powers actually granted must be such as are expressly given or given by necessary implication." This implication, it is true, may follow from the grant of several express powers as well as from one alone, but the power implied must, in all cases, be subsidiary to the execution of the powers expressed. The language of the Constitution respecting the writ of habeas corpus, declaring that it shall not be suspended unless, when in cases

* 1 Wheaton, 326.

of rebellion or invasion, the public safety may require it, is cited as showing that the power to suspend such writ exists somewhere in the Constitution; and the adoption of the amendments is mentioned as evidence that important powers were understood by the people who adopted the Constitution to have been created by it, which are not enumerated, and are not included incidentally in any of those enumerated.

The answer to this position is found in the nature of the Constitution, as one of granted powers, as stated by Mr. Chief Justice Marshall. The inhibition upon the exercise of a specified power does not warrant the implication that, but for such inhibition, the power might have been exercised. In the Convention which framed the Constitution a proposition to appoint a committee to prepare a bill of rights was unanimously rejected, and it has been always understood that its rejection was upon the ground that such a bill would contain various exceptions to powers not granted, and on this very account would afford a pretext for asserting more than was granted.* In the discussions before the people, when the adoption of the Constitution was pending, no objection was urged with greater effect than this absence of a bill of rights, and in one of the numbers of the Federalist, Mr. Hamilton endeavored to combat the objection. After stating several reasons why such a bill was not necessary, he said: "I go further and affirm that bills of rights, in the sense and to the extent they are contended for, are not only unnecessary in the proposed Constitution, but would even be dangerous. They would contain various exceptions to powers not granted, and on this very account would afford a colorable pretext to claim more than were granted. For why declare that things shall not be done which there is no power to do? Why, for instance, should it be said that the liberty of the press shall not be restrained when no power is given by which restrictions may be imposed? I will not

---

* Journal of the Convention, 369; Story on the Constitution, §§ 1861, 1862, and note.

contend that such a provision would confer a regulating power, but it is evident that it would furnish to men disposed to usurp a plausible pretence for claiming that power. They might urge, with a semblance of reason, that the Constitution ought not to be charged with the absurdity of providing against the abuse of an authority which was not given, and that the provision against restraining the liberty of the press afforded a clear implication that a right to prescribe proper regulations concerning it was intended to be vested in the National government. This may serve as a specimen of the numerous handles which would be given to the doctrine of constructive powers by the indulgence of an injudicious zeal for bills of right."*

When the amendments were presented to the States for adoption they were preceded by a preamble stating that the conventions of a number of the States had, at the time of their adopting the Constitution, expressed a desire "in order to prevent *misconception or abuse* of its powers, that further declaratory and restrictive clauses should be added."

Now, will any one pretend that Congress could have made a law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or the right of the people to assemble and petition the government for a redress of grievances, had not prohibitions upon the exercise of any such legislative power been embodied in an amendment?

How truly did Hamilton say that had a bill of rights been inserted in the Constitution, it would have given a handle to the doctrine of constructive powers. We have this day an illustration in the opinion of the majority of the very claim of constructive power which he apprehended, and it is the first instance, I believe, in the history of this court, when the possession by Congress of such constructive power has been asserted.

The interference with contracts by the legislation of the several States previous to the adoption of the Constitution

---

* The Federalist, No. 84.

was the cause of great oppression and injustice. "Not only," says Story,* "was paper money issued and declared to be a tender in payment of debts, but laws of another character, well known under the appellation of tender laws, appraisement laws, instalment laws, and suspension laws, were from time to time enacted, which prostrated all private credit and all private morals. By some of these laws the due payment of debts was suspended; debts were, in violation of the very terms of the contract, authorized to be paid by instalments at different periods; property of any sort, however worthless, either real or personal, might be tendered by the debtor in payment of his debts, and the creditor was compelled to take the property of the debtor, which he might seize on execution, at an appraisement wholly disproportionate to its known value. Such grievances and oppressions and others of a like nature were the ordinary results of legislation during the Revolutionary War and the intermediate period down to the formation of the Constitution. They entailed the most enormous evils on the country and introduced a system of fraud, chicanery, and profligacy, which destroyed all private confidence and all industry and enterprise."

To prevent the recurrence of evils of this character not only was the clause inserted in the Constitution prohibiting the States from issuing bills of credit and making anything but gold and silver a tender in payment of debts, but also the more general prohibition, from passing any law impairing the obligation of contracts. "To restore public confidence completely," says Chief Justice Marshall,† "it was necessary not only to prohibit the use of particular means by which it might be effected, but to prohibit the use of any means by which the same mischief might be produced. The Convention appears to have intended to establish a great principle, that contracts should be inviolable."

It would require very clear evidence, one would suppose, to induce a belief that with the evils resulting from what Marshall terms the system of lax legislation following the

---

* Commentaries on the Constitution, 8, sec. 1371.
† Sturgis v. Crowninshield, 4 Wheaton, 206.

Revolution, deeply impressed on their minds, the framers of the Constitution intended to vest in the new government created by them this dangerous and despotic power, which they were unwilling should remain with the States, and thus widen the possible sphere of its exercise.

When the possession of this power has been asserted in argument (for until now it has never been asserted in any decision of this court), it has been in cases where a supposed public benefit resulted from the legislation, or where the interference with the obligation of the contract was very slight. Whenever a clear case of injustice, in the absence of such supposed public good, is stated, the exercise of the power by the government is not only denounced but the existence of the power is denied. No one, indeed, is found bold enough to contend that if A. has a contract for one hundred acres of land, or one hundred pounds of fruit, or one hundred yards of cloth, Congress can pass a law compelling him to accept one-half of the quantity in satisfaction of the contract. But Congress has the same power to establish a standard of weights and measures as it has to establish a standard of value, and can, from time to time, alter such standard. It can declare that the acre shall consist of eighty square rods instead of one hundred and sixty, the pound of eight ounces instead of sixteen, and the foot of six inches instead of twelve, and if it could compel the acceptance of the same *number* of acres, pounds, or yards, after such alteration, instead of the actual *quantity* stipulated, then the acceptance of one-half of the quantity originally designated could be directly required without going through the form of altering the standard. No just man could be imposed upon by this use of words in a double sense, where the same names were applied to denote different quantities of the same thing, nor would his condemnation of the wrong committed in such case be withheld, because the attempt was made to conceal it by this jugglery of words.

The power of Congress to interfere with contracts for the payment of money is not greater or in any particular different from its power with respect to contracts for lands or

goods.   The contract is not fulfilled any more in one case than in the other by the delivery of a thing which is not stipulated, because by legislative action it is called by the same name.   Words in contracts are to be construed in both cases in the sense in which they were understood by the parties at the time of the contract.

Let us for a moment see where the doctrine of the power asserted will lead.   Congress has the undoubted right to give such denominations as it chooses to the coins struck by its authority, and to change them.   It can declare that the dime shall hereafter be called a dollar, or, what is the same thing, it may declare that the dollar shall hereafter be composed of the grains of silver which now compose the dime.   But would anybody pretend that a contract for dollars, composed as at present, could be satisfied by the delivery of an equal number of dollars of the new issue? I have never met any one who would go to that extent.   The answer always has been that would be too flagrantly unjust to be tolerated.   Yet enforcing the acceptance of paper promises or paper dollars, if the promises can be so called, in place of gold or silver dollars, is equally enforcing a departure from the terms of the contract, the injustice of the measure depending entirely upon the actual value at the time of the promises in the market.   Now reverse the case. Suppose Congress should declare that hereafter the eagle should be called a dollar, or that the dollar should be composed of as many grains of gold as the eagle, would anybody for a moment contend that a contract for dollars, composed as now of silver, should be satisfied by dollars composed of gold?   I am confident that no judge sitting on this bench, and, indeed, that no judge in Christendom could be found who would sanction the monstrous wrong by decreeing that the debtor could only satisfy his contract in such case by paying ten times the value originally stir ated. The natural sense of right which is implanted in every mind would revolt from such supreme injustice.   Yet there cannot be one law for debtors and another law for creditors. If the contract can at one time be changed by congressional

legislation for the benefit of the debtor it may at another time be changed for the benefit of the creditor.

For acts of flagrant injustice such as those mentioned there is no authority in any legislative body, even though not restrained by any express constitutional prohibition. For as there are unchangeable principles of right and morality, without which society would be impossible, and men would be but wild beasts preying upon each other, so there are fundamental principles of eternal justice, upon the existence of which all constitutional government is founded, and without which government would be an intolerable and hateful tyranny. There are acts, says Mr. Justice Chase, in *Calder* v. *Bull*,\* which the Federal and State legislatures cannot do, without exceeding their authority. Among these he mentions a law which punishes a citizen for an innocent action; a law that destroys or impairs the lawful private contracts of citizens; a law that makes a man a judge in his own cause; and a law that takes the property from A. and gives it to B. "It is against all reason and right," says the learned justice, "for a people to intrust a legislature with such powers; and therefore it cannot be presumed that they have done it. The genius, the nature, and the spirit of our State governments amount to a prohibition of such acts of legislation, and the general principles of law and reason forbid them. The legislature may enjoin, permit, forbid, and punish; they may declare new crimes, and establish rules of conduct for all its citizens in future cases; they may command what is right and prohibit what is wrong, but they cannot change innocence into guilt, or punish innocence as a crime, or violate the rights of an antecedent lawful private contract, or the right of private property. To maintain that our Federal or State legislatures possess such powers, if they had not been expressly restrained, would, in my opinion, be a political heresy, altogether inadmissible in our free republican governments."

In *Ogden* v. *Saunders*,† Mr. Justice Thompson, referring to the provisions in the Constitution forbidding the States

---

\* 3 Dallas, 388.          † 12 Wheaton, 303.

to pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, says: " Neither provision can strictly be considered as introducing any new principle, but only for greater security and safety to incorporate into this charter provisions admitted by all to be among the first principles of government. No State court would, I presume, sanction and enforce an *ex post facto* law if no such prohibition was contained in the Constitution of the United States; so, neither would retrospective laws, taking away vested rights, be enforced. Such laws are repugnant to those fundamental principles upon which every just system of laws is founded. It is an elementary principle, adopted and sanctioned by the courts of justice in this country and in Great Britain, whenever such laws have come under consideration, and yet retrospective laws are clearly within this prohibition."

In *Wilkeson* v. *Leland*,[*] Mr. Justice Story, whilst commenting upon the power of the legislature of Rhode Island under the charter of Charles II, said: " The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them, a power so repugnant to the common principles of justice and civil liberty, lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people. The people ought not to be presumed to part with rights so vital to their security and well-being without very strong and direct expressions of such an intention."

Similar views to these cited from the opinions of Chase, Thompson, Story, and Marshall, are found scattered through the opinions of the judges who have preceded us on this bench. As against their collective force the remark of Mr. Justice Washington, in the case of *Evans* v. *Eaton*,[†] is without significance. That was made at *nisi prius* in answer to

---

[*] 2 Peters, 657.          [†] 1 Peters's Circuit Court, 323.

a motion for a nonsuit in an action brought for an infringement of a patent right.    The State of Pennsylvania had, in March, 1787, which was previous to the adoption of the Constitution, given to the plaintiff the exclusive right to make, use, and vend his invention for fourteen years.    In January, 1808, the United States issued to him a patent for the invention for fourteen years from that date.    It was contended, for the nonsuit, that after the expiration of the plaintiff's privilege granted by the State, the right to his invention became invested in the people of the State, by an implied contract with the government, and, therefore, that Congress could not consistently with the Constitution grant to the plaintiff an exclusive right to the invention.    The court replied that neither the premises upon which the motion was founded, nor the conclusion, could be admitted; that it was not true that the grant of an exclusive privilege to an invention for a limited time implied a binding and irrevocable contract with the people that at the expiration of the period limited the invention should become their property; and that even if the premises were true, there was nothing in the Constitution which forbade Congress to pass laws violating the obligation of contracts.

The motion did not merit any consideration, as the Federal court had no power to grant a nonsuit against the will of the plaintiff in any case.    The expression under these circumstances of any reason why the court would not grant the motion, if it possessed the power, was aside the case, and is not, therefore, entitled to any weight whatever as authority.    It was true, however, as observed by the court, that no such contract with the public, as stated, was implied, and inasmuch as Congress was expressly authorized by the Constitution to secure for a limited time to inventors the exclusive right to their discoveries, it had the power in that way to impair the obligation of such a contract, if any had existed.    And this is perhaps, all that Mr. Justice Washington meant.    It is evident from his language in *Ogden* v. *Saunders*, that he repudiated the existence of any general power in Congress to destroy or impair vested private rights.

What I have heretofore said respecting the power of Congress to make the notes of the United States a legal tender in payment of debts contracted previous to the act of 1862, and to interfere with contracts, has had reference to debts and contracts between citizens. But the same power which is asserted over these matters is also asserted with reference to previous debts owing by the government, and must equally apply to contracts between the government and the citizen. The act of 1862 declares that the notes issued shall be a legal tender in payment of *all debts, public and private*, with the exception of duties on imports and interest on the public debt. If they are a legal tender for antecedent private debts, they are also a legal tender for such debts owing by the United States, except in the cases mentioned. That any exception was made was a mere matter of legislative discretion. Express contracts for the payment of gold or silver have been maintained by this court, and specifically enforced on the ground that, upon a proper construction of the act of 1862, in connection with other acts, Congress intended to except these contracts from the operation of the legal tender provision. But the power covers all cases if it exist at all. The power to make the notes of the United States the legal equivalent to gold and silver necessarily includes the power to cancel with them specific contracts for gold as well as money contracts generally. Before the passage of the act of 1862, there was no legal money except that which consisted of metallic coins, struck or regulated by the authority of Congress. Dollars then meant, as already said, certain pieces of gold or silver, certified to be of a prescribed weight and purity by their form and impress received at the mint. The designation of dollars, in previous contracts, meant gold or silver dollars as plainly as if those metals were specifically named.

It follows, then, logically, from the doctrine advanced by the majority of the court as to the power of Congress over the subject of legal tender, that Congress may borrow gold coin upon a pledge of the public faith to repay gold at the maturity of its obligations, and yet, in direct disregard of its

pledge, in open violation of faith, may compel the lender to take, in place of the gold stipulated, its own promises; and that legislation of this character would not be in violation of the Constitution, but in harmony with its letter and spirit.

The government is, at the present time, seeking, in the markets of the world, a loan of several hundred millions of dollars in gold upon securities containing the promises of the United States to repay the money, principal and interest, in gold; yet this court, the highest tribunal of the country, this day declares, by its solemn decision, that should such loan be obtained, it is entirely competent for Congress to pay it off, not in gold, but in notes of the United States themselves, payable at such time and in such manner as Congress may itself determine, and that legislation sanctioning such gross breach of faith would not be repugnant to the fundamental law of the land.

What is this but declaring that repudiation by the government of the United States of its solemn obligations would be constitutional? Whenever the fulfilment of the obligation in the manner stipulated is refused, and the acceptance of something different from that stipulated is enforced against the will of the creditor, a breach of faith is committed; and to the extent of the difference of value between the thing stipulated and the thing which the creditor is compelled to receive, there is repudiation of the original obligation. I am not willing to admit that the Constitution, the boast and glory of our country, would sanction or permit any such legislation. Repudiation in any form, or to any extent, would be dishonor, and for the commission of this public crime no warrant, in my judgment, can ever be found in that instrument.

Some stress has been placed in argument in support of the asserted power of Congress over the subject of legal tender in the fact that Congress can regulate the alloy of the coins issued under its authority, and has exercised its power in this respect, without question, by diminishing in some instances, the actual quantity of gold or silver they contain. Congress, it is assumed, can thus put upon the coins issued

other than their intrinsic value; therefore, it is argued, Congress may, by its declaration, give a value to the notes of the United States, issued to be used as money, other than that which they actually possess.

The assumption and the inference are both erroneous, and the argument thus advanced is without force, and is only significant of the weakness of the position which has to rest for its support on an assumed authority of the government to debase the coin of the country.

Undoubtedly Congress can alter the value of the coins issued by its authority by increasing or diminishing, from time to time, the alloy they contain, just as it may alter, at its pleasure, the denominations of the several coins issued, but there its power stops. It cannot make these altered coins the equivalent of the coins in their previous condition; and, if the new coins should retain the same names as the original, they would only be current at their true value. Any declaration that they should have any other value would be inoperative in fact, and a monstrous disregard by Congress of its constitutional duty. The power to coin money, as already declared by this court,* is a great trust devolved upon Congress, carrying with it the duty of creating and maintaining a uniform standard of value throughout the Union, and it would be a manifest abuse of this trust to give to the coins issued by its authority any other than their real value. By debasing the coins, when once the standard is fixed, is meant giving to the coins, by their form and impress, a certificate of their having a relation to that standard different from that which, in truth, they possess; in other words, giving to the coins a false certificate of their value. Arbitrary and profligate governments have often resorted to this miserable scheme of robbery, which Mill designates† as a shallow and impudent artifice, the "least covert of all modes of knavery, which consists in calling a shilling a pound, that a debt of one hundred pounds may be cancelled by the payment of one hundred shillings."

---

* United States v. Marigold, 9 Howard, 567.
† Mill's Political Economy, vol. 2, p. 20.

In this country no such debasement has ever been attempted, and I feel confident that none will ever be tolerated. The changes in the quantity of alloy in the different coins has been made from time to time, not with any idea of debasing them, but for the purpose of preserving the proper relative value between gold and silver. The first coinage act, passed in 1792, provided that the coins should consist of gold, silver, and copper—the coins of cents and half-cents consisting of copper, and the other coins consisting of gold and silver—and that the relative value of gold and silver should be as fifteen to one, that is, that an ounce of gold should be taken as the equal in value of fifteen ounces of silver.

In progress of time, owing to the increased production of silver, particularly from the mines of Mexico and South America, this relative value was changed. Silver declined in relative value to gold until it bore the relation of one to sixteen instead of one to fifteen. The result was that the gold was bought up as soon as coined, being worth intrinsically sixteen times the value of silver, and yet passing by law only at fifteen times such value, and was sent out of the country to be recoined. The attention of Congress was called to this change in the relative value of the two metals and the consequent disappearance of gold coin. This led, in 1834,* to an act adjusting the rate of gold coin to its true relation to silver coin.

The discovery of gold in California, some years afterwards, and the great production of that metal, again changed in another direction the relative value of the two metals. Gold declined, or in other words, silver was at a premium, and as gold coin before 1834 was bought up, so now silver coin was bought up, and a scarcity of small coin for change was felt in the community. Congress again interfered, and in 1853 reduced the amount of silver in coins representing fractional parts of a dollar, but even then these coins were restricted from being a legal tender for sums exceeding five

---

* 4 Stat. at Large, 699.

dollars, although the small silver coins of previous issue continued to be a legal tender for any amount. Silver pieces of the denomination of three cents had been previously authorized in 1851, but were only made a tender for sums of thirty cents and under. These coins did not express their actual value, and their issue was soon stopped, and in 1853 their value was increased to the standard of coins of other fractional parts of a dollar.

The whole of this subject has been fully and satisfactorily explained in the very able and learned argument of the counsel who contended for the maintenance of the original decision of this court in *Hepburn* v. *Griswold*. He showed by the debates that Congress has been moved, in all its actions under the coinage power, only by an anxious desire to ascertain the true relative value of the two precious metals, and to fix the coinage in accordance with it; and that in no case has any deviation from intrinsic value been permitted except in coins for fractional parts of a dollar, and even that has been only of so slight a character as to prevent them from being converted into bullion, the actual depreciation being made up by their portability and convenience.

It follows, from this statement of the action of Congress in altering at different times the alloy of certain coins, that the assumption of power to stamp metal with an arbitrary value and give it currency, does not rest upon any solid foundation, and that the argument built thereon goes with it to the ground.

I have thus far spoken of the legal tender provision with particular reference to its application to debts contracted previous to its passage. It only remains to say a few words as to its validity when applied to subsequent transactions.

So far as subsequent contracts are made payable in notes of the United States, there can of course be no objection to their specific enforcement by compelling a delivery of an equal amount of the notes, or by a judgment in damages for their value as estimated in gold or silver dollars, nor would there be any objection to such enforcement if the legal tender provision had never existed. From the general use

of the notes throughout the country and the disappearance of gold and silver coin from circulation, it may perhaps be inferred, in most cases, that notes of the United States are intended by the parties where gold or silver dollars are not expressly designated, except in contracts made in the Pacific States, where the constitutional currency has always continued in use. As to subsequent contracts, the legal tender provision is not as unjust in its operation as when applied to past contracts, and does not impair to the same extent private rights. But so far as it makes the receipt of the notes, in absence of any agreement of the parties, compulsory in payment of such contracts, it is, in my judgment, equally unconstitutional. This seems to me to follow necessarily from the duty already mentioned cast upon Congress by the coinage power,—to create and maintain a uniform metallic standard of value throughout the Union. Without a standard of value of some kind, commerce would be difficult, if not impossible, and just in proportion to the uniformity and stability of the standard is the security and consequent extent of commercial transactions. How is it possible for Congress to discharge its duty by making the acceptance of paper promises compulsory in all future dealings—promises which necessarily depend for their value upon the confidence entertained by the public in their ultimate payment, and the consequent ability of the holder to convert them into gold or silver—promises which can never be uniform throughout the Union, but must have different values in different portions of the country; one value in New York, another at New Orleans, and still a different one at San Francisco.

Speaking of paper money issued by the States,—and the same language is equally true of paper money issued by the United States—Chief Justice Marshall says, in *Craig* v. *The State of Missouri:* * "Such a medium has been always liable to considerable fluctuation. Its value is continually changing; and these changes, often great and sudden, expose in-

---

* 4 Peters, 432.

dividuals to immense loss, are the sources of ruinous specu-
lations, and destroy all confidence between man and man.
To cut up this mischief by the roots, a mischief which was
felt through the United States, and which deeply affected
the interest and prosperity of all, the people declared in their
Constitution that no State should emit bills of credit."

Mr. Justice Washington, after referring, in *Ogden* v. *Saun-
ders*,\* to the provision of the Constitution declaring that no
State shall coin money, emit bills of credit, make anything
but gold and silver coin a tender in payment of debts, says:
"These prohibitions, associated with the powers granted to
Congress 'to coin money and to regulate the value thereof,
and of foreign coin,' most obviously constitute members of
the same family, being upon the same subject and governed
by the same policy. This policy was to provide a fixed and
uniform standard of value throughout the United States, by
which the commercial and other dealings between the citi-
zens thereof, or between them and foreigners, as well as the
moneyed transactions of the government, should be regu-
lated. For it might well be asked, why vest in Congress
the power to establish a uniform standard of value by the
means pointed out, if the States might use the same means,
and thus defeat the uniformity of the standard, and conse-
quently the standard itself? And why establish a standard
at all for the government of the various contracts which
might be entered into, if those contracts might afterwards
be discharged by a different standard, or by that which is
not money, under the authority of State tender laws? It
is obvious, therefore, that these prohibitions in the tenth
section are entirely homogeneous, and are essential to the
establishment of a uniform standard of value in the forma-
tion and discharge of contracts."

It is plain that this policy cannot be carried out, and this
fixed and uniform metallic standard of value throughout the
United States be maintained, so long as any other standard
is adopted, which of itself has no intrinsic value and is for-
ever fluctuating and uncertain.

---

\* 12 Wheaton, 265.

For the reasons which I have endeavored to unfold, I am compelled to dissent from the judgment of the majority of the court. I know that the measure, the validity of which I have called in question, was passed in the midst of a gigantic rebellion, when even the bravest hearts sometimes doubted the safety of the Republic, and that the patriotic men who adopted it did so under the conviction that it would increase the ability of the government to obtain funds and supplies, and thus advance the National cause. Were I to be governed by my appreciation of the character of those men, instead of my views of the requirements of the Constitution, I should readily assent to the views of the majority of the court. But, sitting as a judicial officer, and bound to compare every law enacted by Congress with the greater law enacted by the people, and being unable to reconcile the measure in question with that fundamental law, I cannot hesitate to pronounce it as being, in my judgment, unconstitutional and void.

In the discussions which have attended this subject of legal tender there has been at times what seemed to me to be a covert intimation, that opposition to the measure in question was the expression of a spirit not altogether favorable to the cause, in the interest of which that measure was adopted. All such intimations I repel with all the energy I can express. I do not yield to any one in honoring and reverencing the noble and patriotic men who were in the councils of the nation during the terrible struggle with the rebellion. To them belong the greatest of all glories in our history,—that of having saved the Union, and that of having emancipated a race. For these results they will be remembered and honored so long as the English language is spoken or read among men. But I do not admit that a blind approval of every measure which they may have thought essential to put down the rebellion is any evidence of loyalty to the country. The only loyalty which I can admit consists in obedience to the Constitution and laws made in pursuance of it. It is only by obedience that affection and reverence can be shown to a superior having a

General statement of the case.

right to command.   So thought our great Master when he said to his disciples: "If ye love me, keep my commandments."